No. 21-35121

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY**;
*Plaintiff-Appellant*,

v.

**DEB HAALAND,** in her official capacity as Secretary of the United States
Department of the Interior;[1] **MARTHA WILLIAMS**, in her official
capacity as Principal Deputy Director of
U.S. Fish and Wildlife Service;
*Defendants-Appellees*,

and

**STATE OF WYOMING** et al.;
*Intervenor Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
NO. 9:19-cv-00109-DLC
THE HONORABLE JUDGE DANA L. CHRISTENSEN, PRESIDING

**BRIEF OF PLAINTIFF-APPELLANT**

Collette Adkins
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

Eric Robert Glitzenstein
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 849-8401
eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiff-Appellant*

---

[1] Former Acting Secretary Scott de la Vega automatically substituted with
Secretary Haaland, his successor in office, under Fed. R. App. P. 43(a).

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Center for Biological Diversity (the "Center") states that it is not a publicly held corporation, does not issue stock, and does not have parent corporations.

<u>/s/ Collette Adkins</u>
Collette Adkins

*Attorney for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF AUTHORITIES ................................................................................ v

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUE .............................................................................. 1

PERTINENT STATUTES AND REGULATIONS ................................................ 2

STATEMENT OF THE CASE .............................................................................. 3

    A.   The ESA's Requirement That The Service "Shall" Develop Recovery
           Plans To Conserve Listed Wildlife ............................................................... 3

    B.   The Grizzly Bear And Its Outdated Recovery Plan .................................... 4

    C.   The Center's Petition To Update The Grizzly Bear Recovery Plan ............. 7

    D.   The District Court's Rejection Of The Center's Challenge To The
           Service's Denial Of Its Petition ................................................................... 9

SUMMARY OF ARGUMENT .............................................................................. 11

STANDARD OF REVIEW .................................................................................... 14

ARGUMENT .......................................................................................................... 14

    I.   A RECOVERY PLAN QUALIFIES AS A "RULE" UNDER THE
        APA ............................................................................................................... 14

        A.   A Recovery Plan Implements Law Because It Embodies
              Requirements Of ESA Section 4(f) ...................................................... 16

        B.   A Recovery Plan Implements Conservation Policy By Identifying
              Concrete Measures That Can Be Taken To Help Rare Wildlife ........ 19

        C.   A Recovery Plan Prescribes Policy Because It Is The Service's
              Authoritative Statement On How To Conserve Species .................... 24

1. Recovery Plans Establish Concrete Conservation Measures After A Formal Process That Applies The Service's Expertise And Involves The Public .......................................................25

2. Recovery Plans Direct Conservation Actions To Fulfill Agencies' Obligations Under The ESA.......................................................27

3. An Agency Statement Can "Prescribe" Policy Even If Nonbinding ...................................................................................35

D. The APA's Policy Of Promoting Public Involvement And The ESA's Policy of Species Conservation Would Both Be Furthered By Holding That Citizens Can Petition For Recovery Plans..................................40

II. THE COURT SHOULD REMAND TO THE DISTRICT COURT, WHICH HAS JURISDICTION TO REVIEW THE SERVICE'S DENIAL OF THE CENTER'S PETITION................................................................42

CONCLUSION.......................................................................................................43

STATEMENT OF RELATED CASES .................................................................44

CERTIFICATE OF COMPLIANCE ....................................................................45

ADDENDUM ...........................................................................................................A1

CERTIFICATE OF SERVICE ...........................................................................A30

iv

# TABLE OF AUTHORITIES

## CASES

*Alaska v. Lubchenco,*
   723 F.3d 1043 (9th Cir. 2013) ..................................................................30

*Animal Legal Def. Fund v. Veneman,*
   469 F.3d 826 (9th Cir. 2006),
   *vacated on other grounds*, 490 F.3d 725 (9th Cir. 2007)............................ passim

*Bennett v. Spear,*
   520 U.S. 154 (1997) ..................................................................... 28, 39

*Biodiversity Legal Found. v. Norton,*
   285 F. Supp. 2d 1 (D.D.C. 2003) ..........................................................32

*Carson-Truckee Water Conservancy Dist. v. Clark,*
   741 F.2d 257 (9th Cir. 1984) ..................................................................30

*Cascadia Wildlands v. Bureau of Indian Affairs,*
   801 F.3d 1105 (9th Cir. 2015) ................................................................33

*Cascadia Wildlands v. Thrailkill,*
   49 F. Supp. 3d 774 (D. Or. 2014) ..........................................................30

*Cook Inletkeeper v. Raimondo,*
   No. 3:19-cv-00238-SLG, 2021 U.S. Dist. LEXIS 60671
   (D. Alaska Mar. 30, 2021)......................................................................31

*Ctr. for Biological Diversity v. Bernhardt,*
   480 F. Supp. 3d 69 (D.D.C. 2020) .........................................................28

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
   35 F. Supp. 3d 1137 (N.D. Cal. 2014)....................................................28

*Ctr. for Biological Diversity v. Zinke,*
   399 F. Supp. 3d 940 (D. Ariz. 2019).......................................................34

*Defs. of Wildlife v. Tuggle,*
   607 F. Supp. 2d 1095 (D. Ariz. 2009).....................................................38

*Dep't of Homeland Sec. v. MacLean*,
   574 U.S. 383 (2015) ............................................................39

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134, 1141 (2018) ...........................................16

*Friends of Blackwater v. Salazar*,
   691 F.3d 428 (D.C. Cir. 2012) .........................................28

*Friends of the Wild Swan, Inc. v. Thorson*,
   745 F. App'x 718, 721 (9th Cir. 2018)..............................34

*Fund for Animals v. Babbitt*,
   903 F. Supp. 96 (D.D.C. 1995) ................................. 17, 28

*Gardner v. U.S. Bureau of Land Mgmt.*,
   638 F.3d 1217 (9th Cir. 2011)...........................................14

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*,
   378 F.3d 1059 (9th Cir. 2004)...........................................31

*Gross* v. *FBL Fin. Servs.*,
   557 U.S. 167, 175 (2009) ..................................................25

*Gunderson v. Hood*,
   268 F.3d 1149 (9th Cir. 2001)...........................................38

*Idaho Cnty. v. Evans*,
   No. CV02-80-C-EJL, 2003 U.S. Dist. LEXIS 23459
   (D. Idaho Sep. 30, 2003) ..................................................38

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) .........................................40

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) .....................................................17

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ..........................................................23

*Me. Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) .....................................................27

*Nat'l Wildlife Fed'n v. Babbitt*,
    128 F. Supp. 2d 1274 (E.D. Cal. 2000) ................................................32

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ..............................................................31

*O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*,
    92 F.3d 940 (9th Cir. 1996) ................................................................43

*Palila v. Haw. Dep't of Land & Nat. Res.*,
    639 F.2d 495 (9th Cir. 1981) ..............................................................31

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...................................................................... 14, 15

*Rocky Mt. Wild v. Walsh*,
    216 F. Supp. 3d 1234 (D. Colo. 2016) ................................................38

*Rosenbloom v. Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ............................................................15

*Sacora v. Thomas*,
    628 F.3d 1059 (9th Cir. 2010) ............................................................37

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ...........................................................................15

*Sw. Ctr. for Biological Diversity v. Bartel*,
    457 F. Supp. 2d 1070 (S.D. Cal. 2006) ..............................................29

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ...................................................................... 3, 41

*United States v. Monsanto*,
    491 U.S. 600, 607 (1989) ...................................................................28

*WildEarth Guardians v. Steele*,
    No. CV 19-56-M-DWM, 2021 U.S. Dist. LEXIS 118341
    (D. Mont. June 24, 2021)....................................................................30

*Wilderness Soc'y v. U.S. Fish and Wildlife Serv.*,
    353 F.3d 1051, 1060 (9th Cir. 2003) ..................................................36

*Young v. UPS*,
  575 U.S. 206 (2015) ...........................................................................................36

**STATUTES**

*Administrative Procedure Act*

5 U.S.C. § 551(4) ............................................................................... passim

5 U.S.C. § 553(b) ..........................................................................................37

5 U.S.C. § 553(b)(3)(A) ........................................................................ 37, 39

5 U.S.C. § 553(b)-(c) ....................................................................................41

5 U.S.C. § 553(c) ..........................................................................................37

5 U.S.C. § 553(d) ..........................................................................................37

5 U.S.C. § 553(e) ................................................................................ passim

5 U.S.C. § 702 ................................................................................................1

5 U.S.C. § 706 ..............................................................................................41

*Marine Mammal Protection Act*

16 U.S.C. § 1371(a)(5)(E)(i)..........................................................................18

16 U.S.C. § 1374(c)(4)(A)(ii) ........................................................................19

16 U.S.C. § 1374(c)(4)(B)(iii) .......................................................................19

16 U.S.C. § 1387(f)(11) .................................................................................19

*Endangered Species Act*

16 U.S.C. § 1531(a)(3).................................................................................41

16 U.S.C. § 1531(b) ................................................................................ 3, 20

16 U.S.C. § 1531(c)(1)............................................................................ 12, 20

16 U.S.C. § 1532(3) .......................................................................................3

16 U.S.C. § 1533(b) .................................................................39

16 U.S.C. § 1533(f) ............................................................ passim

16 U.S.C. § 1533(f)(1) ....................................................... passim

16 U.S.C. § 1533(f)(1)(B) ................................................ 10, 12, 17, 20

16 U.S.C. § 1533(f)(1)(B)(i) ................................................. 4, 21, 25

16 U.S.C. § 1533(f)(1)(B)(ii) ............................................... 4, 26, 34

16 U.S.C. § 1533(f)(2) ....................................................... 13, 25, 40

16 U.S.C. § 1533(f)(3) ............................................................29

16 U.S.C. § 1533(f)(4) .................................................... 4, 13, 26, 37

16 U.S.C. § 1536(a)(1) ...........................................................29

16 U.S.C. § 1536(a)(2) ...........................................................29

16 U.S.C. § 1540(c) ...............................................................1

16 U.S.C. § 1540(g)(1)(C) .........................................................1

*Other Statutes*

16 U.S.C. § 6512(a)(5)(A) ........................................................33

26 U.S.C. § 175 ...................................................................33

28 U.S.C. § 1331 ...................................................................1

28 U.S.C. § 2107(b) ................................................................1

28 U.S.C. §§ 2201-2202 .............................................................1

42 U.S.C. § 10364(a)(1)(H) .......................................................19

## REGULATIONS

50 C.F.R. Part 424.................................................................23

ix

## LEGISLATIVE HISTORY

S. Rep. No. 752, 79th Cong., 1st Sess. (1945)....................................................15

H.R. Rep. No. 1980, 79th Cong., 2d Sess. (1946)..................................................15

## OTHER AUTHORITIES

40 Fed. Reg. 31,734 (July 28, 1975)....................................................................4

78 Fed. Reg. 17,708 (Mar. 22, 2013)..................................................................27

81 Fed. Reg. 13,174 (Mar. 11, 2016)..................................................................27

82 Fed. Reg. 30,502 (June 30, 2017) ..................................................................21

Fed. R. App. P. 28(f)...........................................................................................2

9th Cir. R. 28-2.7 ...............................................................................................2

9th Cir. R. 36-3(a) .............................................................................................35

*Black's Law Dictionary* (11th ed. 2019)............................................................36

*The Concise Oxford Dictionary of Current English* (7th ed. 1982) ................ 25, 36

DICTIONARY BY MERRIAM-WEBSTER (2021),
    https://www.merriam-webster.com .......................................................... 21, 25

OXFORD ENGLISH DICTIONARY ON LEXICO.COM (2021),
    https://www.lexico.com......................................................................21

Tom C. Clark, U.S. Dep't of Justice, Attorney General's Manual on the
    Administrative Procedure Act 13 (1947), *available at*
    https://fall.fsulawrc.com/admin/1947i.html .......................................................41

## JURISDICTIONAL STATEMENT

The Center alleged that the district court had jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief), 16 U.S.C. §§ 1540(c), (g)(1)(C) (action arising under the Endangered Species Act, "ESA," and its citizen suit provision), and 5 U.S.C. § 702 (Administrative Procedure Act, "APA"). ER_84 (Compl. ¶ 5).

The district court held that it lacked subject matter jurisdiction in its final order dated December 23, 2020 (ER_6-32), which granted Defendants' motions for summary judgment. The Clerk entered judgment in favor of Defendants on December 23, 2020 (ER_4-5), and the Center filed a timely notice of appeal on February 11, 2021 (ER_107-109). *See* 28 U.S.C. § 2107(b). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the district court's final order.

1

## **STATEMENT OF THE ISSUE**

The ESA mandates that the U.S. Fish and Wildlife Service (the "Service") "shall develop and implement" recovery plans for endangered and threatened species. 16 U.S.C. § 1533(f)(1). At issue in this case is the Center's submission of a formal petition, pursuant to the APA, 5 U.S.C. § 553(e), for the development of an updated and strengthened recovery plan for the grizzly bear, which is listed as a threatened species under the ESA. The Service denied the Center's Petition based primarily on the agency's position that the APA does not authorize petitioning for recovery plans because they do not fall within the APA's broad definition of a "rule." 5 U.S.C. § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"). The district court agreed with the Service that recovery plans do not qualify as rules under the APA and held that it therefore lacked subject matter jurisdiction to review the Center's challenge to the Service's denial of the Petition.

Consequently, the sole issue on appeal is whether a formal recovery plan, like other legally mandated agency policy statements, qualifies as a "rule" under the APA's expansive definition, thus conferring on the interested public the ability to petition for changes to these vitally important documents.

1

## <u>PERTINENT STATUTES AND REGULATIONS</u>

Pursuant to Fed. R. App. P. 28(f) and 9th Cir. R. 28-2.7, all pertinent

statutory and regulatory provisions appear in the attached Addendum.

## STATEMENT OF THE CASE

**A.    The ESA's Requirement That The Service "Shall" Develop Recovery Plans To Conserve Listed Wildlife**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is intended to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to "provide a program for the conservation of such … species." 16 U.S.C. § 1531(b).

To carry out the ESA's paramount purpose that listed species be conserved, section 4(f) of the ESA sets forth a detailed recovery planning process. Section 4(f)(1) provides that the Service "shall develop and implement [recovery] plans for the conservation and survival of endangered species and threatened species . . . ." *Id*. § 1533(f)(1). The ESA defines "conservation" as the "use of all methods and procedures which are necessary to bring [listed] species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id*. § 1532(3), i.e. to bring about the full recovery of listed species.

The ESA provides that the Service, "in developing and implementing recovery plans, shall, to the maximum extent practicable" incorporate "such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species," as well as "objective, measurable criteria

3

which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id*. § 1533(f)(1)(B)(i), (ii). Further, the Service "shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan," and "shall consider all information presented during the public comment period prior to approval of the plan." *Id*. § 1533(f)(4).

## B.     The Grizzly Bear And Its Outdated Recovery Plan

The grizzly bear once ranged throughout most of western North America, from the high Arctic to Mexico, and from the coast of California across most of the Great Plains. ER_55. More than 50,000 grizzlies likely once lived in the western United States. *Id*.

European settlement of the American West led to bounty programs aimed at the eradication of grizzly bears and other large carnivores, and they were shot, trapped, and poisoned for decades. ER_79. People eliminated grizzlies from Texas by 1890 and from California by 1922. ER_55. The bears were last reported in Utah in 1923, Oregon in 1931, New Mexico in 1933, and Arizona in 1935. *Id*. By the 1930s, people had reduced the bear's range and numbers to less than two percent of historical levels. ER_79.

In 1975, the Service listed the grizzly bear as "threatened" in the lower 48 states under the ESA. 40 Fed. Reg. 31,734 (July 28, 1975). Likely fewer than 1,000

grizzly bears then remained. ER_55. At the time of listing, grizzlies were known to still survive in portions of Colorado, Idaho, Montana, Washington, and Wyoming. ER_57. A poacher shot Colorado's last known grizzly bear in 1979. ER_56.

The Service approved a grizzly bear recovery plan in 1982 and revised this plan in 1993 ("1993 Recovery Plan"). ER_51. The Service identified four initial recovery zones – Yellowstone, Northern Continental Divide, Cabinet-Yaak, and Selkirks – and three evaluation areas – Bitterroot, North Cascades, and San Juan Mountains – for potential recovery. ER_54.

The Service prepared geographically-specific supplements to the recovery plan in 1996 (Bitterroot, ER_50); 1997 (North Cascades, ER_49); 2007 and 2017 (Greater Yellowstone, ER_46, ER_47, and ER_40); and 2018 (North Continental Divide, ER_38). With these supplements in place, the Service has now designated six recovery zones: Yellowstone, Northern Continental Divide, Cabinet-Yaak, Selkirks, Bitterroot, and North Cascades. ER_65 (map in 2018 Annual Report).

In the 1993 Recovery Plan, the Service committed to evaluating "the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear . . . ." ER_59. The Service anticipated that the analysis would take five years to complete. *Id*.

Thereafter, in August 2011, the Service published a long overdue five-year status review for grizzly bears ("2011 5-Year Review"). In that review, the Service

again specifically noted that "other areas throughout the historic range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery," including "Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and southern Washington (mountain ranges in the western U.S.)." ER_81. Yet the Service has not updated the 1993 Recovery Plan to evaluate or pursue recovery in these additional areas in the grizzly bear's historical range.

In the 2011 5-Year Review, the Service also explained that except for the geographically focused supplements, "the recovery plan and the associated recovery criteria have not been updated since the plan was released in 1993" and "no longer reflects the best available and most up-to-date information on the biology of the species and its habitat." ER_77-78. In the section entitled "Recommendations for Future Actions," the Service listed, as its first priority, the need to "[r]evise the recovery plan . . . so that it reflects the best scientific and commercial information available." ER_80.

The Service subsequently published revised demographic recovery criteria for the Yellowstone Ecosystem in 2017, ER_40, and habitat-based recovery criteria for the Northern Continental Divide Ecosystem in 2018, ER_38. But the Service never updated the recovery criteria nor any of the other outdated information for the other four recovery areas.

6

Fewer than 1,900 grizzlies likely survive in the lower 48 states. ER_66-76 (2018 Annual Report). Most live in the northern Rocky Mountains, in four of six recovery zones. ER_66 (Greater Yellowstone: approximately 709 bears); ER_68 (North Continental Divide: approximately 1,029 bears); ER_70 (Cabinet-Yaak: 55-60 bears); ER_73 (Selkirk, including Canada portions: 75-80 bears). The North Cascades have had only sporadic sightings of lone bears (ER_75) and the Bitterroot zone has no known population (ER_76). Grizzlies cannot be found anywhere else in their vast historical range in the lower 48 states.

## C.    The Center's Petition To Update The Grizzly Bear Recovery Plan

In June 2014, the Center submitted to the Service a formal petition, pursuant to the APA, 5 U.S.C. § 553(e), for the development of an updated recovery plan for the grizzly bear. The APA provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). In turn, a "rule" is defined, in pertinent part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." *Id*. § 551(4).

The Center's Petition requests that the Service amend the grizzly bear's 1993 Recovery Plan to address "significant remaining areas of suitable habitat across the grizzly bear's native range in the western U.S." ER_35. The Petition summarizes numerous scientific publications describing suitable habitat for grizzly

7

bears in areas including the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, and the Uinta Mountains in Utah. ER_36. The Petition also requests revised recovery criteria and updates with current scientific information relevant to bear recovery, such as findings of new research on road density limits and new techniques to reconnect grizzly bear recovery areas. ER_37.

In September 2014, the Service denied the Petition. In its two-page denial letter, the Service asserted that "[r]ecovery plans are not rules under the APA," and thus "Section 553(e) does not provide the right to petition for the issuance of a recovery plan." ER_33 (Denial Letter). The Service also asserted that "any additional recovery planning is subject to Service prioritization and is discretionary," and that it had "satisfied [its] statutory responsibilities for recovery planning and implementation." ER_34.

The Service did not acknowledge its previous commitments, made in the 1993 Recovery Plan and 2011 5-Year Review, to analyze other areas of suitable habitat for grizzly bear recovery. Nor did the agency acknowledge its finding in the 2011 5-Year Review that the outdated 1993 Recovery Plan fails to reflect new science on grizzly bear management.

**D.    The District Court's Rejection Of The Center's Challenge To The Service's Denial Of Its Petition**

The Center filed this case in 2019. ER_82-106. In the only claim at issue in this appeal, the Center contended that the Service's denial of the Center's rulemaking petition – primarily on the grounds that a legally-mandated recovery plan cannot qualify as a "rule" for APA purposes – was arbitrary and capricious. ER_101-104.

In resolving the parties' cross-motions for summary judgment, the district court held that the Center's claims are not moot, notwithstanding the Service's reliance on a post-litigation declaration addressing certain aspects of the Center's Petition. ER_12-16 (Order). The district court concluded that "there remains work that could be done" to satisfy the substantive requests of the Petition. ER_16. The district court further held that the Center has standing based on injuries to its members' interests in grizzly bear recovery that stem in part from the Service's refusal to grant the Petition, which requested, among other things, that the Service consider reintroducing bears to areas where they once lived and could again thrive. ER_17-18.

The district court nonetheless held that it "lack[ed] subject matter jurisdiction to review the merits" of the Center's claim regarding the Service's rejection of its Petition because a recovery plan is not a "rule" and thus the Center

had no right under the APA to submit a petition for a revised recovery plan in the first instance. ER_27.

The Center advanced several distinct arguments that a recovery plan does fall within the plain terms of the APA's broad definition of a "rule." ECF-55 at 17-26. The Center argued that recovery plans are "designed to implement . . . law," 5 U.S.C. § 551(4), namely, the ESA's express mandate under section 4(f) that the Service "shall develop and implement" recovery plans, 16 U.S.C. § 1533(f)(1), embodying several statutory criteria aimed at promoting species conservation, *id*. § 1533(f)(1)(B). ECF-55 at 19-20, 25. The district court acknowledged that "[i]t is true that pursuant to section 4(f), each recovery plan must contain three components" prescribed by Congress. ER_23. Yet, without further explanation, the district court rejected the Center's argument as "circular." *Id.*

Alternatively, the Center argued that, at the very least, recovery plans are "designed to implement, interpret, or prescribe . . . *policy*," 5 U.S.C. § 551(4) (emphasis added), insofar as they set forth the Service's formal, Congressionally-mandated determination – following the solicitation and consideration of public comment – on how to accomplish the ESA's ultimate objective of recovering imperiled species. ECF-55 at 20, 25. The district court acknowledged that "there can be no doubt" that recovery plans are designed to promote the ESA's policy of conserving endangered species. ER_23. Nevertheless, while recognizing the

recovery plan's "importance as a vital tool of conservation," the court held that a recovery plan "does not implement conservation policy because it does not, in and of itself, create change," which only occurs later when "the agency takes concrete action that complies with the plan's guidance." ER_24.

Having reached the conclusion that a recovery plan is not a rule under the APA, the district court held that the Service therefore had no legal obligation under the APA to respond to the Center's Petition. ER_21. On that basis, the district court concluded that the Service's denial of the Petition was not "final agency action" and thus the district court lacked subject matter jurisdiction to review the merits of the denial. ER_27.

## SUMMARY OF ARGUMENT

The Center's rulemaking petition asked the Service to revisit the grizzly bear's outdated 1993 Recovery Plan to address problems that the Service itself identified and repeatedly pledged to address. In rejecting the Center's challenge to the Service's denial of the Petition, the district court agreed with the Service that a recovery plan does not qualify as a "rule" under the APA's definition, and that therefore the APA does not authorize petitioning for recovery plans. The APA broadly defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or

prescribe law or policy . . . ." 5 U.S.C. § 551(4). Formal recovery plans fall within this expansive definition for multiple reasons.

First, recovery plans implement, as well as interpret, law because they are the Congressionally-mandated mechanism for fulfilling the Service's implementation and effectuation of section 4(f) of the ESA. Section 4(f) mandates that the Service "*shall* develop and implement [recovery] plans for the conservation and survival of endangered species and threatened species . . ." (emphasis added). 16 U.S.C. § 1533(f)(1). It further mandates that the Service incorporate standards into recovery plans, such as (1) "site-specific management actions" necessary for the conservation and survival of the species, and (2) "objective, measurable criteria" by which to monitor the species' recovery. 16 U.S.C. § 1533(f)(1)(B). That a recovery plan implements law is therefore the inevitable conclusion reached from examination of the ESA's plain language.

Second, a recovery plan also implements policy, namely, the ESA's policy of conserving endangered species. The ESA directs that it is a "policy of Congress" that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of [the ESA's purposes]." 16 U.S.C. § 1531(c)(1). Recovery plans implement that policy of conservation by identifying the specific actions necessary for the conservation of each covered species. 16 U.S.C. § 1533(f)(1)(B). Contrary

12

to the district court's holding, recovery plans are not disqualified from the definition of "rule" because the Service and other agencies in the future will implement these identified actions on-the-ground. The APA's definition of "rule" does not require that the agency statement "in and of itself, create change." ER_24. Instead, a "rule" must have "*future* effect," 5 U.S.C. § 551(4) (emphasis added), which is undoubtedly the case with recovery plans adopted pursuant to ESA section 4(f).

Third, because recovery plans are the Service's authoritative statements on what is needed to conserve listed species, recovery plans also "prescribe" policy. The Service develops recovery plans with teams of wildlife experts, 16 U.S.C. § 1533(f)(2), informed by public review and comment, *id*. § 1533(f)(4). Because the plain language of section 4(f) requires the Service to "implement" recovery plans, recovery plans authoritatively direct the Service's conservation policy. 16 U.S.C. § 1533(f). Recovery plans also "prescribe" policy for other federal agencies in carrying out their obligations to conserve species under the ESA, particularly section 7 of the Act, which requires federal agencies to "carry[] out programs for the conservation of endangered species and threatened species." *Id*. § 1536(a)(1).

Accordingly, consistent with the plain language of both the ESA and APA, as well as the policies underlying these statutes, the definition of "rule" encompasses formal recovery plans. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S.

92, 95-96 (2015) ("'Rule,' in turn, is defined broadly . . . ."). As such, the district court's underlying rationale for concluding that it lacks subject matter jurisdiction – that the Center had no right to submit a rulemaking petition – is erroneous. This Court should therefore reverse and remand for the district court to address in the first instance the merits of the Service's denial of the Petition.

## STANDARD OF REVIEW

The district court's grant of summary judgment was based on its legal conclusion that it lacked jurisdiction to review the Service's denial of the Center's Petition. That purely legal issue is reviewed *de novo* by this Court. *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011).

## ARGUMENT

## I.    A RECOVERY PLAN QUALIFIES AS A "RULE" UNDER THE APA.

In denying the Center's Petition for a revised grizzly bear recovery plan, the Service primarily relied on its incorrect position that the APA does not authorize a recovery plan petition because a recovery plan is not a "rule." ER_33 (Denial Letter at 1). The district court erroneously sided with the Service on this threshold issue. 13-22, ER_18-27. The APA provides a right to petition for a "rule," 5 U.S.C. § 553(e), and recovery plans squarely fit within the APA's broad definition of a "rule," *id*. § 551(4).

14

Under the APA, a "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). The APA definition controls the analysis, as the district court rightly noted. ER_22 (citing *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.")).

The U.S. Supreme Court, as well as this Court, have emphasized the breadth of the APA's definition. *Perez*, 575 U.S. at 95-96 ("'Rule,' in turn, is defined broadly . . . ."); *see, e.g.*, *Animal Legal Def. Fund v. Veneman*, 469 F.3d 826, 838-40 (9th Cir. 2006), vacated on other grounds, 490 F.3d 725 (9th Cir. 2007) (en banc)[2] ("The term 'rule' may embrace 'virtually every statement an agency may make' . . . ."); *see also* S. Rep. No. 752, 79th Cong., 1st Sess., at 224 (1945) ("The definitions given in section 2 [of the APA] are of very broad character."); H.R. Rep. No. 1980, 79th Cong., 2d Sess., at 252 (1946) ("The definitions simplify the language of the remaining sections [of the APA]. They are necessarily broad.").

---

[2] In *Animal Legal Def. Fund*, the parties reached settlement and requested vacatur of the panel's opinion. 490 F.3d at 726. "[D]ecisions vacated for reasons unrelated to the merits may be considered for the persuasive[ness] of their reasoning." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n.14 (9th Cir. 2014).

The district court's narrow reading of the definition of "rule," as explained below, runs counter to this precedent and direction.

As an initial matter, it is important to note that the APA's definition of "rule" utilizes the disjunctive "or" and does so in two important ways, i.e., the agency statement at issue must be designed to "implement, interpret, *or* prescribe law *or* policy." 5 U.S.C. § 551(4) (emphases added); *see Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018) (explaining that the use of "or" in a statute is "almost always disjunctive"). The Center explains below that a formal ESA recovery plan satisfies the statutory definition in at least three ways: it implements law, implements policy, and prescribes policy. A recovery plan need only do one of those things, however, to satisfy the APA's definition of "rule."

## A. A Recovery Plan Implements Law Because It Embodies Requirements Of ESA Section 4(f)

The district court held that recovery plans do not "implement" law. ER_23. But recovery plans embody the Service's implementation of section 4(f) of the ESA, which imposes mandatory duties on the Service. 16 U.S.C. § 1533(f).

Section 4(f) of the ESA unequivocally mandates that the Service develop recovery plans. 16 U.S.C. § 1533(f)(1) (providing that the Service "*shall* develop and implement [recovery] plans for the conservation and survival of endangered species and threatened species . . .") (emphasis added). Congress further mandated that the Service incorporate particular standards into recovery plans, such as (1)

16

"site-specific management actions" necessary for the conservation and survival of the species, and (2) "objective, measurable criteria" by which to monitor the species' recovery. 16 U.S.C. § 1533(f)(1)(B). Consequently, while the Service may have latitude in *how* it meets these legal obligations, the plain language of the ESA dictates that formal ESA recovery plans do indeed "implement" law. 5 U.S.C. § 551(4); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2382 (2020) (explaining that, in construing legislative intent, "[t]he only question we face today is what the plain language of the statute authorizes").

For example, the grizzly bear's 1993 Recovery Plan – which the Center sought to update through its Petition – reflects the Service's implementation and interpretation of the ESA by including, for example, the "objective, measurable criteria" that section 4(f) of the ESA requires. *See, e.g.*, ER_39 (explaining that the grizzly bear's recovery plan "delineates objective, measurable habitat-based criteria that [the Service found] will help determine when an endangered or threatened species has recovered"). Indeed, the Service revised the 1993 Recovery Plan in response to a court ruling that it failed to satisfy section 4(f)'s legal requirements in critical respects. *See Fund for Animals v. Babbitt*, 903 F. Supp. 96, 111-13 (D.D.C. 1995) (explaining that "Congress has spoken in clarion terms: the objective, measurable criteria must be directed towards the goal of removing the

17

endangered or threatened species from the list" and holding that the Service failed to meet its "burden to develop objective, measurable criteria by which to assess present or threatened destruction, modification or curtailment of the grizzly bear's habitat or range."). Thus, the grizzly bear's formal recovery plan is the Service's implementation of section 4(f) of the ESA, just as with other recovery plans.

The district court acknowledged that "each recovery plan must contain" these mandatory components, but it nevertheless rejected as "circular" the Center's argument that a recovery plan implements the ESA. ER_23. However, that a recovery plan implements law as required by Congress is not a circular argument; rather, it is the inevitable conclusion reached from examining the statutory text and recovery plans that implement the ESA's mandate.

Moreover, recovery plans not only implement the mandatory requirements of the ESA, but also play important roles in implementing *other* laws. For example, section 1371 of the Marine Mammal Protection Act allows for the incidental take of marine mammals during commercial fishing operations if, among other things, "a recovery plan has been developed or is being developed for such species pursuant to the Endangered Species Act . . . ." 16 U.S.C. § 1371(a)(5)(E)(i). Several other provisions of the Marine Mammal Protection Act

also rely on recovery plans to implement their mandates.[3] As another example, under 42 U.S.C § 10364, Water Management Improvement, the Secretary of the Interior may provide grants or assist applicants who wish to "achieve the acceleration of the recovery" of species "subject to a recovery plan or conservation plan under the Endangered Species Act of 1973 . . . ." 42 U.S.C. § 10364(a)(1)(H).

In short, formal recovery plans embody the Service's implementation of the legal requirements of section 4(f) of the ESA. They also help implement provisions of other conservation laws, such as the Marine Mammal Protection Act. For these reasons alone, recovery plans qualify as rules, and the district court's holding must be reversed.

## B. A Recovery Plan Implements Conservation Policy By Identifying Concrete Measures That Can Be Taken To Help Rare Wildlife

While the Court need go no further, a recovery plan not only implements law, but also "implements" the ESA's overriding "policy" of conservation and

---

[3] 16 U.S.C. § 1374(c)(4)(A)(ii) (requiring that any permits to allow take or importation of marine mammals for enhancement of species survival or recovery be consistent with "any recovery plan developed under section 1533(f)"); 16 U.S.C. § 1374(c)(4)(B)(iii) (allowing for removal of a marine mammal from the wild and into captivity if the Secretary requires that "the marine mammal or its progeny be returned to the natural habitat of the species or stock as soon as feasible, consistent with the objectives of any applicable conservation plan or recovery plan"); 16 U.S.C. § 1387(f)(11) (providing that "take reduction plans" for commercial fishing operations that affect marine mammals "shall be consistent with any recovery plan developed for such species or stock under section 4 of such act . . . .").

therefore satisfies the APA's definition of "rule" for that distinct reason. 5 U.S.C. § 551(4).

The ESA directs that it is a "policy of Congress" that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of [the ESA's purposes]." 16 U.S.C. § 1531(c)(1); *see also id.* § 1531(b) (stating the ESA's "purposes," which include "provid[ing] a program for the conservation" of listed species). Recovery plans implement that policy of conservation by identifying those actions necessary for survival and recovery – i.e., the "conservation" – of endangered and threatened species. 16 U.S.C. § 1533(f)(1)(B). In other words, for each listed species, formal recovery plans provide that "program for conservation" that is central to fulfilling the ESA's core mission. *Id.* § 1531(b). If this is inadequate to constitute "an agency statement of general or particular applicability and future effect designed to implement . . . policy" within the meaning of the APA, 5 U.S.C. § 551(4), it is difficult to see what would be sufficient.

The district court acknowledged that recovery plans "promote or further" "Congress's conservation policy" but it declined to hold that they "implement" such policy. ER_23. The district court's erroneous conclusion stems from its misapplication of the dictionary definitions of "implement."

The district court cited to the Oxford English Dictionary's definition of "implement" which is to "put (a decision, plan, agreement, etc.) into effect." Implement, OXFORD ENGLISH DICTIONARY ON LEXICO.COM, https://www.lexico.com/en/definition/implement; *see* ER_24. The court also pointed to the definition in Merriam-Webster, which defines "implement" as "to give practical effect to and ensure of actual fulfillment by concrete measures." Implement, DICTIONARY BY MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/implement. The district court correctly noted that these definitions are in accordance with each other.

Applying the district court's own dictionary definitions, a recovery plan "implements" the Congressional policy of conserving rare species by "giv[ing] practical effect to" that policy with "concrete measures." *Id*. Again, for example, a recovery plan must include "site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i). Thus, as contemplated by Congress, the Service's inclusion of such measures in a recovery plan serves as an important step in implementing the ESA's policy of conserving wildlife. As the Service has explained, recovery plans "lay out where we need to go and how to get there through specific actions." 82 Fed. Reg. 30,502, 30,508 (June 30, 2017).

Consequently, formal recovery plans fit the district court's cited dictionary definitions of policy "implementation" like a glove.

The district court also held that a recovery plan does not implement conservation policy "because it does not, in and of itself, create change." ER_24. In the court's view, policy implementation does not occur until "the agency takes concrete action that complies with the plan's guidance." *Id.*

To be sure, Congress anticipated that the Service and other federal agencies would take additional steps to implement recovery plans adopted pursuant to section 4(f) of the ESA. Indeed, the ESA *directs* that the Service do so. *See* 16 U.S.C. § 1533(f)(1) (providing that the Service "shall . . . implement plans . . . for the conservation and survival" of listed species). Federal land management agencies have, for example, established protections for grizzly bear habitat consistent with the direction in the 1993 Recovery Plan. ER_48 ("The percent of secure habitat within each bear management subunit must be maintained at or above levels that existed in 1998.").[4] However, the fact that a recovery plan is

---

[4] In turn, the U.S. Forest Service has incorporated the Recovery Plan's restrictions on motorized access and its other habitat protections into its forest plans for areas within the grizzly bear's range. 82 Fed. Reg. at 30,516 ("Affected National Forests and National Parks have incorporated the habitat standards and criteria into their Forest Plans and National Park management plans and/or Superintendent's Compendia via appropriate amendment processes so that they are legally applied to these public lands within the [Greater Yellowstone Ecosystem].").

likely to be *further* implemented on the ground by the Service and other agencies hardly establishes that a recovery plan *itself* does not "implement . . . policy." 5 U.S.C. § 551(4). To the contrary, it shows that the publication of the recovery plan itself *is* the first step in the Service's and other agencies' implementation of the ESA's policy of conservation.

Moreover, contrary to the district court's holding, the APA's definition of "rule" does not require that the agency statement "in and of itself, create change." ER_24. Instead, a "rule" must have "*future* effect," 5 U.S.C. § 551(4) (emphasis added), which is undoubtedly the case with recovery plans adopted pursuant to ESA section 4(f). Indeed, numerous agency statements that clearly qualify as rules do not by themselves "create change" but instead have future effects, such as the Service's regulations that govern the processes for listing species and designating their critical habitat. *See* 50 C.F.R. Part 424. Those regulations only have effects in the future – when the Service lists species or designates their essential habitats – but that does not mean they are not rules.

Thus, this plain language of the APA's definition – "future effect," not immediate effect – shows that the district court was wrong in disqualifying a recovery plan because it will be further implemented on-the-ground in the future. *See also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892 (1990) (holding that certain Bureau of Land Management actions declaring "the agency's intent to grant

23

requisite permission for certain activities, to decline to interfere with other
activities, and to take other particular action if requested" were rules of "general or
particular applicability *and future effect*" "within the meaning of" the APA)
(quoting 5 U.S.C. § 551(4); emphasis in original).

In short, a recovery plan itself is an implementation of the Congressionally
mandated policy of conservation of listed species because each plan specifies the
concrete measures needed for survival and recovery of a particular species. That
the recovery plan will be *further* implemented through on-the-ground conservation
measures shows that it will have "future effect" – precisely as the APA's definition
of "rule" requires.

### C.     A Recovery Plan Prescribes Policy Because It Is The Service's Authoritative Statement On How To Conserve Species

There is yet another independent reason why a formal ESA recovery plan
satisfies the APA's expansive definition of a "rule." Such a plan serves as the
Service's authoritative statement on what is needed to recover a species and
thereby "prescribes . . . policy" for the conservation of listed species. 5 U.S.C. §
551(4).

The definition of "prescribe," as provided in *Black's Law Dictionary* (which
the district court relied upon), is "to dictate, ordain, or direct; to establish
authoritatively (as a rule or guideline)." ER_25. "Policy," as pertinent here, means
a "course or general plan of action (to be) adopted by government . . . ." *The*

24

*Concise Oxford Dictionary of Current English* (7th ed. 1982); *see also* Policy,

DICTIONARY BY MERRIAM-WEBSTER, https://www.merriam-

webster.com/dictionary/policy (Legal definition of "policy": "an overall plan,

principle, or guideline"). Hence, a document falling within the ordinary meaning of

"prescribing policy," as applied here, "direct[s]" or "establish[es] authoritatively" a

"general plan of action" for recovering endangered and threatened species. *See also*

*Gross* v. *FBL Fin. Servs.*, 557 U.S. 167, 175 (2009) ("Statutory construction must

begin with the language employed by Congress and the assumption that

the ordinary meaning of that language accurately expresses the legislative

purpose"). This is exactly what a formal recovery plan does, as explained below.

> 1. **Recovery Plans Establish Concrete Conservation Measures After A Formal Process That Applies The Service's Expertise And Involves The Public**

A recovery plan prescribes conservation policy by offering the Service's

expert – and thus "authoritative" – statement on how the Service and its partners

can conserve a listed species through site-specific management actions. 16 U.S.C.

§ 1533(f)(1)(B)(i). Indeed, the development of a recovery plan requires application

of the expertise of scientists at the Service, with help from other recognized experts

on the species. *See* 16 U.S.C. § 1533(f)(2) (providing that the Service, "in

developing and implementing recovery plans, may procure the services of

appropriate public and private agencies and institutions, and other qualified persons").

For example, the grizzly bear's 1993 Recovery Plan prescribes policy by identifying a long list of key actions necessary to conserve the bear. ER_60-63. These actions include, for example, "developing and implementing public education and awareness programs" to reduce killing of bears. *Id*. Recovery plans must also set forth the Service's expert assessment of the "objective, measurable criteria" for gauging the species' progress towards recovery as the site-specific actions are undertaken. 16 U.S.C. § 1533(f)(1)(B)(ii). For the grizzly bear, for example, this includes "demographic recovery criteria" such as minimum population sizes and presence of reproductive females. ER_42-43.

Furthermore, prior to final approval of any "new or revised recovery plan," the ESA requires that the Service "provide public notice and an opportunity for public review and comment." 16 U.S.C. § 1533(f)(4). That recovery plans are the culmination of this formal notice and comment process is further evidence that recovery plans are authoritative statements of the Service that qualify as rules. *See Animal Legal Def. Fund*, 469 F.3d at 840 ("Our conclusion [that the enrichment policy is a rule] is buttressed by the Draft Policy's publication in the Federal Register, and the fact that the USDA opened a public comment period for it.").

Consider, for example, the process that led to development of the Service's 2017 Supplement to the grizzly bear's recovery plan, which covers the Greater Yellowstone Ecosystem. ER_40. The Service explains that the revised demographic recovery criteria included in that recovery plan chapter stemmed from review of numerous scientific publications, publication of multiple reports, and participation in a three-day workshop by the "Interagency Grizzly Bear Study Team." ER_44-45. The draft plan was then shaped by two rounds of public comment and scientific peer review. ER_41; *see also* 78 Fed. Reg. 17,708 (Mar. 22, 2013); 81 Fed. Reg. 13,174 (Mar. 11, 2016). The process took about four years, and the culmination of this formal public process is a document that, by any reasonable measure, "prescribes" Service "policy" regarding grizzly bear recovery.

## 2. Recovery Plans Direct Conservation Actions To Fulfill Agencies' Obligations Under The ESA

The plain language of section 4(f) imposes obligations upon the Service to "implement" recovery plans to conserve listed species. 16 U.S.C. § 1533(f). That provision could hardly be clearer in mandating that the Service "*shall* develop and implement [recovery] plans . . . ." *Id.* (emphasis added). The use of "shall" denotes obligation. *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (noting that "shall" is "mandatory language" that presumptively "connotes a requirement") (collecting cases); *United States v. Monsanto*, 491 U.S. 600, 607

27

(1989) (recognizing that by using "shall," "Congress could not have chosen stronger words to express its intent" to impose a mandatory requirement).

Again, while the Service may have some flexibility in *how* it goes about implementing its own formal recovery plans, the Service cannot completely disregard the plans' authoritative direction. *See, e.g.*, *Friends of Blackwater v. Salazar*, 691 F.3d 428, 437 (D.C. Cir. 2012) ("The Secretary, moreover, must implement the plan. That is, as long as a species is listed as endangered, the agency is obligated to work toward the goals set in its recovery plan.") (internal citation omitted); *Ctr. for Biological Diversity v. Bernhardt*, 480 F. Supp. 3d 69, 75 (D.D.C. 2020) (explaining that the use of "shall" in section 4(f) imposed mandatory obligations on the Service because the "word 'shall' usually creates a mandate, not a liberty") (internal citation omitted); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1150-51 (N.D. Cal. 2014) (citing *Bennett v. Spear*, 520 U.S. 154, 172 (1997)) ("The words in section 4(f), 'shall develop and implement,' are 'those of obligation rather than discretion.'"); *Fund for Animals*, 903 F. Supp. at 111 ("The word 'shall' [in section 4(f)] is an imperative denoting a definite obligation.").

Section 4(f) of the ESA further requires that the Service must report to Congressional committees every two years "on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the

28

status of all species for which such plans have been developed." 16 U.S.C. § 1533(f)(3); *see also Sw. Ctr. for Biological Diversity v. Bartel*, 457 F. Supp. 2d 1070, 1086 n.16 (S.D. Cal. 2006) ("There would be no need for such ongoing reports if [the Service was] not endeavoring to meet the goal of recovery, as described in the recovery plan."). This reporting requirement also underscores that Congress fully intended for recovery plans to prescribe conservation policy, as the ESA itself envisions efforts toward implementation of measures identified in recovery plans.

In addition to setting policy for the Service itself, recovery plans also prescribe policy for other federal agencies in carrying out their obligations to conserve species under the ESA, particularly section 7 of the Act. Section 7(a)(2) of the ESA requires all federal agencies to consult with the Service or the National Marine Fisheries Service ("NMFS") so as to "insure" that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat" that has been designated as "critical." 16 U.S.C. § 1536(a)(2). Section 7(a)(1) requires all federal agencies, "in consultation with and with the assistance of the [Service or NMFS]" to "utilize their authorities in furtherance of the purposes of this [Act] by carrying out programs for the conservation of endangered species and threatened species . . . ." *Id.* § 1536(a)(1); *see also Carson-Truckee Water*

29

*Conservancy Dist. v. Clark*, 741 F.2d 257, 261 (9th Cir. 1984) ("ESA § 7(a)(1), moreover, specifically directs that the Secretary 'shall' use programs administered by him to further the conservation purposes of ESA.").

Recovery plans often play a vital role in how these section 7 consultations are conducted, as well as in judicial review of whether agencies are complying with their section 7 duties. For example, in *Alaska v. Lubchenco*, this Court discussed how NMFS through section 7 consultation addressed the prospects of the Stellar sea lion's recovery, as set out in its recovery plan, when limiting commercial fishing to mitigate the sea lion's nutritional stress. 723 F.3d 1043, 1053-54 (9th Cir. 2013); *see also, e.g.*, *Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 787 (D. Or. 2014) (explaining that the Service and the Bureau of Land Management through consultation directed implementation of the spotted owl's recovery plan by limiting timber salvage activities in the owl's core use areas). Indeed, courts have repeatedly held that the Service and other federal agencies were arbitrary and capricious for failing to adequately take recovery plans into consideration before taking or authorizing actions that might impair species' survival or recovery.[5]

---

[5] *See, e.g.*, *WildEarth Guardians v. Steele*, No. CV 19-56-M-DWM, 2021 U.S. Dist. LEXIS 118341, at *64-65 (D. Mont. June 24, 2021) (holding that the Forest Service unreasonably relied on the Service's "conclusion that the less stringent culvert removal plan would not significantly adversely affect bull trout" "in light of the Recovery Plan, which identified culvert removal as an aspect of

Recovery plans also often play a key role in the designation of critical habitat under the Act. This is unsurprising given that "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival *but also essential for the species' recovery*." *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (emphasis added); *see also id.* ("The ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted."). Accordingly, both the Service and courts have looked to formal recovery plans in assessing whether and the extent to which habitat should be designated as critical. *See, e.g.*, *Palila v. Haw. Dep't of Land & Nat. Res.*, 639 F.2d 495, 496 (9th Cir. 1981) (explaining that an endangered bird's recovery plan "led to establishment of the bird's critical habitat [where] the plan concluded that the eradication of the sheep and goats was

---

successful bull trout recovery just two years before . . ."); *Cook Inletkeeper v. Raimondo*, No. 3:19-cv-00238-SLG, 2021 U.S. Dist. LEXIS 60671, at *20 n.93, *49 (D. Alaska Mar. 30, 2021) (holding that the NMFS unreasonably concluded that noise from tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales given that the agency "itself" in the whale's recovery plan identified tugboat noise as a major threat); *see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) ("Requiring some attention to recovery issues does not improperly import ESA's separate recovery planning provisions into the section 7 consultation process. Rather, it simply provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger.").

31

necessary to achieve the regeneration of the forest and restoration of the Palila.");
*Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 13-14 (D.D.C. 2003)
(holding that a recovery plan that called for revising the Cape Sable seaside
sparrow's critical habitat imposed on the Service a "duty to revise" the critical
habitat given the recovery plan's "assessment of the seaside sparrow's dire
situation" in the absence of the revision).

Recovery plans also guide the Service's decisions on whether, and on what
conditions, to issue "incidental take permits" that authorize collateral harm to
endangered and threatened species if mitigated through "habitat conservation
plans." 16 U.S.C. § 1539(a); *see Sw. Center for Biological Diversity,* 457 F. Supp.
at 1087 (discussing the importance of timely developing a recovery plan,
explaining that the Service "would use the recovery plan to evaluate the
sufficiency of the application for an ITP [Incidental Take Permit]."); *Nat'l Wildlife
Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1283 (E.D. Cal. 2000) (explaining that a
habitat conservation plan provided for incorporating elements of the giant garter
snake's recovery plan).

Finally, as already explained, recovery plans not only play a central role in
how the Service and all federal agencies carry out their obligations under the ESA,
they also – by statutory mandate – must be considered in how agencies discharge

their duties under *other* statutes, like the Marine Mammal Protection Act. *See supra* at 18-19.[6]

Accordingly, recovery plans have legal consequences, which in turn demonstrates recovery plans' authoritative nature and their ability to prescribe policy, in accordance with the APA's definition of "rule." Given all this, there should not be any serious dispute as to whether recovery plans in fact "prescribe . . . policy," 5 U.S.C. § 551(4), regarding species conservation in a host of ways.

In concluding otherwise, the district court placed undue reliance on this Court's ruling in *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1114 n.8 (9th Cir. 2015), which narrowly addressed whether a specific forest management plan complied with the Coquille Restoration Act. *Id.* at 1114. While construing that statute, the Court mentioned – in a footnote – that "[i]t is undisputed that, generally, [Service] recovery plans are not mandatory." *Id.* at 1114 n.8. Unsurprisingly, this cursory dictum did not address, let alone analyze, the meaning of the ESA's express directive that the Service "shall develop and

---

[6] Additionally, the Healthy Forests Restoration Act requires the Secretary of Agriculture to "implement authorized hazardous fuel reduction projects" on federal lands that contain threatened and endangered species habitat if consistent with "a species recovery plan prepared under section 1533 of this title." 16 U.S.C. § 6512(a)(5)(A). Even the tax code imports recovery plans with legal significance. One provision allows farmers to deduct expenditures associated with "endangered species recovery" defined as "expenditures paid or incurred for the purpose of achieving site-specific management actions recommended in recovery plans approved pursuant to the Endangered Species Act of 1973." 26 U.S.C. § 175.

implement" recovery plans for listed species. In any case, *Cascadia Wildlands v. Bureau of Indian Affairs* certainly does not stand for the proposition that recovery plans do not even "prescribe . . . policy" within the meaning of the ESA's definition of a rule.[7]

Nor is the district court's holding supported by this Court's unpublished decision in *Friends of the Wild Swan, Inc. v. Thorson*, 745 F. App'x 718, 721 (9th Cir. 2018). In that case, the plaintiffs flatly (and erroneously) "conceded that recovery plans are not legally binding," in any manner or to any extent, *id*. at 720, notwithstanding the Congressional mandate that such plans "shall [be] develop[ed] and implement[ed]." 16 U.S.C. § 1533(f)(1). The Court recognized that section 4(f) "provides, among other things, that in promulgating a recovery plan, the [Service] 'shall, to the maximum extent practicable . . . incorporate in each plan . . . objective, measurable'" recovery criteria. *Friends of the Wild Swan,* 745 F. App'x at 720 (quoting 16 U.S.C. § 1533(f)(1)(B)(ii)). The Court simply held that the plaintiff did not even "plausibly allege" that the Service had failed to carry out this

---

[7] The district court also pointed to a case dealing with the Mexican wolf's recovery plan. *Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d 940, 948 (D. Ariz. 2019). While that case acknowledges that the Service has discretion in crafting recovery plans, it also that holds recovery plans are reviewable under the ESA's citizen suit provision because they must include certain nondiscretionary elements mandated under section 4(f) of the ESA. *Id*. at 948-50. Again, the fact that recovery plans contain nondiscretionary elements further shows why recovery plans operate as the Service's authoritative statements on conservation of species.

mandatory duty for the specific recovery plan at issue. *Id*. Accordingly, the Court's

nonprecedential disposition, *see* 9th Cir. R. 36-3(a), is consistent with the Center's

argument that recovery plans implement law – i.e., the nondiscretionary elements

of section 4(f) – and, at the very least, "implement" and "prescribe" the ESA's

conservation "policy."[8]

### 3. An Agency Statement Can "Prescribe" Policy Even If Nonbinding

The district court was also mistaken in holding that because recovery plans

do not invariably bind the Service or another agency to any single course of action,

they do not prescribe policy. ER_25-26. Whether an agency statement is binding in

all respects is not dispositive in determining whether it qualifies as a rule.

As explained, the definition of "rule" includes statements of "law *or* policy."

5 U.S.C. § 551(4) (emphasis added). And this Court has recognized that

"statements of policy" need not bind the agency to a particular course of action.

*Animal Legal Def. Fund*, 469 F.3d at 839 ("'[G]eneral statements of policy' are

'statements issued by an agency to advise the public prospectively of the manner in

which the agency proposes to exercise a discretionary power.' . . . A policy

---

[8] In view of the plaintiffs' concession in *Friends of the Wild Swan* that "recovery plans are not legally binding" in any fashion, the Court concluded that a recovery plan is not a "final agency action" that is immediately reviewable under the APA. Regardless of the validity of that conclusion, it does not control whether recovery plans satisfy the far broader definition of a "rule" subject to the public's petition rights under the APA § 553(e). 5 U.S.C. § 553(e); *id*. § 551(4).

statement is intended 'to allow agencies to announce their tentative intentions for the future . . . without binding themselves.'"). And again, the definition of "policy" encompasses nonbinding documents like a "plan." *The Concise Oxford Dictionary of Current English* (7th ed.).

Nor does the APA's use of "prescribe" in the definition of "rule" mean that agency statements must invariably have mandatory outcomes. The definition of "prescribe" means to establish "authoritatively," but does not require establishing inflexible legal obligations. ER_25 (citing *Black's Law Dictionary* (11th ed. 2019)). Instead, the definition specifically provides that a "guideline" can be prescribed. *Id.*; *see Wilderness Soc'y v. U.S. Fish and Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (explaining that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").

Indeed, the district court's interpretation of "rule" under the APA – namely, that the agency statement must be strictly binding, as with a law – has the impermissible effect of removing "policy" from the APA's definition of "rule." That reading is contrary to basic principles of statutory construction and must be rejected. *See Young v. UPS*, 575 U.S. 206, 226 (2015) ("We have long held that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause is rendered superfluous, void, or insignificant.") (internal quotation marks omitted).

36

The district court's approach also misapprehends the import of the APA's various categories of rules, which include "substantive rules" (sometimes also called legislative rules), "interpretative rules," and "statements of policy." 5 U.S.C. § 553(b)(3)(A), (d). Only substantive rules are subject to the APA's notice and comment rulemaking requirement. 5 U.S.C. § 553(b), (c). As such, the issue in many APA cases is whether an agency statement qualifies as a substantive rule; to qualify, the rule must establish a "binding norm." *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010). However, whether an agency statement imposes binding legal obligations does not control whether it can be the subject of a petition filed under APA § 553(e), which covers *any* statement that qualifies as a "rule," not just substantive rules. 5 U.S.C. § 553(e).[9]

Consequently, a nonbinding policy statement can qualify as a "rule" under APA § 551(4). *See, e.g.*, *Animal Legal Def. Fund*, 469 F.3d at 830, 838-40 (holding that "Draft Policy on Environment Enhancement for Nonhuman Primates" would be a "rule" if finalized); *Rocky Mt. Wild v. Walsh*, 216 F. Supp.

---

[9] The ESA imposes the notice and comment requirement for recovery plans. 16 U.S.C. § 1533(f)(4). If recovery plans are substantive rules, then that formal process would also be required under the APA. 5 U.S.C. § 553(b), (c). Here, in the context of the right to petition for a rule under APA § 553(e), it only matters that a recovery plan qualifies as a "rule" under APA § 551(4) and does not matter within which category of rule a recovery plan falls. That said, because formal Service recovery plans most obviously qualify, at bare minimum, as "statements of policy," the plain language of the APA authorizes the Center to petition for the issuance or amendment of a recovery plan. 5 U.S.C. § 553(b), (c).

3d 1234, 1245 (D. Colo. 2016) (holding that a policy drafted by the Service – to guide its decisions about the effectiveness of voluntary conservation efforts that could preclude the need for listing under the ESA – was a "rule"). And this Court has referred to statements of policy as "rules." *See, e.g.*, *Animal Legal Def. Fund*, 469 F.3d at 838 ("There are essentially three kinds of agency rules: legislative rules, interpretive rules, and *policy statements*.") (emphasis added); *Gunderson v. Hood*, 268 F.3d 1149, 1153-54 (9th Cir. 2001) ("The APA requires that rules promulgated by administrative agencies undergo certain procedures unless those rules are 'interpretative rules, *general statements of policy*, or rules of agency organization, procedure, or practice.'") (emphasis added).

Additionally, while no court has addressed whether recovery plans, in particular, qualify as rules under section 551(4) of the APA, many courts have held that similar formal planning documents qualify. For example, in *Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095 (D. Ariz. 2009), environmental groups challenged the Service's adoption of two formal documents that govern the management of reintroduced Mexican wolves, like a recovery plan does. The court held that these planning documents fall within the APA's definition of "rule." *Id.* at 1114-15; *see also Idaho Cnty. v. Evans*, No. CV02-80-C-EJL, 2003 U.S. Dist. LEXIS 23459, at *20-21 (D. Idaho Sep. 30, 2003) (holding that an amendment to the "Pacific Salmon Fishery Management Plan" that identifies habitat for Pacific salmon

38

qualifies as a "rule"). Just like the management plans at issue in these cases, a formal recovery plan qualifies as a rule.

The district court found import in the ESA's reference to citizen petitions in a subsection of the ESA dealing with listings and critical habitat, 16 U.S.C. § 1533(b), but not in the subsection dealing with recovery plans, *id*. § 1533(f). ER_26. But the ESA does not state that its provisions displace rights otherwise provided under the APA, and any implied repeal of the general right to petition for rulemaking under the APA is foreclosed by Supreme Court precedent. *See Bennett*, 520 U.S. at 175 ("No one contends (and it would not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen-suit provision are exclusive, supplanting those provided by the APA."). While Congress plainly intended to supply firm *deadlines* for the Service's response to listing and critical habitat petitions, 16 U.S.C. § 1533(b), nothing in the ESA evinces an intent to foreclose affected citizens from invoking their rights to submit otherwise valid APA petitions.

Further, while the APA excludes certain kinds of rules – specifically, nonbinding statements of policy and interpretive rules – from notice and comment rulemaking procedures, 5 U.S.C. § 553(b)(3)(A), it does not exclude *any* rules from the right to petition, *id*. § 553(e). That distinction cannot be ignored by the Court. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015)

39

(invoking the statutory construction axiom that "Congress acts intentionally when it omits language included elsewhere"). Any agency statement that qualifies as a rule – whether binding or not – can be the subject of a petition. 5 U.S.C. § 553(e).

In summary, recovery plans are the Service's authoritative statement on what is needed to conserve rare wildlife. Therefore, they prescribe policy and qualify as rules on that basis as well.[10]

### D. The APA's Policy Of Promoting Public Involvement And The ESA's Policy of Species Conservation Would Both Be Furthered By Holding That Citizens Can Petition For Recovery Plans

In addition to being fully consistent with plain statutory language of the APA and ESA, it would also be wholly consonant with the policies underlying both statutes to interpret "rule" as encompassing formal recovery plans.

---

[10] The district court did not address whether recovery plans have "future effect," as the APA's definition of "rule" requires. 5 U.S.C. § 551(4). As explained, recovery plans have "future effect" because the Service and other agencies in fact do routinely consider and implement recovery plans when carrying out their duties under the ESA. The district court also did not address whether a recovery plan is "the whole or a part of an agency statement of general or particular applicability." *Id.* A recovery plan is an agency statement because the Service – a federal agency – publishes recovery plans pursuant to the ESA's requirement to do so. 16 U.S.C. § 1533(f). Recovery plans have "general or particular applicability" because they are applicable to the Service, state and federal agencies, and other partners who collaborate "in developing and implementing recovery plans." *See* 16 U.S.C. § 1533(f)(2). Courts rarely find it necessary to address these largely self-evident aspects of the "rule" definition. *See, e.g.*, *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) ("[T]he EPA Letter is certainly a statement of general or particular applicability – what isn't? . . .").

The APA serves to generate public involvement in agency decisionmaking by, for example, providing for notice-and-comment rulemaking procedures, 5 U.S.C. § 553(b)-(c), authorizing petitions for rules, 5 U.S.C. § 553(e), and enabling challenges to final agency actions, 5 U.S.C. § 706; *see* Tom C. Clark, U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act, 13 (1947), *available at* https://fall.fsulawrc.com/admin/1947i.html (explaining that one of the "basic purposes" of the APA is to "provide for public participation in the rule making process"). The effectiveness of such public involvement is stymied by the district court's narrow construction of the definition of "rule" to exclude agency statements, like recovery plans, that are the result of formal notice-and-comment processes and address issues of the utmost importance for organizations like the Center as well as other members of the public with compelling interests in species conservation.

The complete exclusion of recovery plans from the general right to petition under the APA is particularly harmful given the central role that Congress gave to recovery plans in furthering the ESA's goal of conserving endangered species. 16 U.S.C. § 1533(f). Indeed, Congress has found that species such as the grizzly bear "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3); *see Tenn. Valley Auth.*, 437 U.S. at 174 (explaining that "Congress intended endangered species to be

41

afforded 'the highest of priorities'"). Where, as here, interested and informed members of the public have asked the Service to update and strengthen a recovery plan, no valid reason exists to foreclose their ability to do so under the mechanism afforded in the APA. To the contrary, recognizing such a right can only serve to further the ESA's policy of conserving our nation's increasingly imperiled wildlife.

## II. THE COURT SHOULD REMAND TO THE DISTRICT COURT, WHICH HAS JURISDICTION TO REVIEW THE SERVICE'S DENIAL OF THE CENTER'S PETITION

In wrongly holding that a recovery plan cannot qualify as a rule, the district court reached the erroneous conclusion that the Center's Petition was not valid under the APA. ER_21. The court found that the Service had no legal obligation even to respond to the Petition, which the district court characterized as merely a "solicitation letter," and the Service's denial of the Petition was thus not final agency action. *Id.* The district court declined to reach the merits of the Service's denial on the grounds that the court lacked subject matter jurisdiction in the absence of reviewable, final agency action. ER_27.

Because a recovery plan qualifies as a rule, the Center rightfully utilized section 553(e) of the APA to petition the Service to amend the grizzly bear's 1993 Recovery Plan. 5 U.S.C. § 553(e). And this Court has held that denial of a petition is final agency action reviewed under section 706(2)(A) of the APA. *See O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th

Cir. 1996) (reviewing agency's denial of petition brought under section 553(e) of the APA as "final agency action" pursuant to section 706(2)(A)). As the district court acknowledged, "if the petition is valid [] the Service's denial constitute[s] a final agency action which, in turn, vests this Court with subject matter jurisdiction over the merits." ER_21. Indeed, in the proceedings below, none of the parties disputed that the Service's denial of the Center's Petition was final agency action. ER_19.

To summarize, the district court's underlying rationale for concluding that it lacks subject matter jurisdiction – that the Center had no right to submit a rulemaking petition – is erroneous. Thus, this Court should reverse and remand for the district court to address in the first instance the merits of the Service's denial of the Petition.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Center respectfully requests that this Court reverse and remand to the district court for further proceedings.

<u>/s/ Collette Adkins</u>
Collette Adkins

*Attorney for Plaintiff-Appellant*

43

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to 9th Cir. R. 28-2.6, the Center states that no related cases are

pending.

/s/ Collette Adkins
Collette Adkins

*Attorney for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7) and 9th Cir. R. 32-1, the undersigned counsel certifies that this brief complies with the type-volume and typeface requirements of this Court. Specifically:

1. Exclusive of the portions exempted by the Fed. R. App. P. 32(a)(7)(B)(i), this brief contains 10,286 words.

2. This brief is printed in proportionally spaced, serif typeface using Times New Roman 14-point font in text produced by Microsoft Office 365 software.

<u>/s/ Collette Adkins</u>
Collette Adkins

*Attorney for Plaintiff-Appellant*

45

## **ADDENDUM**

## **TABLE OF CONTENTS**

**Administrative Procedure Act ("APA")**

    5 U.S.C. § 551(4) ............................................................................ A2

    5 U.S.C. § 553 .............................................................................. A3

    5 U.S.C. § 706 .............................................................................. A6


**Endangered Species Act ("ESP")**

    16 U.S.C. § 1533 .......................................................................... A8

## Administrative Procedure Act

**5 U.S.C. § 551 – Definitions**

**5 U.S.C. § 551(4)**

"rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

## 5 U.S.C. § 553 – Rule making

**(a)**    This section applies, according to the provisions thereof, except to the extent that there is involved—

>    **(1)**    a military or foreign affairs function of the United States; or

>    **(2)**    a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

**(b)**    General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

>    **(1)**    a statement of the time, place, and nature of public rule making proceedings;

>    **(2)**    reference to the legal authority under which the rule is proposed; and

>    **(3)**    either the terms or substance of the proposed rule or a description of the subjects and issues involved.

>    Except when notice or hearing is required by statute, this subsection does not apply—

>    >    **(A)**    to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

A3

**(B)**    when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

**(c)**    After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**(d)**    The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

    **(1)**    a substantive rule which grants or recognizes an exemption or relieves a restriction;

    **(2)**    interpretative rules and statements of policy; or

    **(3)**    as otherwise provided by the agency for good cause found and published with the rule.

A4

**(e)** Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## 5 U.S.C. § 706 – Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)**    compel agency action unlawfully withheld or unreasonably delayed; and

**(2)**    hold unlawful and set aside agency action, findings, and conclusions found to be—

    **(A)**    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)**    contrary to constitutional right, power, privilege, or immunity;

    **(C)**    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)**    without observance of procedure required by law;

    **(E)**    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)**    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 16 U.S.C. § 1533 – Determination of endangered species and threatened species

**(a)  GENERALLY**

**(1)**  The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

**(A)**  the present or threatened destruction, modification, or curtailment of its habitat or range;

**(B)**  overutilization for commercial, recreational, scientific, or educational purposes;

**(C)**  disease or predation;

**(D)**  the inadequacy of existing regulatory mechanisms; or

**(E)**  other natural or manmade factors affecting its continued existence.

**(2)**  With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

**(A)**  in any case in which the Secretary of Commerce determines that such species should—

**(i)**  be listed as an endangered species or a threatened species, or

**(ii)** be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior; who shall list such species in accordance with this section;

**(B)** in any case in which the Secretary of Commerce determines that such species should—

**(i)** be removed from any list published pursuant to subsection (c) of this section, or

**(ii)** be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

**(C)** the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

**(3)**

**(A)** The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and

determinable—

> **(i)** shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

> **(ii)** may, from time-to-time thereafter as appropriate, revise such designation.

**(B)**

> **(i)** The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

> **(ii)** Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

> **(iii)** Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this

A10

title, including the prohibition preventing extinction and taking of endangered species and threatened species.

**(b)** **BASIS FOR DETERMINATIONS**

**(1)**

**(A)** The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

**(B)** In carrying out this section, the Secretary shall give consideration to species which have been—

**(i)** designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

**(ii)** identified as in danger of extinction, or likely to become

so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

**(2)** The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

**(3)**

    **(A)** To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If

A12

such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

**(B)**    Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

> **(i)**    The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.
>
> **(ii)**    The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).
>
> **(iii)**    The petitioned action is warranted, but that—
>
>> **(I)**    the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by

A13

pending proposals to determine whether any species is an

endangered species or a threatened species, and

**(II)**    expeditious progress is being made to add

qualified species to either of the lists published under

subsection (c) and to remove from such lists species for

which the protections of this chapter are no longer

necessary,

in which case the Secretary shall promptly publish such

finding in the Federal Register, together with a

description and evaluation of the reasons and data on

which the finding is based.

**(C)**

**(i)**    A petition with respect to which a finding is made under

subparagraph (B)(iii) shall be treated as a petition that is

resubmitted to the Secretary under subparagraph (A) on the date

of such finding and that presents substantial scientific or

commercial information that the petitioned action may be

warranted.

**(ii)**    Any negative finding described in subparagraph (A) and

any finding described in subparagraph (B)(i) or (iii) shall be

A14

subject to judicial review.

**(iii)**    The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7 [1] to prevent a significant risk to the well being of any such species.

**(D)**

**(i)**    To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

**(ii)**    Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

**(4)**    Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

**(5)**    With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3), the Secretary shall—

    **(A)**    not less than 90 days before the effective date of the regulation—

        **(i)**    publish a general notice and the complete text of the proposed regulation in the Federal Register, and

        **(ii)**    give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county, or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

    **(B)**    insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in

A16

which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

**(C)**  give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

**(D)**  publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

**(E)**  promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

**(6)**

**(A)**  Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register—

**(i)**  if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either—

**(I)**  a final regulation to implement such determination,

A17

**(II)**   a final regulation to implement such revision or a finding that such revision should not be made,

**(III)**   notice that such one-year period is being extended under subparagraph (B)(i), or

**(IV)**   notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

**(ii)**   subject to subparagraph (C), if a designation of critical habitat is involved, either—

**(I)**   a final regulation to implement such designation, or

**(II)**   notice that such one-year period is being extended under such subparagraph.

**(B)**   Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register—

**(i)**   If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is

A18

substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

**(ii)**    If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

**(iii)**    If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to

A19

implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

**(C)** A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that—

**(i)** it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

**(ii)** critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

A20

**(7)** Neither paragraph (4), (5), or (6) of this subsection nor section 553 of title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if—

**(A)** at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

**(B)** in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of

A21

the best appropriate data available to him, that substantial

evidence does not exist to warrant such regulation, he shall

withdraw it.

**(8)**     The publication in the Federal Register of any proposed or final

regulation which is necessary or appropriate to carry out the purposes of this

chapter shall include a summary by the Secretary of the data on which such

regulation is based and shall show the relationship of such data to such

regulation; and if such regulation designates or revises critical habitat, such

summary shall, to the maximum extent practicable, also include a brief

description and evaluation of those activities (whether public or private)

which, in the opinion of the Secretary, if undertaken may adversely modify

such habitat, or may be affected by such designation.


**(c)**     **LISTS**

**(1)**     The Secretary of the Interior shall publish in the Federal Register a list

of all species determined by him or the Secretary of Commerce to be

endangered species and a list of all species determined by him or the

Secretary of Commerce to be threatened species. Each list shall refer to the

species contained therein by scientific and common name or names, if any,

specify with respect to each such species over what portion of its range it is

endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b). **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;

**(2)** The Secretary shall—

    **(A)** conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

    **(B)** determine on the basis of such review whether any such species should—

        **(i)** be removed from such list;

        **(ii)** be changed in status from an endangered species to a threatened species; or

        **(iii)** be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b).

**(d)    PROTECTIVE REGULATIONS**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e)    SIMILARITY OF APPEARANCE CASES**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that—

**(A)**    such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

**(B)**    the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

**(C)**    such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f)    RECOVERY PLANS**

**(1)**    The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

**(A)**    give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

**(B)**    incorporate in each plan—

**(i)** a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

**(ii)** objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

**(iii)** estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

**(2)** The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

**(3)** The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

**(4)** The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

**(5)** Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g)** **MONITORING**

**(1)** The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c).

**(2)** The Secretary shall make prompt use of the authority under paragraph 7 [2] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h)    AGENCY GUIDELINES; PUBLICATION IN FEDERAL REGISTER; SCOPE; PROPOSALS AND AMENDMENTS: NOTICE AND OPPORTUNITY FOR COMMENTS**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to—

**(1)**    procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

**(2)**    criteria for making the findings required under such subsection with respect to petitions;

**(3)**    a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

**(4)**    a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**(i)     SUBMISSION TO STATE AGENCY OF JUSTIFICATION FOR**

**REGULATIONS INCONSISTENT WITH STATE AGENCY'S**

**COMMENTS OR PETITION**

If, in the case of any regulation proposed by the Secretary under the authority of

this section, a State agency to which notice thereof was given in accordance with

subsection (b)(5)(A)(ii) files comments disagreeing with all or part of the proposed

regulation, and the Secretary issues a final regulation which is in conflict with such

comments, or if the Secretary fails to adopt a regulation pursuant to an action

petitioned by a State agency under subsection (b)(3), the Secretary shall submit to

the State agency a written justification for his failure to adopt regulations

consistent with the agency's comments or petition.

## <u>CERTIFICATE OF SERVICE</u>

I, Collette L. Adkins, certify that today, August 23, 2021, I electronically filed the foregoing Brief of Plaintiff-Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

<u>/s/ Collette Adkins</u>
Collette Adkins

*Attorney for Plaintiff-Appellant*

A30