No. 21-35121

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY**;
*Plaintiff-Appellant*,

v.

**DEB HAALAND,** in her official capacity as Secretary of the United States Department of the Interior;[1] **MARTHA WILLIAMS**, in her official capacity as Principal Deputy Director of
U.S. Fish and Wildlife Service**;**
*Defendants-Appellees*,

and

**STATE OF WYOMING** et al.;
*Intervenor Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
NO. 9:19-cv-00109-DLC
THE HONORABLE JUDGE DANA L. CHRISTENSEN, PRESIDING

**EXCERPTS OF RECORD – VOLUME 1 OF 1**

Collette Adkins
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: (651) 955-3821
cadkins@biologicaldiversity.org

Eric Robert Glitzenstein
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Telephone: (202) 849-8401
eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiff-Appellant*

---

[1] Former Acting Secretary Scott de la Vega automatically substituted with Secretary Haaland, his successor in office, under Fed. R. App. P. 43(a).

**INDEX**

| DOCUMENT | DATE FILED | LOCATION IN DISTRICT COURT RECORD | ER PAGE |
|---|---|---|---|
| Clerk's Judgment | 12/23/2020 | ECF 90 | ER_4-5 |
| Order | 12/23/2020 | ECF 89 | ER_6-32 |
| Denial Letter | 12/18/2019 | AR00008<br>AR00009 | ER_33<br>ER_34 |
| Petition | 12/18/2019 | AR00011<br>AR00022<br>AR00033 | ER_35<br>ER_36<br>ER_37 |
| 2018 Supplement (Habitat-Based Recovery Criteria for Northern Continental Divide Ecosystem) | 12/18/2019 | AR00047<br>AR00048 | ER_38<br>ER_39 |
| 2017 Supplement (Revised Demographic Recovery Criteria for Yellowstone Ecosystem) | 12/18/2019 | AR00100<br>AR00101<br>AR00102-03<br>AR00105-06 | ER_40<br>ER_41<br>ER_42-43<br>ER_44-45 |
| 2007 Supplement (Revised Demographic Recovery Criteria for Yellowstone Ecosystem) | 12/18/2019 | AR00130 | ER_46 |
| 2007 Supplement (Habitat-Based Recovery Criteria for Yellowstone Ecosystem) | 12/18/2019 | AR00165<br>AR00166 | ER_47<br>ER_48 |
| 1997 Supplement (North Cascades Ecosystem Recovery Plan Chapter) | 12/18/2019 | AR00217 | ER_49 |
| 1996 Supplement (Bitterroot Ecosystem Recovery Plan Chapter) | 12/18/2019 | AR00281 | ER_50 |
| 1993 Recovery Plan | 12/18/2019 | AR00310<br>AR00312-13<br>AR00315<br>AR00329<br>AR00331<br>AR00353 | ER_51<br>ER_52-53<br>ER_54<br>ER_55<br>ER_56<br>ER_57 |

| | | AR00362 | ER_58 |
|---|---|---|---|
| | | AR00433 | ER_59 |
| | | AR00445-48 | ER_60-63 |
| | | AR00473 | ER_64 |
| 2018 Annual Report | 12/18/2019 | AR00716 | ER_65 |
| | | AR00717-27 | ER_66-76 |
| 2011 5-Year Review | 12/18/2019 | AR05277-78 | ER_77-78 |
| | | AR05291 | ER_79 |
| | | AR05368 | ER_80 |
| | | AR05370 | ER_81 |
| Complaint | 06/27/2019 | ECF 1 | ER_82-106 |
| Plaintiffs' Notice of Appeal | 02/11/2021 | ECF 91 | ER_107-109 |
| U.S. District Court for District of Montana Civil Docket for Case #: 9:19-cv-00109-DLC | | | ER_110-119 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | CV 19–109–M–DLC |
| Plaintiff, | |
| vs. | JUDGMENT |
| DAVID BERNHARDT, Secretary of the U.S. Department of the Interior; and MARGARET EVERSON, Principal Deputy Director of U.S. Fish and Wildlife Service, | |
| Defendants, | |
| STATE OF WYOMING, STATE OF IDAHO, WYOMING STOCK GROWERS' ASSOCIATION, WYOMING FARM BUREAU FEDERATION, UTAH FARM BUREAU FEDERATION, | |
| Defendant-Intervenors. | |

**Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**X Decision by Court.** This action came before the Court for bench trial, hearing, or determination on the record. A decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of Defendants and Defendant-Intervenors and against Plaintiff in accordance with the Order issued on today's date.

Dated this 23rd day of December, 2020.

TYLER P. GILMAN, CLERK 

By: /s/ A.S. Goodwin
A.S. Goodwin, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | CV 19–109–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| DAVID BERNHARDT, Secretary of the U.S. Department of the Interior; and MARGARET EVERSON, Principal Deputy Director of U.S. Fish and Wildlife Service, | |
| Defendants, | |
| STATE OF WYOMING, STATE OF IDAHO, WYOMING STOCK GROWERS' ASSOCIATION, WYOMING FARM BUREAU FEDERATION, UTAH FARM BUREAU FEDERATION, | |
| Defendant-Intervenors. | |

Before the Court is Plaintiff Center for Biological Diversity's Motion for
Summary Judgment (Doc. 54); Defendant-Intervenor State of Wyoming's Cross-
Motion for Summary Judgment (Doc. 59); Defendant-Intervenor State of Idaho's
Cross-Motion for Summary Judgment (Doc. 62); Defendant David Bernhardt and
Margaret Everson's Cross-Motion for Summary Judgment (Doc. 65); and

Defendant-Intervenor Wyoming Stock Growers' Association, Wyoming Farm

Bureau Federation, and Utah Farm Bureau Federation's (together "Agricultural

Associations") Cross-Motion for Summary Judgment (Doc. 69).  For the reasons

explained, the Center's motion is denied.  All remaining motions are granted.

## BACKGROUND

In 1975, the U.S. Fish and Wildlife Service ("the Service") listed the grizzly

bear as a threatened species in the lower 48 states.  40 Fed. Reg. 31,734 (July 28,

1975).  Although the grizzly bear once ranged throughout most of the west, with a

population estimated to be over 50,000, western settlement and eradication

programs proved largely fatal to the bear, and by 1930 grizzly bears were

estimated to occupy no more than two percent of its once vast historical range.  AR

5291.  At the time of listing, less than 1,000 grizzly bears remained.  AR 329.

Pursuant to the ESA, the Service issued its first grizzly bear recovery plan in

1982, and then revised this plan in 1993.  AR 310.  The revised 1993 plan

identified four recovery zones (in the Yellowstone, Northern Continental Divide,

Cabinet-Yaak, and Selkirk areas) and three evaluation areas (in the Bitterroot,

North Cascades, and San Juan Mountains).  AR 315.  Over the coming years, the

Service prepared three geographically specific supplements that cumulatively

resulted in the designation of six recovery zones (in addition to the original four, it

added the North Cascades and the Bitterroot).  AR 716.  The recovery plan's goal

is to achieve recovery by establishing a stable population of grizzly bears in each recovery zone.  AR 312, 335.

In 2011, the Service issued its five-year status review and observed that "other areas throughout the historic [sic] range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery," including areas in "Colorado, New Mexico, Arizona, Utah, Colorado, Nevada, Oregon and southern Washington."  AR 5370.  Additionally, the Service noted that aside from the geographically updated supplements, "the recovery plan and associated recovery criteria have not been updated since the plan was released in 1993" and "no longer reflect[] the best available and most up-to-date information on the biology of the species and its habitat."  AR 5277–78.  The Service indicated its intent to tackle this work in the future.  *Id.*

In June of 2014, Plaintiff Center for Biological Diversity ("the Center") submitted a letter requesting that the Service update its recovery plan for the grizzly bear to address "significant remaining areas of suitable habitat" across the grizzly bear's historical range, including the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, the Uinta Mountains in Utah among others.  AR 16.  The letter also requested the Service address the current scientific information related to bear recovery, such as new research on road density and new techniques to reconnect recovery areas.  AR

33.  As authority for its requests, the Center claimed its letter was a rulemaking petition as permitted under the Administrative Procedure Act.  AR 11.

On September 22, 2014, the Service sent a response letter denying the Center's request and asserting that its letter was not a valid rulemaking petition because "recovery plans are not rules under the APA."  AR 8.  It also indicated that it had "prioritized" recovery where bear populations were thought to be present at the time of listing.  AR 9.  The Service indicated that "any additional recovery planning is subject to Service prioritization and is discretionary."  *Id.*

Between 2017 and 2018, the Service subsequently updated its recovery criteria for the Yellowstone Ecosystem and the Northern Continental Divide Ecosystem but did not tackle the remaining four recovery zones.   AR 47, 100.

Subsequently, in 2019, the Service evaluated whether the San Juan Mountains or other areas within the grizzly bear's historical range are appropriate for reintroduction.  AR 872–89.

On June 27, 2019, the Center filed suit claiming, inter alia, that the Service's 2014 denial of its petition was arbitrary and capricious.  (Doc. 1.)

## LEGAL STANDARDS

### I.    Endangered Species Act

Congress enacted the Endangered Species Act ("ESA") to conserve and protect threatened and endangered species.  16 U.S.C § 1531(b).  "Congress

intended endangered species to be afforded the highest of priorities," and its "plain intent . . . in enacting [the] statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 174 (1978). To that end, the ESA requires the Secretary of the Interior to identify endangered and threatened species and define their critical habitat. 16 U.S.C. §§ 1533, 1536.

Once a species is listed, § 4(f) of the ESA instructs the Secretary to "develop and implement" a recovery plan "for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species[.]" 16 U.S.C. § 1533(f). While each agency retains broad discretion in designing the particulars of its recovery plan, each plan must contain the following three components:

> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and
> (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1)(B).

The ESA's citizen suit provision provides the primary mechanism for enforcing the ESA. *See* 16 U.S.C. § 1540(g)(1)(C); *Bennett v. Spear*, 520 U.S.

154, 165 (1997).  This provision authorizes "any person [with standing to]

commence a civil suit . . . against the Secretary where there is alleged a failure of

the Secretary to perform any act or duty under section 1533 of this title which is

not discretionary with the Secretary."  *Id.*

## II.   Summary Judgment

When a district court reviews an agency decision, summary judgment is the

"appropriate mechanism for deciding the legal question of whether the agency

could reasonably have found the facts as it did."  *City & Cty. of San Francisco v.*

*United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v.*

*INS*, 753 F.2d 766, 770 (9th Cir. 1985)).  Generally summary judgment is

appropriate when "there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In an APA case, however, the summary judgment standard is modified by

the APA.  A court may not overturn an agency's decision unless it is arbitrary and

capricious.  *City & Cty. of San Francisco*, 130 F.3d at 877.

Under this standard:

> [A]n agency must examine the relevant data and articulate a satisfactory
> explanation for its action.  An agency's action is arbitrary and
> capricious if the agency fails to consider an important aspect of a
> problem, if the agency offers an explanation for the decision that is
> contrary to the evidence, if the agency's decision is so implausible that
> it could not be ascribed to a difference in view or be the product of
> agency expertise, or if the agency's decision is contrary to the
> governing law.

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 974 (9th Cir. 2014)

(internal citation and quotation marks omitted).

**DISCUSSION**

## I.  Mootness

The Center's 2014 letter, submitted as a rulemaking petition, made two requests of the Service.  *See* AR 16.  It requested the Service update its recovery plan to evaluate the potential for grizzly bear reintroduction in additional suitable habitat within its historical range.  *Id.*  It also requested it update the plan to reflect the best available and most current science on the subject.  *Id.*  Although the Service denied those requests in its response letter citing limited resources as a constraint, the Service then apparently completed some, if not all, of the work the Center had requested.  (Doc. 66-1 at 5.)  The Service updated the recovery plan twice in that time with supplements addressing recovery criteria.  AR 47, 100.  It also evaluated whether the San Juan Mountains or Sierra Nevada Mountains were appropriate for reintroduction.  (Doc. 66-1 at 5.)

When the Service filed its cross-motion for summary judgment, it included an affidavit prepared by Dr. Jennifer Fortin-Noreus, a wildlife biologist and member of the Interagency Grizzly Bear Study Team for the Greater Yellowstone Ecosystem.  (*Id.* at 1.)  Dr. Fortin-Noreus explains the work she and her team conducted in 2019 in preparation for issuing a new draft proposed rule.  (*Id.* at 6.)

Their team evaluated the potential for habitat throughout the grizzly bear's historical range, focusing their efforts on the San Juan Mountains and the Sierra Nevada Mountain Range, as these areas proved most promising. (*Id.* at 5, 7.) Dr. Fortin-Noreus concluded that reintroduction was not likely to be successful, however, as these two areas contained less secure core habitat than the current six recovery zones and both were unlikely to achieve a self-sustaining population. (*Id.* at 8–11.)

This affidavit, coupled with the 2017 and 2018 updates to the recovery criteria, raise a mootness concern. The United States Constitution constricts the subject matter of Article III courts to justiciable "cases" and "controversies." U.S. Const., Art. III, § 2. A moot case does not present a case or controversy. *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1172 (9th Cir. 2009). A case becomes moot when "changes in the circumstances . . . forestall[] any occasion for meaningful relief." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc). The question here is whether any of the Service's work between 2017 and 2019 moots the Center's requested relief. Stated differently, the question is whether "it is impossible for [the Court] to grant any effectual relief" to the Center, when the Service appears to have analyzed additional areas throughout the grizzly bear's historical range and updated its recovery criteria. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

As an initial matter, the Center asserts that the Court may not review the Fortin-Noreus affidavit because it does not fall within one of the Ninth Circuit's recognized exceptions to the rule against admitting extra-record evidence in an APA case. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). As the Service notes, the Court is not limited to the record rule in determining whether it has jurisdiction over a case. (Doc. 76 at 9 n.1); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997).

When asked at oral argument whether the Fortin-Noreus affidavit rendered its lawsuit moot, the Center asserted that the only way to moot an improper denial of a petition is to have a new decision that supersedes that denial. This is inaccurate. The question of mootness hinges on whether there is any remaining available relief; it is not tethered to a single mechanism. When asked the same question, neither the Service nor the Defendant-Intervenors took the bait to argue that the Court lacks subject matter jurisdiction over this entire dispute.

Nevertheless, the Court has an independent duty to examine the basis for its jurisdiction even in the absence of the parties' arguments. *Aguirre v. S.S. Sohio Intrepid*, 801 F.2d 1185, 1189 (9th Cir. 1986). In fact, the Court must presume it is without jurisdiction unless and until it concludes otherwise. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

Although the Fortin-Noreus affidavit directly answers the Center's call to evaluate the potential for additional recovery areas, the Center also requested the Service update its recovery criteria as listed in the 1993 Recovery Plan with the best available science. AR 16. This request is consistent with the Service's recognition in its 5-year status review that such criteria had become outdated. AR 5368, 5277–78. Elsewhere, the Service specifically noted that the Cabinet/Yaak and Selkirk Chapters required a revision to their standards and protocols for population monitoring. Supplemental AR 8628. The Center concedes that in 2017 and 2018, the Service conducted most of this required work. (Doc. 55 at 45 n.6.) The Center maintains, however, that the Service never updated the criteria for the Cabinet-Yaak and Selkirk Chapters. (*Id.*)

The Service retains broad discretion in the development of its recovery plan, and there is no mandate that any recovery plan be based on the best available science. *Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d 940, 947–49 (D. Ariz. 2019) ("Although FWS might logically aim to incorporate the best available science where practicable, whether the agency does so or not is a separate inquiry from whether the agency has produced a recovery plan that satisfies Section 4(f)" because "Section 4(f) . . . does not include a 'best available science' mandate."). Given the Service's vast and unreviewable authority in this area, it is not clear that the Service's 2017 and 2018 updates necessarily fail to satisfy the Center's broad

request for inclusion of more up-to-date science, even without providing an update to each Chapter.  Nevertheless, as the Center did not update all of its recovery criteria, there remains a small window of relief available to the Court.

The same is true of Center's request to evaluate additional potential recovery areas.  Although the Service arguably complied with the Center's request when it addressed the potential for recovery in the San Juan and Sierra Nevada Mountains, it did not specifically address the potential for successful reintroduction throughout other areas of the grizzly bear's historical range including the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, and the Uinta Mountains in Utah.  AR 16.

In sum, although it appears the Service has largely satisfied the substantive requests of the Center's petition, there remains work that could be done, and the Court will not deny the Center's case on mootness.

## II.    Standing

The Service asserts that the Center lacks standing because it cannot prove that it has suffered an injury "fairly traceable" to the Service's conduct and it cannot show redressability.  (Doc. 66 at 17–18.)  To establish Article III standing,

> the plaintiff has the burden of establishing . . . : (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision.

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).  It does not appear the Service challenges the first requirement to standing.

As for the latter two, the Court sees no issue.  The Service argues that the Center's members' injury—that they have been denied the ability to observe grizzly bears throughout their historical range—cannot be traced to the Service because the Service did not remove the bears from those areas.  (*Id.* at 17.)  Be that as it may, it is no stretch of the imagination to say that the current plan's failure to designate additional areas once occupied by grizzly bears as recovery zones has prolonged and exacerbated their injury.

As for redressability, the Service asserts that even if the Court instructed it to evaluate additional areas, any additional evaluation would not necessarily lead to the reintroduction of grizzly bears in those areas, so the Center is unable to show that a "favorable decision is substantially likely to redress its . . . injury."  (Doc. 66 at 18.)  But here, the Center complains of a procedural injury so the standard for assessing redressability is lowered.  *Id.* at 1226.  A plaintiff need only show "that they have a procedural right that, if exercised, *could* protect their concrete interests."  *Id.* (citing *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis in original).  The Center has met this burden by alleging that, had the Service not summarily denied its petition, it *could* lead to the

reintroduction of grizzly bears throughout suitable areas of its historical range.
The Center has standing to pursue its claims.

## III.    The Center's Claims

After receiving a summary denial of its request for the Service to update the
recovery plan, the Center seeks this Court's review.  The problem is that recovery
plans themselves are largely unreviewable.  *Friends of the Wild Swan, Inc. v. Dir.
of United States Fish & Wildlife Serv.*, 745 F. App'x 718, 720 (9th Cir. 2018)
(unpublished).  The Ninth Circuit has determined that 5 U.S.C. § 704 precludes
judicial review of recovery plans as they are not actions "made reviewable by
statute" nor are they "final agency actions."  *Id.*  With these doors closed, the
Center cleverly asserts that even though recovery plans *themselves* are not final
agency actions, the Service's denial of its petition (as authorized under 5 U.S.C.
§ 553(e)—a petition in response to agency rulemaking) *is* a final agency action
which allows for judicial review.  (Doc. 55 at 17–19.)  Secondarily, the Center
asserts that its challenge to the Service's failure to update its 1993 Recovery Plan
is reviewable under the ESA's citizen suit provision.  (*Id.* at 38–39.)  Both
arguments ultimately fail.  Notwithstanding the merits of the Center's claim that
the Service is simply not doing enough to protect the grizzly bear, Congress has
authorized only limited avenues for judicial review of administrative action, none
of which are available in this case.  The Court will first address why the APA does

not authorize the Center's backdoor challenge to the 1993 Recovery Plan.  It will then address why the Center cannot invoke the ESA's citizen suit provision for the claims raised in this litigation.

### A. The APA does not authorize a challenge to a recovery plan as a rulemaking petition because recovery plans are not rules.

As an initial matter, Defendants do not directly dispute the Center's claim that the Service's denial of its petition is a "final agency action."  Instead, it argues that the APA does not authorize a rulemaking petition to a recovery plan because recovery plans are not "rules" within the APA's definition at 5 U.S.C. § 551(4). Alternatively, Idaho and the Service both argue that the Court may simply skip this question and deny the Center's claim on the merits, finding that the Service's denial of the petition was not arbitrary and capricious.  (Docs. 63 at 19; 66 at 46.) This alternative proposal begs the question: if review of the petition is not authorized under § 553(e) and § 704, under what authority is the Court able to reach the merits?  When asked at oral argument, the Service asserted that the Court could review the Center's petition under 5 U.S.C. § 706—which, in pertinent part, restricts a court from setting aside agency action unless it finds such action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law[.]"  5 U.S.C. § 706(2)(A).  However, § 706 merely determines the "scope of

review"—it is not an independent authorization for review.[1]

 The APA authorizes judicial review to persons "suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute[.]"  5 U.S.C. § 702.  Despite this broadly

encompassing language, not all agency action is reviewable.  *Lujan v. Nat'l

Wildlife Fed'n*, 497 U.S. 871, 882 (1990).  The APA constricts a federal court's

subject matter jurisdiction to only those agency actions that are specifically

authorized for judicial review by statute—such as the ESA's citizen suit

provision—or are "final agency actions."  5 U.S.C. § 704; *Lujan*, 497 U.S. at 882;

*Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990) ("finality is .

. . a jurisdictional requirement").  An agency action is final when it: "(1) 'mark[s]

the consummation of the agency's decisionmaking process' and (2) "[is] one by

which rights or obligations have been determined, or from which legal

---

[1] The Court supposes it *could* construe the Service's urging a merits decision as a concession that despite the Center's tenuous authority for bringing a petition, the Service's denial itself constitutes a "final agency action."  The Court will not adopt this interpretation, however.  If the Center can obtain judicial review over the Service's denial of its petition regardless of whether a recovery plan is a rule, it renders a large portion of the Service's briefing on the subject simply irrelevant.  The Court will not adopt an interpretation of a parties' argument that renders moot the central question of this litigation.  For this reason, the Court generously assumes that the Service opposes any contention that its denial constitutes a "final agency action" *if* a recovery plan is not a rule.

consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Contrary to Idaho and the Service's suggestion, the questions here are sequenced: the first question is whether a recovery plan constitutes a rule under § 551(4)—the answer to which determines whether the petition itself is valid. If there is no valid petition, the Center's so-called "petition" is simply a solicitation letter for which the Service had no legal obligation to respond (and correspondingly, its denial letter creates no rights or obligations and there is no final agency action). Only if the petition is valid does the Service's denial constitute a final agency action which, in turn, vests this Court with subject matter jurisdiction over the merits. Only then may the Court reach the second issue of whether the Service's denial was arbitrary and capricious. Because the Court answers the first question in the negative, it lacks jurisdiction to reach the second.

Turning to the first issue, the APA grants each "interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). A rule, in turn, is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551(4). The Center asserts that as a matter of statutory interpretation, a recovery plan fits squarely within the APA's broad

definition as a statement of "general or particular applicability and future effect designed to implement or prescribe law or policy[.]"  (Doc. 55 at 17–24.)

In response, Wyoming and the Agricultural Associations assert that recovery plans are not rules because they are not binding upon the agency.  (Docs. 59 at 20–21; 70 at 17–18.)  Idaho observes that the agency has vast discretion in developing its recovery plan and carrying out its recovery efforts, and recovery plans do not create rights or obligations in third parties.  (Doc. 63 at 9–11.)  While these observations are all true, the argument that a recovery plan is not a rule because it is nonbinding misses the mark for failing to address the statutory issue.  The nonbinding nature of a recovery plan, while certainly not irrelevant, is not a sufficient explanation for why a recovery plan is not a rule because it does not address which component of the APA's definition fails.  Although the belief that rules are mandatory likely accords with the word's ordinary meaning,[2] that is not the meaning which governs here.  *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").

---

[2] For example, Black's Law Dictionary defines a rule as "an established and authoritative standard or principle; a general norm mandating or guiding conduct or action in a given type of situation."  Rule, Black's Law Dictionary (11th ed. 2019).

The Service tackles the statutory question directly.  It asserts that a recovery plan is not a rule because it fails the component of the APA's definition which requires a rule to "implement or prescribe law or policy."  (Doc. 66 at 37–39.)

The first question then is whether a recovery plan implements law.  The Center argues that a recovery plan implements law because it enacts the ESA's mandate to incorporate particular standards into each recovery plan.  (Doc. 55 at 19–20.)  It is true that pursuant to § 4(f), each recovery plan must contain three components:

> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and
> (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1)(B).  However, the Center's argument—in sum, that a recovery plan is a rule because it implements the statutory requirements for a recovery plan—is circular and therefore unpersuasive.

The next question is whether a recovery plan implements policy.  The Center argues that the relevant policy is Congress's conservation policy as enacted by the ESA.  (Doc. 55 at 20.)  While there can be no doubt that recovery plans promote or further conservation, the Service hinges its argument on the word "implement,"

arguing that a recovery plan does not, on its own, "implement" anything.  It asserts that recovery plans are guidance documents "with no tangible effect on the species . . . *unless and until* implemented through subsequent agency actions."  (Doc. 66 at 37–38 (emphasis in original).)

Because the APA does not define "implement," the Court will rely on the word's ordinary meaning.  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").  The Center posits the following definition: to implement means "to give practical effect to and ensure actual fulfillment by concrete measures."  (Doc. 72 at 14 (citing Implement, https://www.merriam-webster.com/dictionary/implement).)  This definition accords with the Oxford English Dictionary's—to "put (a decision, plan, agreement, etc.) into effect."  Implement, Oxford English Dictionary, https://www.lexico.com/en/definition/implement.

Here, the Service has the better argument.  A recovery plan does not implement conservation policy because it does not, in and of itself, create change; it doesn't "put [itself] into effect."  This is not to diminish its importance as a vital tool of conservation.  It's simply a recognition that recovery planning is only a precursor to policy implementation.  The "implementation" occurs when the agency takes concrete action that complies with the plan's guidance.

The Center raises no specific argument as to why it believes a recovery plan "prescribes law or policy," nevertheless, the Service's analysis of the issue leaves little doubt that it does not.  As the APA provides no specific definition, the Service cites the following: to "prescribe" means "to dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)."  (Doc. 66 at 38 (citing Black's Law Dictionary (11th ed. 2019).)  On this point, Defendant-Intervenors' arguments carry the day.  A recovery plan cannot "prescribe" law or policy because it does not "authoritatively" establish or dictate the agency's action.  Nor does it always "direct" an agency's action—although it may.

What's important here is that recovery plans do not bind an agency into any single course of action.  *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 947.  By design, recovery plans are flexible documents that allow an agency to deviate from the plan as circumstances change.  *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1114 n.8 (9th Cir. 2015) ("The Endangered Species Act does not mandate compliance with recovery plans for endangered species."); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012) ("A plan is a statement of intention, not a contract.  If the plan is overtaken by events, then there is no need to change the plan; it may simply be irrelevant."); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 107–08 (D.D.C. 1995) *as amended by* 967 F. Supp. 6 (D.D.C. 1997) (recognizing that the Service is entitled to "flexibility as it

implements [a] recovery plan," because "[b]y the time an exhaustively

detailed recovery plan is completed and ready for publication, science or

circumstances could have changed and the plan might no longer be suitable").  A

recovery plan is merely a "road map," or a statement of intent, that may be

followed at times and disregarded at others.  *Fund for Animals*, 903 F. Supp. at

103.  For this reason, the Court concludes that although vital, the nonbinding and

discretionary nature of recovery plans means they do not "prescribe" law or policy

and therefore do not fit within the APA's definition of a rule.

This conclusion is bolstered by the fact that the ESA specifically allows

persons to petition "to add a species to, or to remove a species from" threatened or

endangered status.  16 U.S.C. § 1533(b)(3)(A).  Congress's specific inclusion of

the right to petition for listed status, and failure to include any specific petition

right when it comes to recovery plans in the same statute is unlikely to be arbitrary.

*Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019) ("We []

presume that Congress acts intentionally when it uses particular wording in one

part of a statute but omits it in another.").  This result is also consistent with the

Ninth Circuit's determination that recovery plans are not reviewable under statute

or as final agency action.  *Friends of the Wild Swan, Inc.*, 745 F. App'x at 720.  To

permit a plaintiff to circumvent this rule by simply bringing a rulemaking petition

prior to its lawsuit creates a backdoor challenge to the substance of every recovery plan and renders the APA's limited review virtually meaningless.

Having so concluded, the Court need not address the Service's remaining argument that § 553(e) does not authorize petitions for "general statement[s] of policy." (Doc. 66 at 39.) The Court lacks subject matter jurisdiction to review the merits.

### B. The Center cannot invoke the ESA's citizen suit provision for the agency's purported failure to update its recovery plan with a broader geographic analysis or updated science.

The Center next claims that the Service violated its duties under § 4(f) and § 7(a)(1) of the ESA by failing to update its 1993 Recovery Plan to address additional potential recovery areas across the grizzly bear's historical range and by failing to update its plan as the science on grizzly survival has changed. (Doc. 55 at 38.) As the basis for the Court's jurisdiction, the Center invokes the ESA's citizen suit provision, which allows an individual to bring suit "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). The Center asserts that § 4(f) imposes a nondiscretionary duty on the Service to "develop and implement" recovery plans for the "conservation and survival" of listed species, and that § 7(a)(1) imposes a

nondiscretionary duty to "carry out programs for the conservation of endangered species." (*Id.*)

In response, the Service argues that the Court lacks jurisdiction over the Center's § 4(f) claim, and the § 7(a)(1) claim fails as a matter of law and fact. (Doc. 66 at 20–36.)  The Court will start with the jurisdictional question which is dispositive.

The Service argues that § 4(f) imposes no mandatory duty to "revise a recovery plan, implement specific portions of a plan, or provide recovery throughout a species' historical range." (Doc. 66 at 19.)  The Court agrees.

As an initial matter, the Court notes that even the decision to develop a recovery plan in the first place is one that is left to the discretion of the Secretary. Under § 4(f), a recovery plan is not required when the Secretary "finds that such a plan will not promote the conservation of the species."  16 U.S.C. § 1533(f)(1).  If the Secretary elects to develop a recovery plan, the plain language of the statute requires the Secretary to include three specific plan components,[3] but only "to the maximum extent practicable[.]"  *Id.*  While the phrase "'to the maximum extent

---

[3] These are: (1) "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;" (2) "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list;" and (3) "estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal." 16 U.S.C. § 1533(f)(1)(B).

practicable' does not permit an agency unbridled discretion," *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 131 (D.D.C. 2001), it does significantly constrain a court's review, *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 948.  A court may review a recovery plan to the extent it is missing one of the required plan components (absent a showing that its inclusion was "impracticable"), *e.g.*, *Grand Canyon Tr. v. Norton*, No. 04-CV-636PHXFJM, 2006 WL 167560, at *5 (D. Ariz. Jan. 18, 2006), but it may not entertain disagreements with the agency concerning the substance of those components, *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 949.

Recognizing that any challenge to the substance of a recovery plan must be tethered to one of the three components listed at § 1533(f)(1)(B), the Center argues that § 4(f) creates a nondiscretionary duty for the Service to update its recovery plan to include a broader geographic recovery analysis as a "description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species."  (Doc. 55 at 46–47.)  The Court disagrees.  The Center does not argue that the 1993 Recovery Plan failed to include a "description of . . . site-specific management action."  Its argument here amounts to nothing more than a policy disagreement about the best way to promote grizzly bear conservation.  To the extent the Center believes that the 2011 5-year status review—which noted the need to update the recovery plan with newer science and

expand the scope of its recovery analysis—created nondiscretionary duties, the law clearly refutes this contention. The only nondiscretionary duties which are cognizable under § 4(f) arise from a failure to include a necessary requirement under 16 U.S.C. § 1533(f)(g)(1)(B)—they do not arise from subsequent policy statements issued by the agency. Nor does the Service's awareness that updated analysis would be beneficial void any part of the 1993 Recovery Plan. Because the Center has alleged no failure to act pursuant to a nondiscretionary duty, the Court lacks jurisdiction to hear this claim.

The Center next argues that the Court may review its claim concerning the best available science because it goes to the Service's duty to use "objective and measurable criteria[.]" (Doc. 55 at 45.) The Court disagrees. Section § 4(f), "unlike its statutory counterparts, does not include a 'best available science' mandate," *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 949. At most, this claim amounts to a mere disagreement over the ongoing validity of the objective and measurable criteria as listed in the 1993 Recovery Plan. Accordingly, the Court lacks jurisdiction over the Center's § 4(f) challenges.

The Center's § 7(a)(1) claim fairs no better. The Center argues that § 7(a)(1) imposes a mandatory conservation duty on the Service. Speaking to interagency cooperation, § 7(a)(1) requires "[a]ll other Federal agencies,"—by which the statute means all "non-Interior Department agencies," *Pyramid Lake Paiute Tribe*

*of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1417 n.15 (9th Cir. 1990)—to

consult with the Secretary and "utilize their authorities . . . by carrying out

programs for the conservation of endangered species and threatened species listed

pursuant to section 1533 of this title." 16 U.S.C. § 1536(a)(1). Although the Court

does not disagree that § 7(a)(1) imposes a mandatory conservation duty, that duty

plainly does not apply to the Fish and Wildlife Service which is an Interior

Department agency. The Center clarified at oral argument that their broad

conservation challenge was specifically tailored to § 7(a)(1) and they had not

alleged any other source for this duty. Accordingly, the Center does not allege any

duty—let alone a nondiscretionary one—which would allow it to bring a § 7(a)(1)

claim against the Service under the ESA's citizen suit provision.

Having concluded that the Court lacks jurisdiction to hear any claims raised,

IT IS ORDERED that the Center's Motion for Summary Judgment (Doc.

54) is DENIED.

IT IS FURTHER ORDERED that Defendant-Intervenor State of Wyoming's

Cross-Motion for Summary Judgment (Doc. 58) is GRANTED.

IT IS FURTHER ORDERED that Defendant-Intervenor State of Idaho's

Cross-Motion for Summary Judgment (Doc. 62) is GRANTED.

IT IS FURTHER ORDERED that the Service's Cross-Motion for Summary

Judgment (Doc. 65) is GRANTED.

IT IS FURTHER ORDERED that Defendant-Intervenor Agricultural

Association's Cross-Motion for Summary Judgment (Doc. 69) is GRANTED.

DATED this 23rd day of December, 2020.

Dana L. Christensen, District Judge
United States District Court



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
Mountain-Prairie Region

IN REPLY REFER TO
FWS/R6/ES

MAILING ADDRESS:
P.O. BOX 25486, DFC
Denver, Colorado 80225-0486

STREET LOCATION:
134 Union Boulevard
Lakewood, Colorado 80228-1807

SEP 2 2 2014

Noah Greenwald
Endangered Species Director
Center for Biological Diversity
P.O. Box 710
Tucson, Arizona 85702-0710

Dear Mr. Greenwald:

This responds to your June 18, 2014, petition to prepare a recovery plan for the grizzly bear (*Ursus arctos horribilis*) across its native range in the conterminous United States. For the reasons set forth below, we deny your petition.

Your request was submitted pursuant to section 1553(f) of the Endangered Species Act, 16 U.S.C., § 1531, *et seq.* (ESA), and section 553 of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* (APA). Section 1553(f) of the ESA authorizes petitions to add or remove a species from the list of Endangered and Threatened Wildlife and Plants and to amend existing critical habitat designations. The ESA does not authorize petitions for recovery plans. The APA authorizes citizens to petition for the issuance, amendment or repeal of a rule. 5 U.S.C. § 553(e).

Recovery plans are not rules under the APA. The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). In short, rules are regulatory actions with the effect of law. In contrast, recovery plans are discretionary guidance documents that are non-binding and non-enforceable. "A plan is a statement of intention, not a contract." *Friends of Blackwater, et al. v. Salazar, et al.*, 691 F.3d 428, 434 (DC Cir. 2012)). "Section 1533(f) makes it plain that recovery plans are for guidance purposes only." *Fund for Animals v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996). Because recovery plans are not rules under Section 551 of the APA, Section 553(e) does not provide the right to petition for the issuance of a recovery plan. Thus, neither the ESA nor the APA authorizes petitions to prepare or revise recovery plans.

Furthermore, we believe we have satisfied our statutory responsibilities for recovery planning and implementation for the grizzly bear. Section 1533(f)(1) of the ESA instructs us to develop and implement plans for the conservation and survival of threatened and endangered species. The ESA also specifies that we must give priority to species that are most likely to benefit from such plans.

000008

**ER_33**

To this end, we have prioritized grizzly bear recovery planning and implementation efforts to focus on the locations where grizzly bear populations were present or thought to be present in 1975 (when they were listed) and where habitat and environmental conditions existed for grizzly recovery. These areas centered on and around the remaining populations in portions of Wyoming, Montana, Idaho, and Washington.

The grizzly bear recovery plan was completed in 1981 and revised in 1993. Several supplements were prepared in 1996, 1997, 2007, and 2013. We remain committed to recovery in all six ecosystems identified and covered by individual chapters in the recovery plan (i.e., the Greater Yellowstone, Northern Continental Divide, North Cascade, Selkirk, Cabinet-Yaak, and Bitterroot Ecosystems). Thus, recovery actions are ongoing across these areas. Any additional recovery planning would require redirecting limited grizzly bear recovery dollars away from these ongoing recovery efforts with subsequent erosion of recovery success. If and when we revise the existing recovery plan, we will provide the public with notice and the opportunity for review and comment in accordance with 16 U.S.C. § 1533(f)(4). Having satisfied our statutory responsibilities for recovery planning and implementation, any additional recovery planning is subject to Service prioritization and is discretionary.

Given the above, we do not anticipate additional follow-up on your petition. If you have any questions, please feel free to contact me at the above address.

Sincerely,

Acting Regional Director

000009

2

June 18, 2014

The Honorable Sally Jewell                     The Honorable Dan Ashe
Secretary                                       Director
Department of the Interior                      U.S. Fish and Wildlife Service
1849 C Street, NW                               1849 C Street, NW
Washington, D.C.  20240                         Washington, D.C.  20240

**Re:** **Petition to the U.S. Department of Interior and U.S. Fish and Wildlife Service, for Development of a Recovery Plan for the Grizzly Bear (*Ursus arctos horribilis*) across its Native Range in the Conterminous United States.**

Dear Secretary Jewell and Director Ashe:

Pursuant to 16 U.S.C. § 1533(f) of the Endangered Species Act and section 5 U.S.C. § 553(e) of the Administrative Procedure Act, the Center for Biological Diversity ("Center") hereby petitions the U.S. Department of the Interior ("DOI"), by and through the U.S. Fish and Wildlife Service ("Service"), to meet its mandatory duty to develop a recovery plan for the grizzly bear, 16 U.S.C. § 1533(f) by revising and updating its 1993 recovery plan for the grizzly bear (*Ursus arctos horribilis*) for the populations that were identified at the time the species was listed, and by identifying all additional geographic areas where recovery strategies are needed, to ensure full recovery of the species across its native range in the United States.

Since the grizzly bear was listed as a threatened species under the Endangered Species Act (ESA) in 1975, the Service has pursued a fragmented approach to grizzly bear recovery that does not adhere to the law's intention that listed species be recovered in all significant portions of their range. Instead, the Service has developed recovery strategies for six populations occupying a relatively small portion of the grizzly bear's historic range, including the Greater Yellowstone Ecosystem (GYE), the Northern Continental Divide Ecosystem (NCDE), the Cabinet-Yaak Ecosystem (CYE), the Selkirk Ecosystem (SE), North Cascades Ecosystem (NCE) and Selway-Bitterroot Ecosystem (SBE), and has, for the most part, only enacted protections or carried out on-the-ground recovery efforts for the first four.

The Service has failed to develop recovery strategies for ecosystems that still contain substantial and sufficient suitable habitat, which is not only an abdication of the Service's responsibilities under the Endangered Species Act as a legal matter, but leaves grizzly bears endangered across significant portions of their range as a biological fact. Hence, we hereby petition the Service to finally meet the full scope of its obligations under section 4 of the ESA by revising its 1993 recovery plan to include all significant remaining areas of suitable habitat across the grizzly bear's native range in the western U.S., in addition to those populations that are already covered in the 1993 plan, including at least the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, the Uinta Mountains in Utah, and areas of southern Utah.

000011

13

Based on available studies, there are several areas that have a high likelihood of having sufficient suitable habitat to act as grizzly bear recovery areas, including the Mogollon Rim and Gila Wilderness complex, Sierra Nevada, Grand Canyon and Uinta Mountains (Table 2). All of these areas have more modeled suitable habitat than both the Cabinet-Yaak and Selkirk recovery zones and appear to contain habitat that is remote enough and productive enough to support a grizzly bear population. In addition, several of the areas have large blocks of suitable habitat nearby that with management of linkage areas could provide additional space for bears and further buttress populations. Those areas include portions of the Prescott National Forest south of the Grand Canyon, the Chiricahua and surrounding Sky Islands south of the Mogollon Rim and Gila Complex, and the Washington Cascades just south of the North Cascades.

**Table 2.** Potential grizzly bear recovery areas according to available studies.

| High Likelihood Recovery Areas | States | Habitat Area (sq mi) |
|---|---|---|
| Mogollon Rim and Gila Complex | AZ, NM | 14,488 |
| Sierra Nevada | CA | 7,747 |
| Grand Canyon | AZ | 6,180 |
| Uinta Mountains | UT | 6,067 |

In addition to the above potential core recovery areas, there are several areas of smaller blocks of habitat that considered together may have the potential to support grizzly bear populations, including the Klamath-Siskiyou, southern Rocky Mountains and the eastern Colorado Plateau on the Utah and Colorado border (Table 3). A revised recovery plan should further evaluate the recovery potential of all of these areas.

**Table 3.** Additional potential grizzly bear recovery areas pending further study.

| Additional Potential Recovery Areas | States | Habitat Area (sq mi) |
|---|---|---|
| Klamath-Siskiyou | CA, OR | 6,861 |
| Southern Rocky Mountains | CO, NM | 4,004 |
| Eastern Colorado Plateau | UT, CO | 3,856 |
| Southern Utah | UT | 3,028 |

In order to ensure the grizzly bear is recovered to all significant portions of its range, this petition requests that the Service move expeditiously to revise the 1993 recovery plan to include recovery strategies for all additional areas that are found to support sufficient core habitat to support a population. Greater Yellowstone and North Continental Divide – the two areas where substantial recovery has occurred and where removal of protections are being considered – represent a mere 22 percent of the suitable habitat identified in available studies and less than 4 percent of the species' historic range, meaning the bear is not yet recovered.

000022

To ensure the recovery of the grizzly bear, a revised recovery plan must develop consistent road density standards for public lands, and restore degraded lands through closing and decommissioning roads. Indeed, in the 1993 plan, the Service stated that roads were the biggest threat facing grizzly bears today.

There is an enormous body of scientific information on the amount of secure habitat that is needed at the scale of a bear's home range and the limits that are required on roads and access. Yet, this information has been applied haphazardly. And there is new research on roads since the 1993 when the recovery plan was developed that should be incorporated in a revised plan.

**Revised Recovery Criterion 4:** Protect habitat in areas that link grizzly bear recovery areas.

The Service must identify areas that link recovery areas and develop habitat standards to protect these areas. Since 1993 scientific research and management practice have amply demonstrated that new techniques make it possible to reconnect grizzly bear recovery areas, with prospects of establishing connected populations large enough to ensure demographic and evolutionary resilience.

Given the slow dispersal rates and philopatry of female grizzly bears, linkage habitat should not be thought of as a corridor, but more as contiguous occupied habitat. Addressing the problem of fragmentation associated with highways and the continued human development of low-elevation areas is important. Major highway-related fracture zones between grizzly bear recovery areas in the northern Rockies have been identified (Figure 4),[83] but little systematic work on a comprehensive scale has been done with this information to improve prospects for bear movement across highways.



**Figure 4.** Grizzly bear population fragments identified by Proctor et al. (2012) and potential linkages shown in green together with potential grizzly bear habitat in central Idaho.

# Grizzly Bear Recovery Plan

Supplement: Habitat-based Recovery Criteria for the Northern Continental Divide Ecosystem

Original Approved: January 29, 1982
Revised Plan Approved: September 10, 1993

Prepared by:
Grizzly Bear Recovery Office
U.S. Fish and Wildlife Service
University Hall #309
University of Montana
Missoula, MT 59812

Approved:

_____
Regional Director, U.S. Fish and Wildlife Service

May 16, 2018
_____
Date

000047

## Habitat-based Recovery Criteria for the Grizzly Bear Population in the Northern Continental Divide Ecosystem

### Background

Restoring an endangered or threatened animal or plant to the point where it is again a secure member of its ecosystem is a primary goal of our endangered species program. Recovery plans help guide recovery efforts by describing actions we consider necessary for the conservation of the species, establishing criteria for downlisting and delisting listed species, and estimating time and cost for implementing the measures needed for recovery measures. Under the provisions of the Endangered Species Act of 1973, as amended (Act) (16 U.S.C. 1531 *et seq.*), we approved the first Grizzly Bear Recovery Plan on January 29, 1982 (USFWS 1982). In 1993, we approved a revision to the Grizzly Bear Recovery Plan (USFWS 1993), which included additional tasks and new information that increased the focus and effectiveness of recovery efforts. Supplements to the Recovery Plan were approved in 1996 and 1997 (USFWS 1996, 1997).

Due to a settlement agreement regarding the 1993 Recovery Plan, we are required to publish habitat-based recovery criteria for the Northern Continental Divide Ecosystem (NCDE). As part of the settlement agreement, we also agreed to hold a workshop for the public to provide input. We held workshops on July 7, 2016 (81 FR 29295, May 11, 2016) and January 3, 2018 (82 FR 58444) and opened a 45-day public comment period beginning December 12, 2017 (82 FR 58444) to seek the best available information to inform our habitat-based recovery criteria. In total we received over 275 written and oral comments on the draft habitat-based recovery criteria (Appendix A). In addition, the Service sought and received peer reviews from three reviewers.

### Considerations for Establishing Habitat-Based Recovery Criteria for the NCDE Recovery Zone

This recovery plan supplement delineates objective, measurable habitat-based criteria that we believe will help determine when an endangered or threatened species has recovered to the point that the protections afforded by the Act are no longer necessary and the grizzly bear may be delisted. At this point, recovery criteria no longer apply. Therefore, the Recovery Plan, which includes the criteria, no longer applies. However, our partner agencies in the NCDE have committed to maintaining these standards after delisting. Further details of the HBRC and commitments made by our conservation partners are outlined in the Conservation Strategy (NCDE Subcommittee 2018).

Grizzly bear density and the number of grizzly bears that can live in an ecosystem depends on overall habitat productivity, availability and quality of food sources, and the levels and types of human activities. There is no published method to deductively calculate minimum habitat values required for a healthy and recovered population. Grizzly bears are long-lived, opportunistic omnivores whose food and space requirements vary depending on a multitude of environmental

000048

# Grizzly Bear Recovery Plan

---

## Supplement: Revised Demographic Recovery Criteria for the Yellowstone Ecosystem

Original Approved: January 29, 1982
Revised Plan Approved: September 10, 1993
Previous Supplement on Demographic Recovery Criteria Approved: March 6, 2007

Prepared by: Grizzly Bear Recovery Office
U.S. Fish and Wildlife Service
University Hall #309
University of Montana
Missoula, MT 59812

Approved:

_____
*Regional Director, U.S. Fish and Wildlife Service*

5.4.17
_____
*Date*

1

# Demographic Recovery Criteria for the Grizzly Bear Population in the Greater Yellowstone Ecosystem

In 2007, we supplemented the 1993 Grizzly Bear Recovery Plan with revised demographic criteria for the Greater Yellowstone Ecosystem (GYE) population (72 FR 11376, March 13, 2007).  Since that time, new information relevant to these demographic criteria has become available.  Consistent with Task Y11 of the Grizzly Bear Recovery Plan (U.S. Fish and Wildlife Service 1993, p. 44) that directs the Service to "Reevaluate and refine population criteria as new information becomes available," we are revising the demographic criteria based on updated demographic analyses and the best available science.

We released draft revisions to the demographic recovery criteria for the GYE grizzly bear population for public comment and peer review on March 22, 2013 (78 FR 17708).  We revised parts of the 2013 draft revisions and released new draft revisions to the demographic recovery criteria for public comment and peer review on March 11, 2016 (81 FR 13174).

We updated portions of demographic recovery criteria 1 and 3 for the GYE grizzly bear population based on new scientific analyses and information.  The second criterion pertaining to the distribution of females with offspring remains unchanged.  The current demographic recovery criteria to be appended to the 1993 Recovery Plan are:

- Demographic Recovery Criterion 1—Maintain a minimum population size of 500 grizzly bears[1] and at least 48 females with cubs-of-the-year within the Demographic Monitoring Area (DMA) as shown in figure 1, as indicated by methods established in published, peer-reviewed scientific literature and calculated by the Interagency Grizzly Bear Study Team (IGBST) using the most updated Application Protocol, as

---

[1] This number is required to maintain short-term genetic fitness in the next few decades.  It is not a population target, but a minimum.

000101

posted on their website. If the estimate of total population size drops below 500 in any year or below 48 females with cubs-of-the-year in 3 consecutive years, this criterion will not be met. The 48 females with cubs-of-the-year metric is a model-averaged number of documented unique females with cubs-of-the-year.



**Figure 1. The Demographic Monitoring Area (DMA) within which all demographic criteria would be assessed.**

000102

- Demographic Recovery Criterion 2—Sixteen of 18 bear management units within the Recovery Zone (figure 2) must be occupied by females with young, with no 2 adjacent bear management units unoccupied, during a 6-year sum of observations. This criterion is important as it ensures that reproductive females occupy the majority of the Recovery Zone and are not concentrated in one portion of the ecosystem. If less than 16 of 18 bear management units are occupied by females with young for 3 successive 6-year sums of observations this criterion will not be met (table 1).



**Figure 2. Greater Yellowstone Ecosystem grizzly bear recovery zone boundary showing bear management unit (BMU) and subunit boundaries for application of Demographic Criterion 2.**

000103

**Table 2.  Total mortality rates used to establish annual total mortality limits for independent females, independent males, and dependent young[2] inside the DMA using the model-averaged Chao2 population estimator.  These mortality limits are on a sliding scale to achieve the population goal inside the DMA of the model-averaged Chao2 population size of 674 between 2002–2014 (95% CI = 600–747).  For populations less than 600, there will be no discretionary mortality except as necessary for human safety.**

|  | Total Grizzly Bear Population Estimate* | | |
|---|---|---|---|
|  | ≤674 | 675–747 | >747 |
| **Total mortality rate for independent FEMALES** | **<7.6%** | **9%** | **10%** |
| **Total mortality rate for independent MALES** | **15%** | **20%** | **22%** |
| **Total mortality rate for DEPENDENT YOUNG** | **<7.6%** | **9%** | **10%** |

*Total mortality*: **Documented known and probably grizzly bear mortalities from all causes including but not limited to:  management removals, illegal kills, mistaken identity kills, self-defense kills, vehicle kills, natural mortalities, undetermined-cause mortalities, grizzly bear hunting, and a statistical estimate of the number of unknown/unreported mortalities.**

*using the model-averaged Chao2 population estimator

## Background

In 2000, we began a process to reevaluate and update methods to determine the status of the GYE grizzly bear population, estimate population size, and determine the sustainable level of mortality in the GYE.  The Wildlife Monograph: "Temporal, Spatial, and Environmental Influences on The Demographics of Grizzly Bears in The Greater Yellowstone Ecosystem" (Schwartz et al. 2006); the report: "Reassessing Methods to Estimate Population Size and Sustainable Mortality Limits for the Yellowstone Grizzly

---

[2] Total mortality rates are based on the mortality percentage of the respective population segment relative to the population estimates.

000105

Bear" (Interagency Grizzly Bear Study Team 2005); and the report: "Reassessing Methods to Estimate Population Size and Sustainable Mortality Limits for the Yellowstone Grizzly Bear Workshop Document Supplement 19-21 June, 2006" (Interagency Grizzly Bear Study Team 2006) provided the scientific basis for revising the demographic recovery criteria in the GYE in 2007. Similarly, the revisions we are implementing through this Supplement to the Recovery Plan are based on updated demographic analyses using the same methods as before (Schwartz et al. 2006), as reported in the Interagency Grizzly Bear Study Team's 2012 report: "Updating and Evaluating Approaches to Estimate Population Size and Sustainable Mortality Limits for Grizzly Bears in the Greater Yellowstone Ecosystem." This 2012 Study Team report provides the scientific basis for the changes proposed below.

We proposed to change the first and third criteria because they no longer represent the best scientific data or the best technique to assess recovery of the GYE grizzly bear population. Specifically, these criteria warrant revision because: (1) There are updated demographic analyses for 2002–2011 indicating that the rate of growth seen during the 1983–2001 period has slowed and sex ratios have changed; (2) there is consensus among scientists and statisticians that the area within which we apply mortality limits should be the same area we use to estimate population size; and (3) the need exists to make the demographic criteria dynamic so that the IGBST can incorporate results from updated demographic analyses and implement new scientific methods based on peer-reviewed, scientific literature as they become available.

These criteria will replace the 2007 Demographic Criteria and are hereby appended to the Yellowstone chapter of the Grizzly Bear Recovery Plan (U.S. Fish and Wildlife Service 1993, p. 44) and the 2016 Conservation Strategy for the Grizzly Bear in the Greater Yellowstone Ecosystem.

000106

# Grizzly Bear Recovery Plan

---

Supplement: Revised Demographic Recovery Criteria for the Yellowstone Ecosystem

Original Plan Approved: January 29, 1982
Revised Plan Approved: September 10, 1993

Prepared by: Dr. Christopher Servheen
Grizzly Bear Recovery Coordinator
U.S. Fish and Wildlife Service
University Hall 309
University of Montana
Missoula, MT 59812

Approved:

_Acting_ _Regional Director, U.S. Fish and Wildlife Service_

3-6-00
_Date_

---

000130

ER_46

# Grizzly Bear Recovery Plan

---

## Supplement: Habitat-based Recovery Criteria for the Yellowstone Ecosystem

Original Plan Approved: January 29, 1982
Revised Plan Approved: September 10, 1993

Prepared by: Dr. Christopher Servheen
Grizzly Bear Recovery Coordinator
U.S. Fish and Wildlife Service
University Hall 309
University of Montana
Missoula, MT 59812

Approved:

_____
Acting Regional Director, U.S. Fish and Wildlife Service

3-6-07
_____
Date

# Habitat-based recovery criteria for the Greater Yellowstone Area

**APPENDED TO THE 1993 GRIZZLY BEAR RECOVERY PLAN**

As per a court settlement (Settlement dated March 31, 1997 and approved by the court on May 5, 1997 Fund for Animals v. Babbitt, 967 F. Supp. 6 (D. D.C. 1997)) and as recommended by Recovery Plan Task Y423, we have worked to "establish a threshold of minimal habitat values to be maintained within each Cumulative Effects Analysis Unit in order to ensure that sufficient habitat is available to support a viable population" (U.S. Fish and Wildlife Service 1993). On June 17, 1997, we held a public workshop in Bozeman, Montana, to develop and refine habitat-based recovery criteria for the Yellowstone grizzly bear population. A Federal Register notice notified the public of this workshop and provided interested parties an opportunity to participate and submit comments (62 FR 19777, April 23, 1997). After considering 1,167 written comments, we developed biologically-based habitat recovery criteria with the overall goal of maintaining or improving habitat conditions at levels of human activity that existed in 1998 when the population was increasing at 4-7 percent per year (Eberhardt 1995, Boyce et al. 2001, Harris et al. 2006).

The following 3 objective and measurable habitat criteria within the Recovery Zone (also known as the Primary Conservation Area (PCA)) (Figure 1) are appended to the Yellowstone Chapter of the Grizzly Bear Recovery Plan (U.S. Fish and Wildlife Service 1993) as per task Y423:

## 1. Secure Habitat Standard

The percent of secure habitat within each bear management subunit must be maintained at or above levels that existed in 1998 (Table 1). Temporary and permanent changes are allowed under specific conditions identified below. Figure 2 provides a summary of the secure area management rules. The rule set in Figure 2 will be used for management and evaluation of projects and habitat management actions as appropriate to achieve and maintain this standard.

Application Rules for Changes in Secure Habitat

- Permanent changes to secure habitat. A project may permanently change secure habitat provided that replacement secure habitat of equivalent habitat quality (as measured by the Cumulative Effects Model (CEM) or equivalent technology) is provided in the same grizzly subunit. The replacement habitat must either be in place before project initiation or be provided concurrently with project development as an integral part of the project plan.

- Temporary changes to secure habitat. Temporary reductions in secure habitat can occur to allow projects, if all of the following conditions are met:

  o Only one project is active per grizzly subunit at any one time.

  o Total acreage of active projects within a given Bear Management Unit (BMU) will not exceed 1% of the acreage in the largest subunit within that BMU (Table 2). The acreage of a project that counts against the 1% limit is the acreage associated with the 500-meter buffer around any motorized access route that

# Grizzly Bear Recovery Plan



U.S. FISH & WILDLIFE SERVICE
ECOLOGICAL SERVICES
JUN 2 4 1997
OLYMPIA, WA
RECEIVED

---

Supplement:  North Cascades Ecosystem Recovery Plan Chapter

(Original Approved:  January 29, 1982)

Prepared by: Dr. Christopher Servheen
Grizzly Bear Recovery Coordinator
U.S. Fish and Wildife Service
Forestry Sciences Laboratory
University of Montana
Missoula, MT 59801

Approved:

_Regional Director, U.S. Fish and Wildlife Service_

June 23, 1997
_Date_

000217

# Grizzly Bear Recovery Plan

---

## Supplement:  Bitterroot Ecosystem Recovery Plan Chapter

### (Original Recovery Plan Approved:  January 29, 1982)

Prepared by: Dr. Christopher Servheen
Grizzly Bear Recovery Coordinator
U.S. Fish and Wildife Service
Forestry Sciences Laboratory
University of Montana
Missoula, MT 59801

Approved:

_Ralph O. Morgenweck_
*Regional Director, U.S. Fish and Wildlife Service*

_September 11, 1996_
*Date*

000281

# Grizzly Bear Recovery Plan

(Original Approved: January 29, 1982)

Prepared by: Dr. Christopher Servheen

Grizzly Bear Recovery Coordinator

U.S. Fish and Wildlife Service

Natural Science 312

University of Montana

Missoula, Montana 59812

Approved:

_Ralph O. Morgenweck_

Regional Director, U.S. Fish and Wildlife Service

September 10, 1993

Date



000310

## Executive Summary of the Recovery Plan for the Grizzly Bear

### Current Status

The grizzly bear (*Ursus arctos horribilis*) was listed as threatened on July 28, 1975. The original recovery plan was approved on January 29, 1982. This is the first revision of that plan. The grizzly bear was originally distributed in various habitats throughout Western North America from Central Mexico to the Arctic Ocean. Current distribution is reduced to less than 2 percent of its former range south of Canada in five, and perhaps six, small populations with an estimated total population of 800-1,000 bears. Four regions, or ecosystems—the Northern Continental Divide and Cabinet/Yaak in Montana, the Selkirks of Idaho and Washington, and the North Cascades of Washington—accommodate grizzly populations that are contiguous with Canadian populations. A grizzly population also exists in the Yellowstone ecosystem. These represent the five known populations. The Bitterroot ecosystem in Idaho represents the possible sixth population. It contains sufficient habitat but few if any grizzly bears at this time. A seventh area, the San Juans ecosystem in Colorado, currently is being considered for evaluation, but there has been no confirmed record of grizzly bears in the San Juans since 1979.

### Habitat Requirements and Limiting Factors

The grizzly has a broad range of habitat tolerance. Contiguous, relatively undisturbed mountainous habitat having a high level of topographic and vegetative diversity characterizes most areas where the species remains. Habitat loss and direct and indirect human-caused mortality is related to the decline in numbers.

### Recovery Objective

Delisting of each of the remaining populations by population as they achieve the recovery targets.

### Recovery Priority

The recovery priority for the grizzly bear has been designated as 6C, which indicates a subspecies with a high threat and a high recovery potential that is or may be in conflict with some form of economic activity.

### Recovery Criteria

Each individual population will remain listed until its specific recovery criteria are met. The species throughout the lower 48 States can be delisted when the populations in all established recovery zones have been delisted. (The San Juan ecosystem is being evaluated as a possible recovery zone and is not yet considered established.) Recovery criteria include a minimum number of females with cubs seen annually, distribution of family groups throughout the recovery zone, and a limit on human-caused mortality.

### Actions Needed

1. Minimize sources of human-bear conflict.
2. Limit habitat loss or degradation because of human actions such as road building, timber harvest, oil and gas exploration and development, mining, and recreation.
3. Improve habitat and/or security where applicable.
4. Understand the relationship between bear density and habitat value to better understand limiting factors.
5. Develop techniques to successfully move bears into areas where the populations are in need of augmentation.

ii

000312

6. Improve public relations and education to develop better support for and understanding of the species and to minimize adverse human actions.
7. Continue grizzly bear and habitat research to ensure adequate scientific knowledge is available on which to base management decisions.

## Total Estimated Cost of Recovery

$26,000,000.

## Date of Recovery

This varies by ecosystem. Some ecosystems, such as the North Cascades and the Bitterroot ecosystems, likely will not be recovered for 30-40 years, while some other ecosystems such as the Northern Continental Divide Ecosystem may be recovered sooner.

iii

000313

Management of Genetic Diversity ........................................................27
Ecosystem Management and Benefits to Other Species ...................................28
Human Social Factors in Grizzly Bear Recovery ........................................28
Summary ............................................................................31

**PART III. RECOVERY** ...................................................................33
Step Down Outline ...................................................................34
Yellowstone Grizzly Bear Recovery Zone ...............................................39
Northern Continental Divide Recovery Zone ............................................59
Cabinet/Yaak Recovery Zone ..........................................................81
Selkirks Recovery Zone ..............................................................99
Bitterroot, North Cascades, and San Juan Evaluation Areas ...........................117
Literature Cited ....................................................................122

**PART IV: IMPLEMENTATION SCHEDULE** .....................................................131
Abbreviations .......................................................................131
Grizzly Bear Recovery Implementation Schedule ........................................132

**LIST OF FIGURES**
1.  Historical Grizzly Bear Distribution in the Conterminous 48 States ...........................9
2.  Present Grizzly Bear Ecosystems in the Conterminous 48 States ...........................11
3.  Proposed Linkage Zone Assessment Areas ..............................................25
4.  Major Variables and Important Forces in Wildlife Policy Implementation ..................29
5.  Yellowstone Ecosystem Recovery Zone .................................................39
6.  Unduplicated Females with Cubs in Yellowstone Ecosytem ..............................46
7.  Northern Continental Divide Recovery Zone ...........................................59
8.  Unduplicated Females with Cubs in the Northern Continental Divide Ecosystem ...........67
9.  Known Human-Caused Grizzly Bear Mortalities in the Northern
    Continental Divide Ecosystem ......................................................67
10. Cabinet/Yaak Recovery Zone .........................................................81
11. Selkirk Recovery Zone ..............................................................99
12. North Cascades Evaluation Area .....................................................117
13. Bitterroot Evaluation Area .........................................................119

**LIST OF TABLES**
1.  Position Versus Interest Matrix .....................................................30

**APPENDICES**
A.  Selected Pages from the Interagency Grizzly Bear Guidelines ...........................137
B.  Road Management in Grizzly Bear Habitat .............................................143
C.  Report of the Yellowstone Grizzly Bear Population Task Force ..........................151
D.  Yellowstone Ecosystem Grizzly Bear Survivorship Table ...............................161
E.  Major Changes from the 1982 Plan to the 1993 Revised Plan ...........................165
F.  Revised Reporting Rules for Recovery Plan Targets ...................................169
G.  Summary of Public Comments ........................................................173

000315

In North America, the grizzly's historic range extended from the mid-plains westward to the California coast (Rausch 1963, Herrero 1972) and south into Texas and Mexico (Storer and Tevis 1955). The development of unfavorable environmental conditions in the wake of westward expansion and development caused a rapid distributional recession (Guilday 1968). Populations were present throughout most of Western North America during the 18th century (Storer and Tevis 1955), but the rapidity of local extinctions suggests that many of these also were of marginal status (Martinka 1974).

Between 1800 and 1975, grizzly populations in the lower 48 States receded from estimates of over 50,000 to less than 1,000 grizzly bears. At the time of the Lewis and Clark expedition, grizzly bears inhabited the Great Plains and flourished along rivers and streams (Wright 1909). As fur trapping, mining, ranching, and farming pushed westward, the grizzly was extirpated from much of the Great Plains. As the mountainous areas were settled, logging and recreational development contributed to the increase in human-induced mortality of grizzly bears. In most cases, bears that threatened or appeared to threaten man's early tenuous existence were eliminated. Livestock depredation control, habitat deterioration, commercial trapping, unregulated hunting, and protection of human life were leading causes of decline (Martinka 1976, Brown 1985). Conflicts between bears and livestock were common during the settling of the West. The attitude of the early American stockman was expressed by Bailey (1931): "The destruction of these grizzlies is absolutely necessary before the stock business . . . could be maintained on a profitable basis."

Grizzly bears were eliminated from Texas about 1890, and by 1922 the last of the California grizzly bears were gone (Storer and Tevis 1955) (fig. 1). They were last reported in Utah in 1923, Oregon 1931, New Mexico 1933, and Arizona 1935. Professional hunters/trappers hired by Federal and State agencies and stockmen's groups, and accelerated human settlement were responsible for a large part of the exterminations.



Figure 1.
Historical grizzly bear distribution in the conterminous 48 States, by C.H. Merriam in 1922 (from *Outdoor Life*, Dec. 1922; reprinted with permission from the Popular Science Publishing Company), *in* Earle F. Layser 1978.

000329



Figure 2. Present grizzly bear ecosystems in the conterminous 48 States, 1990 (the San Juan Mountains area of Colorado is not shown).

Although there have been reports of grizzly bears in the Sierra del Nido in Mexico, no hard evidence of their presence exists (Leopold 1967, Koford 1969). A grizzly bear was shot in the San Juan National Forest in Colorado in 1979. This adult female grizzly was killed by an archery hunter on the headwaters of the Navajo River (Hess, Colorado Division of Wildlife, pers. comm. 1980, Brown 1985). Field research during 1979-80, which entailed trapping in a portion of the San Juan ecosystem where the bear was shot, failed to determine the continued existence of grizzly bears in this area. This area is being considered now for further evaluation as an additional recovery area.

Grizzly bears presently occupy over 23,300 km² (9,500 mi²) of mountainous terrain in and surrounding Yellowstone National Park. The YGBE (fig. 5, p. 39) includes Yellowstone National Park, Grand Teton National Park, John D. Rockefeller Mem4--orial Parkway, significant contiguous portions of the Shoshone, Bridger-Teton, Targhee, Gallatin, Beaverhead, and Custer National Forests, Bureau of Land Management lands, and over 222 km² (86 mi²) of State and private lands in Montana, Wyoming, and Idaho. The minimum population estimate in this area is approximately 236 bears.

The NCDE (fig. 7, p. 59) contains 24,800 km² (9,600 mi²) of occupied grizzly bear habitat. It includes Glacier National Park, parts of the Flathead and Blackfeet Indian Reservations, parts of five national forests (Flathead, Helena, Kootenai, Lewis and Clark, and Lolo), Bureau of Land Management lands, and a significant amount of State and private lands. Four wilderness areas (Bob Marshall, Mission Mountains, Great Bear, and Scapegoat) and one wilderness study area (Deep Creek North) are included. Population

000331

## Recovery

The plan addresses seven areas in the conterminous 48 States where grizzly bears are known or thought to have been present in 1975. These seven areas occur in the states of Montana, Wyoming, Idaho, Washington, and Colorado. These seven grizzly bear ecosystems either have or recently had the potential to provide adequate space and habitat to maintain the grizzly bear as a viable and self-sustaining species. These populations will be judged to be viable when they meet the demographic recovery targets and it can be demonstrated that adequate regulatory mechanisms exist to ensure continued population and habitat management after delisting.

The overall goal of the plan is to remove the grizzly bear from threatened status in each of the ecosystems in the 48 conterminous States. This will be achieved by:

(1)　meeting the demographic recovery goals of:

　　(a)　For the YGBE, 15 females with cubs over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone; 16 of 18 BMU's occupied by females with young from a running 6-year sum of verified sightings and evidence, and within the Plateau and Henry's Lake BMU's, a study will be initiated in 1993 to determine the potential and present habitat capability of these BMU's to support females with cubs; and no two adjacent BMU's shall be unoccupied; and known human-caused mortality not to exceed 4 percent of the population estimate based on the most recent 3-year sum of females with cubs. Furthermore, no more than 30 percent of this 4 percent mortality limit shall be females. These mortality limits cannot be exceeded during any 2 consecutive years for recovery to be achieved.

　　(b)　For the NCDE, 10 females with cubs inside Glacier National Park (GNP) and 12 females with cubs outside GNP over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone, excluding Canada; 21 of 23 BMU's occupied by females with young from a running 6-year sum of verified sightings and evidence, with no two adjacent BMU's unoccupied; and known human-caused mortality not to exceed 4 percent of the population estimate based on the most recent 3-year sum of females with cubs. Furthermore, no more than 30 percent of this 4 percent mortality limit shall be females. These mortality limits cannot be exceeded during any 2 consecutive years for recovery to be achieved. Furthermore, recovery cannot be achieved without occupancy in the Mission Mountains portion of this ecosystem.

　　(c)　For the CYE, six females with cubs over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone, excluding Canada; 18 of 22 BMU's occupied by females with young from a running 6-year sum of verified sightings and evidence; and known human-caused mortality not to exceed 4 percent of the population estimate based on the most recent 3-year sum of females with cubs. Furthermore, no more than 30 percent of this 4 percent mortality limit shall be females. These mortality limits cannot be exceeded during any 2 consecutive years for recovery to be achieved. Presently, grizzly bear numbers are so small in this ecosystem that the mortality goal shall be zero known human-caused mortalities.

　　(d)　For the SE, six females with cubs over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone, *including* Canada; 7 of 10 BMU's on the U.S. side occupied by females with young from a running 6-year sum of verified

000353

For the present YGBE population estimate, a 4 percent known human-caused mortality limit is equivalent to:

$$236 \times 0.04 = 9 \text{ human-caused bear mortalities}$$
$$9 \times 0.30 = 3 \text{ human-caused female bear mortalities}$$

(11) The 4 percent known, human-caused mortality limit for 1993 is nine bears (see item 10). The current 6-year average of annual, known, human-caused mortality is 4 bears (see item 5 above), or 1.7 percent of the minimum population estimate of 236 bears. This is below the limit of 4 percent.

The known, human-caused female mortality limit for 1993 is 30 percent of nine, or three females annually (see item 10). The current 6-year average of annual, known, human-caused female mortality is two (see item 5). This is 22 percent of 9, which is below the limit of 30 percent.

Human-caused grizzly mortality in the YGBE appears to be within sustainable levels at this time.

### Determine Population Conditions at which the Species is Viable and Self-sustaining. (Y11)

Reevaluate and refine population criteria as new information becomes available. The grizzly bear population in the YGBE will be viable when monitoring efforts indicate that recruitment and mortality are at levels supporting a stable to increasing population, and reproducing females are distributed throughout the recovery zone. The population will be judged as meeting recovery population requirements when, as determined through systematic monitoring throughout the recovery zone, it meets each of the following criteria:

(a) The average number of unduplicated female grizzly bears with cubs-of-the-year is a minimum of 15 annually on a running 6-year average.

(b) The distribution of family groups of grizzly bears represented by female grizzly bears accompanied by cubs, yearlings, or 2-year olds is reported in 16 of the 18 BMU's, on a running 6-year sum of observations with no two adjacent BMU's unoccupied. This is equivalent to verified evidence of at least one female grizzly bear female with young at least once in each BMU over a 6-year period. The distribution is indicated by verified sightings or verified evidence such as tracks. The Plateau and Henry's Lake BMU's will be the focus of a study started in 1993 to determine their past and present habitat potential for occupancy by females with young. Considerations of recovery for the Yellowstone population will be suspended until the potential for occupancy within the Plateau and Henry's Lake BMU's by females is understood as determined by completion of the special study.

(c) The known human-caused mortality level does not exceed 4 percent of the average of the previous 3 years minimum population estimate based on the unduplicated number of females with cubs, minus known, adult female deaths (see Y1.). In addition, the known, human-caused female mortality shall be no more than 30 percent of the total known mortality limit.

Other parameters may be monitored to evaluate the status of the YGBE population, however, the primary parameters that will be used to judge the status of the population for achievement of recovery and delisting will be the three parameters detailed above: unduplicated females with cubs, distribution of females with young, and annual human-caused mortality.

000362

## Bitterroot and North Cascade Grizzly Bear Recovery Zone

*Subgoal: Develop the planning documents necessary to recovery the grizzly bear in the Bitterroot Mountains of Idaho and Montana (BE) and the North Cascade Mountains of Washington (NCE). (figures 12 and 13). Planning documents should be prepared for the North Cascades and the Bitterroot areas by interagency working groups during 1992 and 1993, and submitted to the Northwest Ecosystems Management Subcommittee for approval by 1994. These planning documents should follow the form and detail of the recovery chapters in this plan for each of the existing ecosystems. Public input should be sought throughout the development of these plans. Once these documents are completed, they should be appended to the grizzly bear recovery plan.*

## Evaluation of the Potential for Grizzly Bear Recovery in the San Juan Mountains and Other Possible Recovery Areas Throughout the Historical Range of the Grizzly Bear

*Subgoal: Evaluate the feasibility of grizzly bear recovery in the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear. This analysis should focus on habitat values, size of the areas, human use and activities in general, relation to other areas where grizzly bears exist, and historical information. This analysis is expected to take 5 years, at which time a report should be presented to the IGBC.*

000433

## Grizzly Bear Recovery Plan Implementation Schedule

| Priority | Task | Task Description | Task Duration | Responsible Party FWS Region | Responsible Party FWS Program | Other Agency | Cost Estimates (in $1,000's) FY-01 | Cost Estimates (in $1,000's) FY-02 | Cost Estimates (in $1,000's) FY-03 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11 | Determine population monitoring methods and criteria. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 112 | Establish reporting procedures and systems to gather and evaluate information on populations. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 12 | Determine current population conditions. | Ongoing | 6,1 | ES | IGBC | 300 | 300 | 300 | |
| 1 | 131 | Identify human sources of direct mortality. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 132 | Identify sources of indirect mortality. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 133 | Determine effects of human activities. | Ongoing | 6,1 | ES | IGBC | 60 | 60 | 60 | |
| 1 | 2111 | Coordinate State, Federal, Tribal law enforcement. | Ongoing | 6,1 | ES | IGBC | 10 | 10 | 10 | |
| 1 | 2112 | Reduce mistaken-identity killing by big game and black bear hunters. | Ongoing | 6,1 | LE, ES | IGBC | 15 | 15 | 15 | |
| 1 | 2113 | Investigate and prosecute illegal killing of grizzly bears. | Ongoing | 6,1 | LE | IGBC | — | — | — | Included in Tasks 21 and 2111 |
| 1 | 21141 | Increase efforts to clean up carrion and other attractants. | Ongoing | 6,1 | ES | IGBC | 80 | 80 | 80 | |
| 1 | 21142 | Reduce losses due to mis-handling of bears during research and management actions through development of a bear handling manual. | Complete | 6, | ES | | | | | |
| 1 | 21143 | Reduce losses due to predator and rodent control. | Ongoing | 6,1 | ES | IGBC | — | — | — | Part of ongoing agency programs |

000445

## Grizzly Bear Recovery Plan Implementation Schedule (Continued)

| Priority | Task | Task Description | Task Duration | FWS Region | FWS Program | Other Agency | Cost Estimates (in $1,000's) FY-01 | FY-02 | FY-03 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 21144 | Ensure that control of nusiance bears is accomplished according to 50 CFR 17.40 and the Guidelines. | Ongoing | 6,1 | ES | IGBC | 100 | 100 | 100 | |
| 1 | 21145 | Reduce losses by developing and implementing public education and awareness programs. | Ongoing | 6,1 | ES | IGBC | 80 | 80 | 80 | |
| 1 | 221 | Apply the Guidelines on Federal lands to make domestic live-stock grazing compatible. | Ongoing | 6,1 | ES | FS,BLM | — | — | — | Part of ongoing agency programs |
| 1 | 222 | Apply the Guidelines on Federal lands to make timber harvest and road building compatible. | Ongoing | 6,1 | ES | FS,BLM | — | — | — | Part of ongoing agency programs |
| 1 | 223 | Apply the Guidelines on Federal lands to make mining, oil and gas exploration and development compatible. | Ongoing | 6,1 | ES | FS,BLM | — | — | — | Part of ongoing agency programs |
| 1 | 224 | Apply the Guidelines on Federal lands to make recreational acti-vities compatible. | Ongoing | 6,1 | ES | FS,NPS BLM | — | — | — | Part of ongoing agency programs |
| 1 | 225 | Coordinate with State and county governments to encourage consideration of grizzly bear habitat needs. | Ongoing | 6,1 | ES | IGBC | 100 | 100 | 100 | |
| 1 | 226 | Monitor the cumulative effects of management actions in grizzly habitat. | Ongoing | 6,1 | ES | IGBC | 350 | 350 | 350 | FS lead |
| 1 | 31 | Define the recovery zone within which the grizzly bear will be managed. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 32 | Identify agency management stratification within the recovery zone. | 2 Years | 6,1 | ES | IGBC | 50 | 50 | — | Complete for NCDE, SE, YE, CYE Incomplete in North Cascades and Bitterroot |

## Grizzly Bear Recovery Plan Implementation Schedule (Continued)

134 · Part 4 / Implementation Schedule

| Priority | Task | Task Description | Task Duration | Region | Program | Other Agency | FY-01 | FY-02 | FY-03 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 36 | Conduct research on effects of road densities. | Ongoing | 6,1 | ES | IGBC | 250 | 250 | 250 | |
| 1 | 411 | Develop a population monitoring system. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 412 | Develop a system of responsibilities to collate, analyze and report annual information on population data. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 413 | Standardize reporting forms and methods. | Complete | 6,1 | ES | IGBC | | | | |
| 1 | 423 | Establish a threshold of minimal habitat values to be maintained. | 1 Year | 6,1 | ES | IGBC | 80 | — | — | |
| 1 | 512 | Develop and test procedures to relocate bears for demographic or genetic purposes. | Ongoing | 6 | ES | FS,NPS | 150 | 150 | 150 | |
| 1 | 513 | Apply the Guidelines to maintain and enhance habitat. | Ongoing | 6,1 | ES | IGBC | — | — | — | Part of ongoing agency programs. |
| 1 | 61 | Evaluate public attitudes towards grizzly bears. | 2 Years | 6,1 | ES | IGBC | 80 | 80 | — | |
| 1 | 62 | Formulate ways to improve public attitudes about grizzly bears. | Ongoing | 6,1 | ES | IGBC | — | — | — | To be done after Task 61 is completed. |
| 1 | 7 | Implement the plan through appointment of a Grizzly Bear Recovery Coordinator. | Ongoing | 6 | ES | | 340 | 340 | 340 | |
| 2 | 212 | Appoint a grizzly bear mortality coordinator. | Complete | 6,1 | ES | MFWP | | | | |
| 2 | 33 | Conduct research to determine extent of grizzly bear range. | Ongoing | 6,1 | ES | IGBC | 240 | 240 | 240 | Complete for NCDE, SE, YE, CYE Incomplete in North Cascades and Bitterroots |
| 2 | 35 | Conduct research to determine the relationship between habitat values, physiological condition, and population viability. | 5 Years | 6,1 | ES | FS,U | 60 | 60 | 60 | Washington State University lead |

000447

## Grizzly Bear Recovery Plan Implementation Schedule (Continued)

| Priority | Task | Task Description | Task Duration | Responsible Party FWS Region | Responsible Party FWS Program | Other Agency | Cost Estimates (in $1,000's) FY-01 | Cost Estimates (in $1,000's) FY-02 | Cost Estimates (in $1,000's) FY-03 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 37 | Conduct research on effects of habitat fragmentation. | Ongoing | 6,1 | ES | IGBC | 265 | 265 | 265 | Include linkage zone studies |
| 2 | 421 | Develop and apply the CEA. | Ongoing | 6,1 | ES | IGBC | 600 | 600 | 600 | |
| 2 | 422 | Complete habitat mapping. | Ongoing | 6,1 | ES | FS, NPS | 550 | 550 | 550 | FS estimates of cost |
| 2 | 424 | Apply CEA analysis to each bear management unit. | Ongoing | 6,1 | ES | IGBC | — | — | — | Part of ongoing agency programs |
| 2 | 426 | Develop a Conservation Strategy that outlines population and habitat monitoring. | Ongoing | 6,1 | ES | IGBC | 66 | 66 | 66 | |
| 2 | 81 | Revise Federal and State regulations as necessary. | Ongoing | 6,1 | ES | IGBC | — | — | — | Part of ongoing agency programs |
| 2 | 82 | Coordinate and exchange information with Canada and other countries. | Ongoing | 6 | ES | IGBC | — | — | — | Included in Task 7 |
| 3 | 23 | Coordinate activities on readdressing population limiting factors and monitor compliance with Recovery Plan. | Ongoing | 6,1 | ES | IGBC | 60 | 60 | 60 | Included in Task 71 |
| 3 | 34 | Conduct research to determine habitat use, food habits, home range size, etc. | Ongoing | 6,1 | ES | IGBC | 240 | 240 | 240 | |
| 3 | 38 | Evaluate applicability of PVA. | Ongoing | 6,1 | ES | IGBC | 10 | 10 | 10 | |
| 3 | 414 | Monitor relocated bears. | Ongoing | 6,1 | ES | IGBC | 10 | 10 | 10 | |
| 3 | 425 | Report management activities. | Ongoing | 6,1 | ES | IGBC | — | — | — | Part of ongoing agency programs |
| 3 | 511 | Refine procedures for relocating or aversively conditioning nuisance bears. | Ongoing | 6,1 | ES | IGBC | 10 | 10 | 10 | |
| 3 | 52 | Manage population and habitat on private and State lands. | Ongoing | 6,1 | ES | IGBC | — | — | — | Part of ongoing agency programs. |
| 3 | 53 | Develop a Conservation Strategy that outlines population and habitat regulatory mechanisms. | Ongoing | 6,1 | ES | IGBC | — | — | — | Included in Task 426. |

**ER_63**

000448

## Conservation Strategy

The revised plan calls for the development of a conservation strategy for each grizzly bear population prior to its delisting. The conservation strategy will be developed through an interagency process and will detail the population monitoring strategies and the population and habitat management measures that will remain in effect after delisting. The strategies detailed in the conservation strategy are intended to ensure that relisting of the population will not be necessary. All participating federal and state agencies will sign the document and agree to its provisions.

## Long-term Strategy for Yellowstone Population

The Yellowstone grizzly bear population is the only one of five grizzly populations that is completely isolated from populations in other U.S. ecosystems and Canada. The population has approximately 300 bears. The population's small size and isolation make it vulnerable to the detrimental effects of the loss of genetic diversity, and to environmental and demographic stochasticity. Connectivity between the Yellowstone Grizzly Bear Ecosystem and other grizzly ecosystems is not likely to be realized in the near future because of the distance to other ecosystems and the intervening human development and alteration of landscape. Therefore, the recovery plan recommends that one grizzly be placed into the ecosystem from an outside population every ten years as an effort to maintain the genetic health of the population.

168 • Appendix E

000473

# GRIZZLY BEAR RECOVERY PROGRAM MISSION

The mission of the Grizzly Bear Recovery Program (GBRP) is to recover grizzly bears in the lower 48 States by implementing the 1993 Grizzly Bear Recovery Plan (USFWS 1993) and coordinating research, management, and recovery efforts. To accomplish this mission, we collaborate with the Interagency Grizzly Bear Committee (IGBC), Federal, State, and Tribal agencies, the provinces of British Columbia and Alberta, as well as non-governmental organizations (NGOs).

In 1975, the U.S. Fish and Wildlife Service (Service) listed the grizzly bear as a threatened species in the lower 48 States under the Endangered Species Act. The Grizzly Bear Recovery Plan outlines six recovery areas, including the Greater Yellowstone Ecosystem (GYE), Northern Continental Divide Ecosystem (NCDE), Cabinet-Yaak Ecosystem (CYE), Selkirk Ecosystem (SE), North Cascades Ecosystem (NCE), and Bitterroot Ecosystem (BE). Principle recovery efforts focus on conflict reduction, information and education, establishment of habitat protections, and other efforts to prevent and reduce human-caused mortality.

## Grizzly Bear Recovery Zones and Distributions



Estimated distributions are current as of 2018 for the GYE and the NCDE and are current as of 2017 for the CYE and the SE. The distribution for the NCE is currently unknown and a draft EIS was released in early 2017 to examine recovery options. The BE is currently unoccupied with a reintroduction proposal and a non-essential experimental population status.

000716

## GRIZZLY BEAR ECOSYSTEM UPDATES

## Greater Yellowstone Ecosystem

The Yellowstone Recovery Zone (23,853 km$^2$) is located in northwest Wyoming, eastern Idaho, and southwest Montana. Ninety-eight percent of the recovery zone is federally-managed land, including all of Yellowstone National Park, as well as portions of Grand Teton National Park, the Shoshone, Beaverhead-Deer Lodge, Bridger-Teton, Caribou-Targhee, and Custer National Forests (including 7 Wilderness Areas).  The Demographic Monitoring Area (DMA) encompasses an additional 23,131 km$^2$ of suitable habitat around the recovery zone.  Monitoring of population size and mortality limits occurs within the DMA (USFWS 2017).  Monitoring of distribution of females with young and secure habitat occurs within the Recovery Zone (USFWS 2007, USFWS 2017).



Greater Yellowstone Recovery Zone
Demographic Monitoring Area (DMA)
National Park Boundaries
Current Known Distribution

**Population Status**

Bears currently occupy 68,736 km$^2$, which includes 49,931 km$^2$ inside the DMA (98 percent of the DMA) and 18,805 km$^2$ outside the DMA.

Recovery Criterion 1: Maintain a minimum population size of 500 animals and at least 48 females with cubs-of-the-year within the DMA.  Progress: There were an estimated 709 bears and 55 unique females with cubs in the DMA in 2018.  This criterion has been met.

Recovery Criterion 2: 16 of 18 BMUs within the PCA must be occupied by females with young, with no 2 adjacent BMUs unoccupied, during a 6-year sum of observations.  Progress: 18 of 18 Bear Management Units occupied by females with young in 2018.  This criterion has been met.

Recovery Criterion 3: Maintain the population within the DMA around the 2002–2014 model-averaged Chao 2 estimate (average = 674; 95% CI = 600–747; 90% CI = 612–735) by maintaining annual mortality limits for independent females, independent males, and dependent young.  The 2018 mortality limits were 9% for independent females and dependent young, and 20% for independent males.  Progress: 2018 mortality rates were 6.1% for independent females, 15.5% for independent males, and 5.0% for independent young; all of which are under current recovery criteria thresholds.

000717

Secure habitat levels have been maintained since 1998. The GYE grizzly bear population is currently isolated from other grizzly bear populations, with no documented genetic interchange between the GYE and NCDE. Despite this isolation, the genetic health of the GYE population has not declined due to increasing size of the population over the last several decades (Miller and Waits 2003, Kamath *et al*. 2015). Additionally, natural connectivity is expected to occur in the near future as both the GYE and NCDE populations expand in distribution. Based on 2018 distributions, the two populations are now only 75 km apart, with additional verified locations between the two distributions. This distance has steadily and significantly decreased in the last decade as they were approximately 122 km apart in 2006.

The Interagency Grizzly Bear Study Team (IGBST) is an interdisciplinary group of State, Tribal, and Federal scientists responsible for long-term monitoring and research on grizzly bears in the GYE. Detailed monitoring information, including annual reports and research results, can be found on the IGBST website.

**Delisting Status**

On June 30, 2017, the Service announced that the GYE grizzly bear population had met recovery targets and then designated and delisted the GYE grizzly bear Distinct Population Segment (DPS), returning management to the States and Tribes. Six lawsuits were filed against the Service over this decision. On September 24, 2018, the U.S. District Court of Montana vacated and remanded our 2017 delisting rule, putting the GYE grizzly population back on the Endangered Species List (as Threatened) as part of the lower 48 States listed entity.



Mike @ onesandzerosphoto.com

000718

## Northern Continental Divide Ecosystem

The Northern Continental Divide Recovery Zone (23,135 km$^2$) is located in northwest Montana and is well connected to large populations in Canada.  It includes all of Glacier National Park, as well as portions of the Flathead, Helena-Lewis and Clark, Kootenai, and Lolo National Forests (including 4 Wilderness Areas), and the Flathead and Blackfeet Indian Reservations.  The Demographic Monitoring Area (DMA) encompasses the recovery zone and a 19,444 km$^2$ buffer (Zone 1).  Monitoring of population size and mortality limits occurs within the DMA (USFWS 1993).   Monitoring of distribution of females with young and secure habitat occurs within the recovery zone (USFWS 1993, USFWS 2018).



**Population Status**

As of 2018, approximately 1,029 bears occupied the NCDE.  Bears currently occupy 63,924 km$^2$, which includes 41,051 km$^2$ inside the DMA (96 percent of the DMA), and 22,873 km$^2$ outside the DMA.

Recovery Criterion 1: 10 females with cubs inside GNP and 12 females with cubs outside Glacier National Park over a running 6-year average both inside the Recovery Zone and within a 10 mile area surrounding the Recovery Zone.  This equates to a minimum of 391 grizzly bears. Progress: Sightings of females with cubs have not been consistently collected since 2004 because of poor sightability in forested habitat. Instead, we use DNA data in combination with radio-telemetry data to project population size.  There were approximately 1,044 (95% CI: 892-1,218) bears in the NCDE in 2017.  This recovery target has been met.

Recovery Criterion 2: 21 of 23 BMUs within the recovery zone must be occupied by females with young, with no two adjacent BMU's unoccupied, during a 6-year sum of observations.  Progress: For the 6-year period 2013-2018, all BMUs were occupied by females with young.  This recovery target has been met.

Recovery Criterion 3: The running 6-year average of known, human-caused mortality shall be ≤ 4% of the population estimate; and ≤ 30% shall be females. The current mortality limit is 35.7 bears and 10.7 females/year. Progress:  Average human caused mortality for 2013-2018 was 23.8 bears/year and 9.7 females/year.  This recovery target has been met.

000719

Secure habitat levels have been maintained since 2011. Due to its connectivity to large populations in Canada, the NCDE has the potential to serve as an important genetic corridor between Canadian grizzly bear populations and the GYE, the BE, and the CYE, and is a potential source population for the BE, which is currently unoccupied. We believe the NCDE has recovered and we are now in a process to evaluate whether delisting is warranted.

Montana Fish, Wildlife and Parks (MFWP), in collaboration with Glacier National Park, the Confederated Salish & Kootenai Tribes, and the Blackfeet Nation are the primary agencies responsible for monitoring of the NCDE grizzly bear population. Additional details, annual reports, and select publications are available on the MFWP website.

**Habitat-Based Recovery Criteria**

In 2018, the Service finalized objective and measurable habitat-based recovery criteria (HBRC) for the NCDE that will maintain or improve upon 2011 levels of secure core habitat, motorized routes, developed sites, and livestock allotments. Habitat conditions in 2011 are believed to be representative of conditions that supported and contributed to the healthy population growth observed from 2004 to 2011. For more details, see the full HBRC.



Montana Fish, Wildlife & Parks

**Conservation Strategy**

The NCDE subcommittee of the IGBC finalized the Conservation Strategy in 2018, which will guide management and monitoring after delisting. The overarching goal of the Conservation Strategy, and the signatory agencies, is to maintain a recovered, genetically diverse grizzly bear population throughout the

DMA while maintaining demographic and genetic connections with Canadian populations and providing the opportunity for demographic and/or genetic connectivity with other ecosystems (CYE, BE, GYE).

## Cabinet-Yaak Ecosystem

The Cabinet-Yaak Recovery Zone (6,705 km$^2$) is located in northwest Montana and northeast Idaho.  Blocks of contiguous habitat extend into British Columbia, making this an international population.  The recovery zone includes portions of the Kootenai, Idaho Panhandle, and Lolo National Forests (including 1 Wilderness Area).  The Kootenai River bisects the CYE, with the Cabinet Mountains to the south and the Yaak River drainage to the north.  The degree of grizzly bear movement between the Cabinet Mountains and Yaak River drainage is believed to be minimal but several movements by males into the Cabinet Mountains from the Yaak River and the Selkirk Mountains have occurred since 2012.



**Population Status**

The current population size is estimated at 55-60 individuals with approximately half of these in the Cabinet Mountains and half in the Yaak River portions of the recovery area.  The population is growing at approximately 1% per year.

Recovery target 1:  6 females with cubs over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone.  Progress: Unduplicated females with cubs averaged 2.7 per year from 2012-2017.  This target has not been met.

Recovery target 2: 18 of 22 BMU's occupied by females with young from a running 6-year sum of verified evidence.  Progress: 11 of 22 BMUs were occupied from 2012-2017.  This recovery target has been met.

Recovery target 3: The running 6-year average of known, human-caused mortality shall be ≤ 4% of the population estimate; and ≤ 30% shall be females.  The current mortality limit is 1.9 bears/year and 0.6 females/year.  Progress:  Average human caused mortality for 2012-2017 was 1 bear/year and 0.2 females/year.  This target has been met.

Population linkage (and more importantly, gene flow) is needed to achieve and maintain long-term genetic health.  We have documented gene flow from sources unrelated to the augmentation program

000721

(see below); three migrants, all originating from the Purcell Mountains north of HWY 3 in BC, have produced 4 offspring in the Cabinet-Yaak. One offspring is known to have recruited to adulthood (male), two are known dead, and the fourth suspected dead or emigrated. We have yet to document gene flow from other populations.

The Service has been leading research and monitoring in the CYE since 1988. Key research partners include Idaho Fish and Game, Montana Fish, Wildlife and Parks, Kootenai Tribe of Idaho, Idaho Panhandle National Forest, Kootenai National Forest, and Lolo National Forest. Further monitoring and research details can be found in the most recent Cabinet-Yaak Grizzly Bear Recovery Area Research and Monitoring Progress Report.

**Augmentation Program**

An augmentation program in the Cabinet Mountains portion of the population began in 1990 after research estimated fewer than 15 animals in the area. Primary objectives of the program are to bolster reproduction through the addition of female bears, and overall genetic diversity through the addition of female and male bears. Twenty bears have been added in the Cabinet Mountains since 1990. All bears have no history of conflicts with people and were moved in the summer to take advantage of developing food supplies in the form of huckleberries. Initial augmentation consisted of females but in recent years males have also been added. Six of these individuals are known to be dead and four others have left the target area. Reproduction has been identified by at least three of the transplanted bears with two females and 1 male that are known to have produced at least 14 first generation offspring, 18 second generation offspring, and one third generation offspring.

000722



**ER_72**

000723

## Selkirk Ecosystem

The Selkirk Mountains Grizzly Bear Recovery Zone (6,575 km$^2$) is located in northwest Idaho, northeast Washington, and southeast British Columbia (BC). It includes portions of the Idaho Panhandle and Colville National Forests (including 1 Wilderness Area) and the South Selkirks unit in BC.

**Population Status**

There are an estimated 75-80 bears in the U.S. and Canadian portions of the SE. The population is growing at approximately 1.8% per year.

Recovery target 1: 6 females with cubs over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone. Progress: Unduplicated females with cubs averaged 3.0 per year from 2012-2017. This target has not been met.



Recovery target 2: 7 of 10 BMUs occupied by females with young from a running 6-year sum of verified evidence. Progress: 7 of 10 BMUs were occupied during 2012-2017. This recovery target has been met.

Recovery target 3: The running 6-year average of known, human-caused mortality shall be ≤ 4% of the population estimate; and ≤ 30% shall be females. The current mortality limit is 2.4 bears/year and 0.7 females/year. Progress: Average human caused mortality for 2012-2017 was 1.8 bears/year and 0.8 females/year. Total mortality numbers for this period came in under the limit; but female mortalities exceeded the limit.

The SE is a historically isolated population, having among the lowest documented genetic diversity of interior North American populations ($H$=0.54, Proctor et al. 2012). Recently, we have documented movement between the Selkirk population and the Purcell Mountains population north of HWY 3 in BC. Perhaps more importantly, we have detected gene flow into the Selkirks from two migrant males from the Purcells. These two males have produced nine known offspring in the Selkirks (median birth year 2015).

The Service has been leading a grizzly bear monitoring and research program in the SE since 2012. Key research and funding cooperators include Idaho Department of Fish and Game, the Panhandle National Forest, the Colville National Forest, Idaho Department of Lands, the Kalispel Tribe, the Kootenai Tribe of Idaho, and Washington Department of Fish and Wildlife. The BC effort was led by Dr. Michael Proctor

000724

with key funding provided by BC Habitat Conservation Trust Fund and BC Fish and Wildlife Compensation Fund.  Further monitoring and research details can be found in the Selkirk Mountains Grizzly Bear Recovery Area 2017 Research and Monitoring Progress Report.



000725

## North Cascades Ecosystem

The North Cascades Recovery Zone (25,305 km$^2$) is located in northcentral Washington. It includes all of North Cascades National Park and portions of the Mount Baker-Snoqualmie, Wenatchee, and Okanogan National Forests (including 9 Wilderness Areas). The ecosystem extends north of the border into BC; however it is isolated from grizzly bear populations in other parts of the US and Canada.



**North Cascades Recovery Zone**
**North Cascades National Park Complex**

**Population Status**

The overall population status of grizzly bears in the greater NCE is unknown; however, it is highly unlikely that the NCE contains a grizzly bear population. There have been only four confirmed detections of grizzly bears in the greater NCE in the past 10 years, all of which occurred in BC and may comprise only two individuals. There has been no confirmed evidence of grizzly bears within the US portion of the NCE since 1996.

**Recovery Efforts**

The Service is working with North Cascades National Park to finalize an Environmental Impact Statement (EIS) evaluating restoration options for grizzly bears in the unoccupied NCE. We released a draft EIS with proposed alternatives for public comment in 2017. We will likely be re-opening public comment on the EIS in 2019.

000726

## Bitterroot Ecosystem

The Bitterroot Recovery Zone (15,100 km$^2$), located in central Idaho and western Montana, is one of the largest contiguous blocks of Federal land in the lower 48 States. Ninety-eight percent of the Recovery Zone is contained within two Wilderness Areas in the Nez Perce-Clearwater and Salmon-Challis National Forests.



**Population Status**

The BE ecosystem is thought to be unoccupied by a grizzly bear population. However, as the GYE and NCDE populations continue to expand, grizzly bears have increasingly been confirmed nearby, including a grizzly bear captured in Stevensville, MT in October 2018. The ecosystem is within maximum dispersal distance of three ecosystems, including the GYE, CYE, and NCDE, and we expect grizzly bears to recolonize the BE, albeit slowly. It is possible that some undetected individuals are currently in the area and there is a need to survey the BE to determine occupancy and distribution. The Service is currently seeking funding for this effort.

000727

Under current policy, each ecosystem must qualify as a DPS in order for us to list or delist individually. To date, we have only revised the listing once to recognize a DPS within the lower 48 State listing. In March 2007, we determined that the GYA grizzly bear population met the definition of a DPS (72 FR 14866, March 29, 2007). On September 21, 2009, other parts of this action were overturned by the Federal Court in the District of Montana (Greater Yellowstone Coalition v. Servheen et al., CV 07-134-M-DWM), vacating the entire determination, including this designation of a DPS. This decision is being appealed as of 2011.

While we believe there is sufficient evidence to support multiple DPSs within the current lower 48 State listing, we are not currently recommending a formal revision to the listing to recognize these potential DPSs. For the time being, further subdivision of the lower 48 State listing is unnecessary. This decision will be re-evaluated as populations near the point where a rulemaking is considered (e.g., when recovery is achieved and delisting is considered; or when listing funds become available to address those populations that are warranted-but-precluded for endangered status).

Our eventual application of the DPS policy within the lower 48 listing would not alter our long-term goal of achieving connectivity and managing grizzly bear populations in the northern Rockies as subpopulations of a metapopulation (FWS 1993; IGBC 2001). To date, we have not documented natural movements by females between any of the recovery ecosystems in the lower 48 States, although efforts are underway to improve connectivity between ecosystems. Because the DPS Policy does not require complete separation of one DPS from another, such movement would not necessarily undermine the discreteness of potential DPSs. The DPS policy only requires that populations be "markedly separated" from each other. Thus, if occasional individual grizzly bears move between populations, the population could still display the required level of discreteness per the DPS Policy. Discreteness, relative to the DPS policy's markedly separate standard, will be evaluated in future rulemakings.

## 2.2    Recovery Criteria

### 2.2.1    Does the species have a final, approved recovery plan containing objective, measurable criteria?

Yes, the species has a final approved recovery plan (FWS 1993). However, many criteria are not measurable criteria pertaining to specific threats, but instead are goals that provide a benchmark for measuring progress toward recovery.

### 2.2.2    Adequacy of Recovery Criteria

Except for the GYA, the recovery plan and the associated recovery criteria have not been updated since the plan was released in 1993 and supplemented in 1996 and 1997 with chapters for the BE and NCASC, respectively. Thus, the plan no longer reflects the best available and most up-to-date information on the biology

14

005277

of the species and its habitat. We are now in the process of updating the recovery plan. Despite some outdated information, the species' status relative to these criteria are discussed below so as to show each recovery unit's relative progress toward recovery.

### 2.2.3    Recovery Criteria From the 1993 Recovery Plan and Status of Each

The 1993 Grizzly Bear Recovery Plan provides three broad goals to reach recovery in each of the grizzly bear ecosystems: 1) achieve the demographic recovery criteria for that ecosystem; 2) develop threshold habitat values necessary to support a viable population; and 3) develop and complete an interagency conservation strategy to ensure adequate regulatory mechanisms will continue after delisting (FWS 1993). The recovery plan provides specific recovery criteria and action items for each recovery zone. Below, we have listed measurable recovery criteria and broad goals/action items as outlined in the current plan with information about how each has or has not been met provided in ***italics***.

### Demographic Recovery Criteria

The FWS is in the process of updating the demographic recovery criteria in the 1993 Recovery Plan because new science and techniques are available. This task has been completed for the GYA grizzly bear population (FWS 2007a) and adherence to the revised criteria is reported below. For all other ecosystems, we describe the 1993 demographic criteria and the mortality data in recent years for each ecosystem.

The following demographic recovery criteria were developed to address overutilization and human-caused mortality (Factors B and C) within each recovery zone and a surrounding 10-mile buffer by ensuring a sufficient population size and distribution. These demographic recovery criteria include measures for population size, distribution, and sustainable mortality:

**(1)** For the GYA, the 1993 demographic recovery criteria were revised to reflect the best available science and appended to the 1993 Recovery Plan on March 6, 2007 (FWS 2007a). Mortalities are now counted throughout the ecosystem instead of just within the recovery zone and a 10-mile buffer. For a complete explanation of these changes, please refer to 72 FR 14866 (March 29, 2007, pp. 14871-14873, Appendix A) and references therein. The revised demographic recovery criteria in the GYA include: 1) maintenance of a total population of at least 500, as indicated by the model averaged $Chao_2$ estimate (Keating et al. 2002) of at least 48 females with cubs-of-the-year which cannot drop below 48 for 2 consecutive years; 2) occupancy of 16 of 18 Bear Management Units (BMUs) by females with young and no adjacent units may be unoccupied during the same 6-year period; 3) the total mortality limit for independent females may not exceed 9% for 2 consecutive years; 4) the total mortality limits for independent males may not exceed 15% for 3 consecutive years; 5) the human-caused mortality limit for dependent young may not exceed 9% for 3 consecutive years.

15

005278

To thoroughly assess the presence of grizzlies in the BE, we systematically surveyed for bears during 2008 and 2009 using barbed wire DNA hair corrals and cameras. These surveys can establish presence of species but cannot be used to establish absence. Sites were constructed according to the methods of Woods et al. (1999). Heat- and motion-triggered cameras were placed at as many sites as possible to document the reproductive status of bears (i.e., are cubs present?) and to serve as a supplemental sampling method in case animals did not leave a hair sample. During 2008 and 2009, we placed 139 hair corrals throughout the study area which was focused on the northern Bitterroot Mountains between U.S. Highway 12 in Idaho and Montana Highway 200 and between Missoula, Montana, and Avery, Idaho. We did not obtain any photos of grizzly bears. The hair samples from 2009 are being analyzed by the genetics lab, but we know that there were no grizzly bear hair samples from 2008. While we did not document any grizzlies in the study area, our sampling methods do not allow us to conclude they are absent from the area. For example, in the CYE, another low-density population with 15 individuals over an area roughly half the size of our BE study area, we generally document 1 or 2 bears annually using the same methods. Our failure to document grizzly bears in this area indicates that if they are regularly occupying the BE, there are very few individuals and they exist at very low densities.

### 2.3.1.3   Current and Historic Distribution

The range and numbers of grizzlies were reduced to less than 2% of their historical levels by the 1930s, approximately 125 years after first contact with European settlers (see FIGURE 1, inset) (FWS 1993; Mattson et al. 1995; Servheen 1999). Of 37 grizzly populations present in 1922, only 5 remained by 1975 (Servheen 1999). Current range and distribution of grizzly bears in the lower 48 States has increased since 1975, although there are no published data with which to make direct comparisons among all ecosystems.

Estimates of grizzly bear distribution vary widely depending on the methods used and the questions trying to be answered. When asking where someone may possibly encounter a grizzly bear, the answer is very different than asking where someone would *expect* to encounter a grizzly bear. The most conservative estimates of distribution and long-term occupancy rely on locations of females with young. This metric best answers where someone would *expect* to encounter grizzly bears. In contrast, an estimate of distribution based on grizzly bear mortalities or locations of grizzly bear conflicts would encompass a much larger area because adult males and dispersing subadult males roam more widely than females and consequently, experience higher conflict and mortality risks. This metric may best answer the question of where someone could *possibly* encounter a grizzly bear but it may not be likely. These different metrics that can be used to estimate grizzly bear distribution are not directly comparable and must be used appropriately depending on the question being asked.

28

005291

## 4.    RECOMMENDATIONS FOR FUTURE ACTIONS

### *Administrative Actions*

- Revise the recovery plan for grizzly bears in the lower 48 States so that it reflects the best scientific and commercial information available.  The revised recovery plan should include objective, measurable criteria which, when met, will result in a determination that the species be removed from the Federal List of Endangered and Threatened Wildlife.  These criteria should continue to be updated to reflect new science and techniques.  Specifically, a team will be created for each recovery plan chapter to evaluate the demographic and habitat criteria, the role of each ecosystem in a metapopulation framework, and any new scientific data available.  The recovery plans also should include estimates of the time required and the cost to carry out those measures needed to achieve the goal for recovery and delisting.

- Delist the "error states" to  correct the 1975 Listing which listed the grizzly bear throughout the lower 48 States, including areas it was absent from historically.

- Begin the EIS process to select appropriate conservation actions to recover the NCASC grizzly bear population and evaluate the need for grizzly bear augmentation in this ecosystem.  Augmentation would allow demographic and genetic reinforcement of this population which is isolated from other populations in Canada.

- When revising demographic recovery criteria for the NCDE, include mortalities in a 10-mile buffer extending into Canada, as is done with our other trans-border populations in the CYE, SE, and NCASC.

- Review the Swan Valley Conservation Agreement to reflect new ownership patterns after the Legacy Project.

- Continue to seek support and resources for a DNA-based population census in the CYE, SE, and NCASC recovery zones.

- Evaluate the scientific basis for each ecosystem's definition of Secure Habitat and consider a standardized definition if appropriate.

### *Threats Abatements*

- Complete the NCDE Conservation Strategy and implement the habitat standards in the strategy via forest plan amendments and park and Tribal management plan amendments.

- Implement standardized sanitation regulations on public and private lands in grizzly habitat as a basic conservation measure for multiple wildlife species across the landscape.

- Enhance conservation action in identified linkage zones between the Purcell Mountains in B.C. southward to the BE and the southward to the GYA.  This work should involve identification of key linkage areas using a data-based approach using GPS collars and RSF modeling, sanitation assistance in private land areas in these areas, easements and acquisitions in appropriate private land areas in these areas, outreach and education to local residents, and work with public land managers in the intervening lands to assure habitat security in these areas.

105

005368

### _Research and Monitoring_

- Develop a standardized definition of "suitable habitat" which can be applied in both occupied and unoccupied areas. It may be more credible to use radio-collar data in the definition of suitable habitat as more of those data become available.

- In accordance with the 1993 Recovery Plan, other areas throughout the historic range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery (FWS 1993). Potential areas for recovery would provide the adequate amounts of quality habitat, space, and managed levels of human activities necessary to sustain a viable population of grizzly bears. As budgets allow, conduct evaluations of habitat suitability for currently unoccupied, historic habitat in Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and southern Washington (mountain ranges in the western U.S. While this is ongoing, continue to focus management efforts on extant populations and the BE before pursuing recovery in currently unoccupied habitat.

- Continue to follow-up on credible sighting data outside existing range and continue surveys using cameras and DNA hair snares in areas where population expansion is likely.

- Develop standardized estimates of current grizzly bear range in each ecosystem using methods of Schwartz et al. 2002 and 2006b, or other scientific methodology.

- With cooperation from the Tribes in the NCDE, update road, habitat security, and livestock data on Tribal lands.

- Assess the impacts of climate change on vegetative food sources, the distribution and extent of important vegetation communities, and the ability of alpine plant communities and insect communities to continue to exist as these areas are important grizzly bear habitat use areas that will be subject to amplified climate change effects.

- Continue genetic monitoring to document range expansion and population exchange by obtaining DNA samples from all management and research captured bears.

- Monitor location and status of radio-collared animals in all ecosystems, using GPS collars when possible.
- To avoid potential conflicts between snowmobiles and denning grizzlies, National Forests should conduct analyses of suitable denning habitat and spring foraging areas that may overlap with snowmobile use then direct snowmobile use accordingly to minimize conflicts.

- Calculate the current number of developed sites on both private and public lands within each recovery ecosystem.

- Obtain habitat data for all public lands outside recovery zones (i.e., road densities, amount of Secure Habitat, number of developed sites, number and type of livestock allotments, etc.).

- Evaluate the effectiveness of MFWP's black bear identification test in reducing the number of mistaken identity grizzly bear mortalities from black bear hunters in Montana.

005370

Kristine M. Akland
AKLAND LAW FIRM PLLC
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, <br><br> Plaintiff, <br><br> v. <br><br> **DAVID BERNHARDT**, Secretary of the Interior; and **MARGARET EVERSON**, Principal Deputy Director of U.S. Fish and Wildlife Service; <br><br> Defendants. | Case No. _____ <br><br><br> **COMPLAINT** |

## INTRODUCTION

1.      The Center for Biological Diversity ("the Center") brings this case against David Bernhardt, Secretary of the Interior; and Margaret Everson, Principal Deputy Director of the U.S. Fish and Wildlife Service (collectively the "Service") for violating the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559. Specifically, the

ER_82

Service has failed to prepare a timely grizzly bear five-year status review in
violation of section 4(c) of the ESA, failed to update or amend its outdated grizzly
bear recovery plan in violation of section 4(f) of the ESA, failed to evaluate or
pursue further grizzly bear recovery in violation of section 7(a)(1) of the ESA, and
unreasonably denied the Center's 2014 petition for an updated and amended
grizzly bear recovery plan in violation of the APA.

2.      The Service listed grizzly bears in the lower 48 states as "threatened"
under the ESA over forty years ago. The Service prepared a grizzly bear recovery
plan in 1982 with a revision in 1993 and supplements thereafter. In 2011, the
Service released a five-year status review for the grizzly bear, in which the agency
found that the 1993 Recovery Plan was no longer based upon the best available
science and needed to be updated. The Service specifically noted that the agency
must evaluate other areas of the grizzly bear's historic range in the lower 48 states
to determine their habitat suitability for grizzly bear recovery, including historic
habitat in Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and
southern Washington. But the Service never updated the Plan in the manner that
the agency itself had said was necessary.

3.      On June 18, 2014, the Center filed a petition asking the Service to
amend the 1993 Recovery Plan to include updated biological information and
consider other significant areas of suitable habitat across the grizzly bear's historic

range in the western United States. As explained below, the Service unreasonably denied the Center's petition.

4.     Through this litigation, the Center asks the Court for an order providing deadlines for the Service to prepare a timely five-year status review for the grizzly bear, update the recovery plan, and evaluate the need to pursue grizzly bear recovery in additional areas.

## JURISDICTION AND VENUE

5.     This action arises under the ESA, 16 U.S.C. § 1531 *et seq.*, and the APA, 5 U.S.C. §§ 551, 701-706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief), 16 U.S.C. § 1540(c), (g)(1)(C) (action arising under the ESA and citizen suit provision), and 5 U.S.C. § 702 (APA). The Center has properly given notice to the Service of its claims under the ESA in accordance with 16 U.S.C. § 1540(g)(2)(C).

6.     Venue in this Court is proper under 28 U.S.C. § 1391(e) because grizzly bears and the Service's Grizzly Bear Recovery Office occur in this District.

## PARTIES

7.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a nonprofit organization dedicated to the protection and restoration of biodiversity. The Center is based in Tucson, Arizona, with offices throughout the

country, including in California, Colorado, Idaho, New Mexico, Nevada, Oregon, Utah, and Washington. The Center has over 1.4 million members and supporters, including many who live within the grizzly's bears current and historic range.

8.    Because the Center values the grizzly bear and its role in promoting healthy ecosystems, the Center places high priority on protecting and recovering the grizzly bear across its range. The Center works toward this goal through education, advocacy, scientific study, and litigation.

9.    For example, on June 18, 2014, the Center filed a petition pursuant to the APA, 5 U.S.C. § 553(e), to the U.S. Department of the Interior and the U.S. Fish and Wildlife Service requesting that the Service update and amend the 1993 Recovery Plan. On September 22, 2014, the Service denied the petition.

10.    The Center's members – including its Board members, supporters, and staff – live, work, recreate, study, and otherwise use and enjoy areas throughout the grizzly bear's current and historic range in the lower 48 states. The Center's members use lands covered by the Center's petition, including the Gila-Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, the Uinta Mountains in Utah, and areas of southern Utah. In such areas, the Center's members frequently engage in hiking, camping, boating, snowshoeing, skiing, wildlife watching, photography, and other activities, and will continue to do so. The Center's members enjoy seeing grizzly bears and

Page 4

their signs (like tracks and scat) where they live in the wild and would like to see them in more of their historic range.

11.     The Center's members have suffered, and will foreseeably continue to suffer, direct injuries to their recreational, aesthetic, scientific, professional, spiritual, and other interests and activities because of the Service's failure to prepare a timely five-year review, update the grizzly bear recovery plan, and evaluate or pursue grizzly bear recovery in additional areas. These are actual, ongoing, concrete injuries, traceable to the Service's inaction, that would be redressed by the relief requested. Specifically, if the Court orders the Service to prepare a five-year status review, update the grizzly bear recovery plan, or evaluate the need to pursue recovery in additional areas, these analyses would further the conservation of grizzly bears and protect the interests of the Center and its members in the species.

12.     Defendant DAVID BERNHARDT is the Secretary of the Department of the Interior. The Secretary of the Interior is responsible for making decisions and promulgating regulations under the ESA, including decisions regarding recovery plans and petitions for rulemaking. He is sued in his official capacity.

13.     Defendant MARGARET EVERSON is the Principal Deputy Director of the U.S. Fish and Wildlife Service. The Secretary of the Interior has delegated to the U.S. Fish and Wildlife Service, among other things, the authority for

responding to petitions for rulemaking and the responsibility to develop and

implement recover plans for non-marine species. She is sued in her official

capacity.

## STATEMENT OF FACTS

**A.  THE ESA: THE ROLE OF RECOVERY PLANS AND STATUS
REVIEWS**

14.     The Endangered Species Act is intended to "provide a means whereby

the ecosystems upon which endangered species and threatened species depend may

be conserved" and to "provide a program for the conservation of such species." 16

U.S.C. § 1531(b). The ESA defines "conservation" as the "use of all methods and

procedures which are necessary to bring any endangered species or threatened

species to the point at which the measures provided pursuant to this chapter are no

longer necessary," *id.* § 1532(3), i.e. to bring about the recovery of species listed as

endangered or threatened.  *See id.* § 1532(6), (20) (definitions of "endangered

species" and "threatened species").

15.     To carry out the ESA's paramount purpose that listed species be

"conserved," section 4(f) of the Act sets forth a detailed process for the

development and implementation of recovery plans. Section 4(f)(1) provides that

the Service "shall develop and implement [recovery] plans for the conservation and

survival of endangered species and threatened species listed pursuant to this

section, unless [it] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). The Service, "in developing and implementing recovery plans, shall, to the maximum extent practicable" incorporate "such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species," as well as "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id.* § 1533(f)(1)(B)(i), (ii). A recovery plan must, therefore, provide for the recovery of the species.

16.     Reinforcing the importance of recovery plans, Congress provided for public participation in the development and amendment of the plans. For example, prior to final approval of any "new or revised recovery plan," the Service must "provide public notice and an opportunity for public review and comment on such plan," 16 U.S.C. § 1533(f)(4), and the Service "shall consider all information presented during the public comment period prior to approval of the plan." *Id.* § 1533(f)(5). The Service must also "report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and the status of all species for which such plans have been developed." *Id.*

Page 7

§ 1533(f)(3).

17.     The ESA also requires the Service to regularly assess the status of listed species. Specifically, section 4(c) requires that the Service "conduct, at least once every five years, a review of all [listed] species . . . ." 16 U.S.C. § 1533(c)(2)(A). Based on that review, the agency can determine whether the species should maintain its protections or be uplisted or delisted. *Id.* § 1533(c)(2)(B); *see also* 50 C.F.R. § 424.21.

18.     Section 7(a)(1) of the ESA provides an "affirmative duty" for federal agencies to conserve listed species. It provides that all federal agencies shall "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed . . . ." 16 U.S.C. § 1536(a)(1). This substantive mandate ensures that listed species benefit from implementation of actions needed for their survival and recovery, such as those prescribed in recovery plans.

## B.     THE GRIZZLY BEAR AND ITS OUTDATED RECOVERY PLAN AND STATUS REVIEW

19.     The grizzly bear (*Ursus arctos horribilis*) once ranged throughout most of western North America, from the high Arctic to the Sierra Madre Occidental of Mexico, and from the coast of California across most of the Greater Plains. *See* U.S. Fish and Wildlife Service, *Revised Grizzly Bear Recovery Plan* 9

Page 8

(1993) (hereinafter "1993 Recovery Plan"). Prior to European settlement, scientists estimate that approximately 50,000 grizzly bears may have occupied the western United States between Canada and Mexico. *Id.*

20.    With European settlement of the American West and a federally-funded bounty program aimed at eradication, grizzly bears were shot, trapped, and poisoned, reducing their range and numbers to less than two percent of historic levels. U.S. Fish and Wildlife Service, Grizzly Bear Recovery Office, *Grizzly Bear 5-Year Review: Summary and Evaluation* 28 (2011) (hereinafter "2011 5-Year Review").

21.    Because of its precipitous decline, in 1975 Service listed the grizzly bear as a "threatened" species in the lower 48 states under the ESA. 40 Fed. Reg. 31,734 (July 28, 1975).

22.    In accordance with the ESA, the Service first approved a grizzly bear recovery plan in 1982, revised in 1993, to "delineate reasonable actions that are believed to be required to recover and/or protect" the grizzly bear. 1993 Recovery Plan at i. The Service identified four recovery zones—Yellowstone, Northern Continental Divide, Cabinet-Yaak, and Selkirks—and three evaluation areas—Bitterroot, North Cascades, and San Juan Mountains—for potential recovery. *Id.* at 39-121.

23.    In the 1993 Recovery Plan, the Service also committed to evaluate

"other potential recovery areas throughout the historical range of the grizzly bear," with an analysis "focus[ed] on habitat values, size of the areas, human use and activities in general, relation to other areas where grizzly bears exist, and historical information." *Id.* at 121. The Service anticipated that the analysis would take five years to complete. *Id.*

24.     It has been over 25 years since the Service issued the 1993 Recovery Plan and committed to evaluate other potential recovery areas, yet the Service has failed to do so.

25.     The Service prepared geographically-specific supplements to the recovery plan in 1996, 1997, 2007, 2017, and 2018. The 1996 Supplement provided a recovery chapter for the Bitterroot Ecosystem, and the 1997 Supplement provided a recovery chapter for the North Cascades Ecosystem. The 2007 and 2017 supplements deal with grizzly bears in the Greater Yellowstone Ecosystem. The 2018 Supplement provides "Habitat-based Recovery Criteria for the Northern Continental Divide Ecosystem."

26.     With these supplements in place, the 1993 Recovery Plan calls for recovery of grizzly bears in six identified recovery areas: 1) the Greater Yellowstone Ecosystem, 2) the Northern Continental Divide Ecosystem, 3) the Cabinet-Yaak Ecosystem, 4) the Selkirk Ecosystem, 5) the North Cascade Ecosystem, and 6) the Bitterroot Ecosystem. The six recovery areas are generally

limited to the northern Rockies in Idaho, Wyoming, Montana, and the North
Cascades in Washington.

27.    The Service did not prepare any supplements to designate the San
Juan Mountains evaluation area as a recovery area, or to analyze and evaluate other
areas of the grizzly bear's historic range as potential recovery areas.

28.    In August 2011, the Service published its last five-year review for
grizzly bears. In the 2011 5-Year Review, the Service again specifically noted that
"other areas throughout the historic range of the grizzly bear in the lower 48 States
should be evaluated to determine their habitat suitability for grizzly bear recovery,"
including "Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon,
and southern Washington (mountain ranges in the western U.S.)."  2011 5-Year
Review at 107. Still, the Service has not undertaken such an evaluation of other
areas in the grizzly bear's historic range.

29.    In the 2011 5-Year Review, the Service also explained that except for
the geographically-focused supplements, "the recovery plan and the associated
recovery criteria have not been updated since the plan was released in 1993" and
"no longer reflects the best available and most up-to-date information on the
biology of the species and its habitat." 2011 5-Year Review at 14-15. And in the
section of the 2011 5-Year Review entitled "Recommendations for Future
Actions," the Service listed, as its first recommendation, the need to "[r]evise the

Page 11

recovery plan . . . so that it reflects the best scientific and commercial information available." *Id.* at 105. The Service published revised demographic recovery criteria for the Yellowstone Ecosystem in 2017 and habitat-based recovery criteria for the Northern Continental Divide Ecosystem in 2018. But the Service never updated the demographic recovery criteria for other recovery areas or otherwise updated the outdated information in the Plan that the agency identified in the 2011 5-Year Review.

30.    Additionally, although the Act requires that the Service prepare status reviews every five years, nearly eight years have passed since the Service's last review in 2011.

31.    According to the most recent estimates available, fewer than 1,900 grizzly bears survive in the lower 48 states. U.S. Fish and Wildlife Service, *Grizzly Bear Recovery Program 2018 Annual Report* (2018). The bears likely exist in four of the six identified recovery areas – not the Bitterroot Ecosystem and probably not in the North Cascade Ecosystem – and nowhere else in the bear's historic range in the lower 48 states. *Id.*

## C.    THE CENTER'S PETITION TO UPDATE AND AMEND THE GRIZZLY BEAR RECOVERY PLAN

32.    On June 18, 2014, the Center submitted to the Service a formal petition, pursuant to the APA, 5 U.S.C. § 553(e), for the development of an

updated and amended recovery plan for the grizzly bear. *See* Center for Biological Diversity, *Petition for a Recovery Plan for the Grizzly Bear* (Ursus arctos horribilis) *Across Its Native Range in the Conterminous United States* 2 (2014). Specifically, the Center requested that the Service update the 1993 Recovery Plan to "include all significant remaining areas of suitable habitat across the grizzly bear's native range in the western U.S." *Id.* The Center requested that the Service consider recovery in at least the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, the Uinta Mountains in Utah, and areas of southern Utah. The Center's petition reviewed numerous scientific publications in explaining that these areas likely provide suitable habitat for grizzly bears. The Center also requested that the Service update demographic parameters for all grizzly bear populations, as well as other outdated biological information.

33.    On September 22, 2014, the Service denied the Center's petition.

34.    The Service asserted that "[r]ecovery plans are not rules under the APA," and thus "Section 553(e) does not provide the right to petition for the issuance of a recovery plan."

35.    The Service further stated that it had "satisfied [its] statutory responsibilities for recovery planning and implementation." It also stated that the agency intended to focus on the "six ecosystems identified and covered by

individual chapters in the recovery plan," and that "any additional recovery planning is subject to Service prioritization and is discretionary."

36.    In its denial letter, the Service did not acknowledge its previous commitments, made in the 1993 Recovery Plan and in the 2011 5-Year Review, to analyze other areas of suitable habitat for grizzly bear recovery. Nor did the agency acknowledge its finding in the 2011 5-Year Review that the existing grizzly bear recovery plan is outdated and fails to reflect the best available science.

37.    Rather than prepare the updated recovery plan requested in the Center's petition, the Service instead moved toward prematurely and unlawfully removing the grizzly bear's ESA protections. The Service proposed in 2016 and finalized in 2017 a rule to delist the Greater Yellowstone Ecosystem population of grizzly bears. *See* 81 Fed. Reg. 13,173, 13,227 (Mar. 11, 2016); 82 Fed. Reg. 30,502 (June 30, 2017). In 2018, the Court reinstated the population's ESA protections after ruling that the Service's delisting decision was unlawful. *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1003 (D. Mont. 2018).

## FIRST CLAIM FOR RELIEF

**ESA Section 4(c): Failure to prepare a timely five-year status review for the grizzly bear**

38.    The Center hereby realleges and incorporates all preceding paragraphs.

Page 14

39.     Section 4(c) of the ESA requires that the Service prepare a status review for each listed species "at least once every five years." 16 U.S.C. § 1533(c)(2)(A); *see also* 50 C.F.R. § 424.21.

40.     The Service last prepared a status review for the grizzly bear in 2011.

41.     Because more than five years have passed since the Service prepared a five-year status review for the grizzly bear, the Service has violated its nondiscretionary duty to do so under ESA section 4(c), 16 U.S.C. § 1533(c)(2)(A).

## SECOND CLAIM FOR RELIEF

**ESA Section 4(f): Failure to "develop and implement" a plan that provides for the "conservation and survival" of the species**

42.     The Center hereby realleges and incorporates all preceding paragraphs.

43.     Under section 4(f) of the ESA, the Service has a non-discretionary duty to "develop and implement" recovery plans for the "conservation and survival" of listed species. 16 U.S.C. § 1533(f)(1).

44.     The Service in the 1993 Recovery Plan committed to "evaluate the feasibility of grizzly bear recovery in the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear . . . ." 1993 Recovery Plan at 121. The Service expected that the analysis would take five years to complete. *Id*.

Page 15

45.     The Service has never updated the grizzly bear recovery plan to evaluate the San Juan Mountains of Colorado or other potential recovery areas throughout the historical range of the grizzly bear.

46.     The Service must "evaluate the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear" because the 1993 Recovery Plan requires it, and the Service "shall develop and implement" recovery plans for the "conservation and survival" of listed species. 16 U.S.C. § 1533(f)(1).

47.     Moreover, the 1993 Recovery Plan's direction to "evaluate the feasibility of grizzly bear recovery in the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear," 1993 Recovery Plan at 121, is one of the "site-specific management actions" that the Service found "necessary to achieve the plan's goal for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i); *see also* 2011 5-Year Review at 107 (explaining that "other areas throughout the historic range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery," including "Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and southern Washington (mountain ranges in the western U.S.)").

48.     "Conservation" of the grizzly bear cannot be achieved if the Service

Page 16

pursues recovery only in the northern Rockies and the North Cascades because the
grizzly bear once ranged throughout most of western North America. Recovery in
additional areas is a prerequisite to getting the grizzly bear "to the point at which
the measures provided pursuant to this Act are no longer necessary." 16 U.S.C.
§ 1532(3); *see id.* § 1532(20) (definition of "threatened species").

49.     Furthermore, the Service explained in the 2011 5-Year Review that
except for the supplements covering specifically identified recovery areas, "the
recovery plan and the associated recovery criteria have not been updated since the
plan was released in 1993" and "no longer reflects the best available and most up-
to-date information on the biology of the species and its habitat." 2011 5-Year
Review at 14-15. The Service released supplements in 2017 and 2018 that cover
the Yellowstone Ecosystem and the Northern Continental Divide Ecosystem, but it
has failed to complete any other updates to reflect the best available information on
grizzly bear biology.

50.     Because the Service never updated the 1993 Recovery Plan to
evaluate additional areas within the bear's historic range, as the Service said it
would, and because the 1993 Recovery Plan no longer reflects the best available
science, as the Service found, the Service has failed to "develop and implement" a
plan for the "conservation and survival" of the grizzly bear, in violation of ESA
section 4(f), 16 U.S.C. § 1533(f)(1).

Page 17

## THIRD CLAIM FOR RELIEF

**ESA Section 7(a)(1) and APA: Violation of the affirmative duty to conserve the grizzly bear in refusing to evaluate or pursue grizzly bear recovery in additional areas**

51.     The Center hereby realleges and incorporates all preceding paragraphs.

52.     Section 7(a)(1) of the ESA provides an "affirmative duty" for federal agencies to conserve listed species. Under section 7(a)(1), all federal agencies have a non-discretionary duty to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed . . . ." 16 U.S.C. § 1536(a)(1). The ESA broadly defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3).

53.     In the 1993 Recovery Plan, the Service stated that it would evaluate within five years the "San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear . . . ." 1993 Recovery Plan at 121. In the 2011 5-Year Review, the Service specifically noted that "other areas throughout the historic range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear

Page 18

recovery," including "Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and southern Washington (mountain ranges in the western U.S.)." 2011 5-Year Review at 107.

54.     The Service has not updated its recovery plan to evaluate other areas throughout the historic range of the grizzly bear, even though it committed to do so in the 1993 Recovery Plan and the 2011 5-Year Review.

55.      The Service has refused to pursue grizzly bear recovery in additional areas, even though the bear's numbers and range are less than two percent of historic levels. 2011 5-Year Review at 28.

56.     "Conservation" of the grizzly bear cannot be achieved if the Service pursues recovery only in the northern Rockies and the North Cascades because the grizzly bear once ranged throughout most of western North America. Recovery in additional areas is a prerequisite to getting the grizzly bear "to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3); *see id.* § 1532(20) (definition of "threatened species").

57.     Because the Service has not updated its recovery plan to evaluate additional areas within the bear's historic range or otherwise pursue recovery in those additional areas, the Service has not adequately "utilize[d its] authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed," in violation of

Page 19

ESA section 7(a)(1), 16 U.S.C. § 1536(a)(1).

58.     The Service's violation of the ESA's section 7(a)(1) affirmative duty

to conserve is arbitrary, capricious, an abuse of discretion, and not in accordance

with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF

### APA Violation: Unreasonable denial of the Center's petition

59.     The Center hereby realleges and incorporates all preceding

paragraphs.

60.     The APA provides that any interested person has "the right to petition

for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

61.     Under the APA, a "rule" is defined as "the whole or a part of an

agency statement of general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy." *Id.* § 551(4). "The term 'rule'

may embrace 'virtually every statement an agency may make . . . .'" *Animal Legal*

*Def. Fund v. Veneman*, 469 F.3d 826, 838-40 (9th Cir. 2006).

62.     Under the framework established by Congress for avoiding the

extinction and facilitating the recovery of endangered and threatened species,

recovery plans prepared in accordance with ESA section 4(f) satisfy the criteria for

a "rule" as defined by the APA. Recovery plans, like other rules, must be adopted

in accordance with notice and comment procedures, and the Service is obligated to

consider information submitted by the public before adoption. 16 U.S.C.

§ 1533(f)(4)-(5). The Service is expressly mandated to "develop and implement"

recovery plans and to incorporate particular items into them. *Id*. § 1533(f)(1). The

Service must report to Congressional committees on the status of efforts to develop

and implement such plans. *See supra* ¶ 16. In addition, the Service takes such plans

into consideration when carrying out its other duties under the ESA, including

when the Service conducts section 7 consultations with federal agencies taking

actions that may affect listed species. *See* 16 U.S.C. § 1536(a)(2).

63.     As just one example, the recovery plan for the Mexican spotted owl

explains that "National Forest Plans were amended in 1996 to incorporate

management recommendations presented in the 1995 Recovery Plan for the

Mexican spotted owl." U.S. Fish and Wildlife Service, *Mexican Spotted Owl*

*Recovery Plan, First Revision* VI (2012). This shows that recovery plans are of

"general or particular applicability" "designed to implement … policy" regarding

endangered species conservation because they prescribe needed recovery actions,

and that recovery plans have "future effect" because they are, in fact, implemented

with some success, including by other federal agencies.

64.     The 1993 Grizzly Bear Recovery Plan – which the Center sought to

amend and update through its petition – is a rule under the APA. The Plan provides

a "basic road map to recovery." *Fund for Animals v. Babbitt*, 903 F. Supp. 96

(D.D.C. 1995). The 1993 Recovery Plan is therefore of "general or particular applicability" because it describes the actions necessary to attain grizzly bear recovery, including actions for federal and state agencies to implement. The 1993 Recovery Plan is of "future effect" because it encourages future actions to effectuate future recovery of grizzly bears. The 1993 Recovery Plan is "designed to implement . . . policy" because the plan lists actions necessary to effectuate recovery of the grizzly bear to promote the policies and requirements of the ESA, in accordance with section 4(f), 16 U.S.C. § 1533(f).

65.     Accordingly, the Service's rejection of the Center's petition – on the principal grounds that recovery plans cannot satisfy the definition of a "rule" and hence the Center had no "right to petition for revision of a recovery plan"– violates the APA, 5 U.S.C. § 706(2)(A).

66.     The Service's secondary rationale for denying the petition – that it has discretion to restrict its recovery efforts to existing recovery units – is also arbitrary and capricious. The Service did not explain its departure from its longstanding commitments, including as stated in the 1993 Recovery Plan, to evaluate other areas of historic habitat for grizzly bear recovery. Given its commitments and section 4(f)'s mandate to "develop and implement" recovery plans, the Service has a non-discretionary duty evaluate additional areas for grizzly bear recovery.

67.     Rather than act consistent with its duty, the Service instead stated in

its response to the petition that it would "evaluate the feasibility of grizzly bear recovery in potential recovery areas throughout the historic range of the grizzly bear when resources allow in the future." It did not set forth when "in the future" this long-delayed evaluation would occur and did not provide any factual basis for the Service's suggestion that it presently lacks the necessary resources to revise, or even begin the revision of, the 1993 Recovery Plan to encompass additional historical areas. The Service's response is tantamount to a concession that the Service has no intention of amending the 1993 Recovery Plan at any time in the foreseeable future, if ever, even though that position reverses without explanation the agency's prior position on the need to update the Plan and evaluate grizzly bear recovery in other portions of the species' historic range.

68.    As a matter of law, recovery plans in general qualify as rules under the APA, and the 1993 Recovery Plan that the Center specifically seeks to update and amend qualifies as a rule. As such, and because the Service has a legal duty to evaluate additional areas for recovery, as the Service committed to do and as the Center requested in the petition, the Service's denial of the Center's petition is arbitrary and capricious, an abuse of discretion, or not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

The Center respectfully requests that the Court grant the following relief:

Page 23

A.     Declare and adjudge that the Service failed to prepare a timely five-year status review for the grizzly bear, in violation of section 4(c), 16 U.S.C. § 1533(c);

B.     Remand for the Service to prepare a five-year status review for the grizzly bear according to a timetable established by the Court;

C.     Declare and adjudge that the Service violated section 4(f) of the ESA, 16 U.S.C. § 1533(f), by failing to develop and implement a recovery plan that provides for the "conservation and survival" of the grizzly bear;

D.     Declare and adjudge that the Service by refusing to evaluate or pursue grizzly bear recovery in additional areas has failed to satisfy the ESA's section 7(a)(1) affirmative duty to conserve the grizzly bear, 16 U.S.C. 1536(a)(1), in violation of the APA, 5 U.S.C. § 706(2)(A);

E.     Remand for the Service to evaluate the need for grizzly bear recovery in additional areas and prepare an updated recovery plan for the grizzly bear according to a timetable established by the Court;

F.     Declare and adjudge that the Service violated the APA by denying the Center's petition for an updated and amended grizzly bear recovery plan;

G.     Remand for the Service to provide a further response to the Center's petition in accordance with instructions and a timetable established by the Court;

H.     Award the Center its reasonable fees, costs and expenses associated

with this litigation under 16 U.S.C. § 1540(g)(4) and 28 U.S.C. § 2412; and

I.      Grant such further and other relief as the Court deems just and proper

to remedy the Service's violations of law.

Respectfully submitted this 27th day of June, 2019.

/s/ Collette L. Adkins
Collette L. Adkins*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

/s/ Andrea Santarsiere
Andrea Santarsiere*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
(303) 854-7748
asantarsiere@biologicaldiversity.org

/s/ Kristine M. Akland
Kristine M. Akland
AKLAND LAW FIRM PLLC
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

*Attorneys for Plaintiff*

*Seeking admission pro hac vice

Kristine M. Akland
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

*Attorney for Plaintiff* (additional counsel listed on signature page)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 9:19-cv-00109-DLC |
| Plaintiff, | **PLAINTIFF'S NOTICE OF APPEAL** |
| vs. | |
| SCOTT DE LA VEGA, Acting Secretary of the Interior; and MARTHA WILLIAMS, Principal Deputy Director of the U.S. Fish and Wildlife Service;[1] | |
| Defendants, | |
| STATE OF WYOMING, STATE OF IDAHO, WYOMING STOCK GROWERS' ASSOCIATION, WYOMING FARM BUREAU FEDERATION, UTAH FARM BUREAU FEDERATION, | |
| Defendant-Intervenors. | |

---

[1] The successors in office have been automatically substituted pursuant to Rule 25(d). Fed. R. Civ. P. 25(d).

Plaintiff Center for Biological Diversity hereby gives notice of appeal to the

United States Court of Appeals for the Ninth Circuit from this Court's Order

denying Plaintiff's motion for summary judgment and granting Federal

Defendants' and Defendant-Intervenors' motions for summary judgment (ECF No.

89). Judgment was entered on December 23, 2020 (ECF No. 90).

Plaintiff's Representation Statement is attached to this notice pursuant to

Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Rule 3-2(b).

Respectfully submitted this February 11, 2021.

/s/ Collette L. Adkins
Collette L. Adkins, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

/s/ Andrea Zaccardi
Andrea Zaccardi, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
(303) 854-7748
azaccardi@biologicaldiversity.org

/s/ Kristine M. Akland
Kristine M. Akland
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

*Attorneys for Plaintiff*

1

## CERTIFICATE OF SERVICE

I certify that on February 11, 2021, the foregoing Plaintiff's Notice of

Appeal with the attached Representation Statement was served electronically on all

parties via CM/ECF.

/s/ Collette L. Adkins
Collette L. Adkins, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

*Attorney for Plaintiff*

2

APPEAL,CLOSED

# U.S. District Court
## District of Montana (Missoula)
## CIVIL DOCKET FOR CASE #: 9:19-cv-00109-DLC

Center for Biological Diversity v. Bernhardt et al            Date Filed: 06/27/2019
Assigned to: Judge Dana L. Christensen                        Date Terminated: 12/23/2020
Case in other court: Ninth Circuit, 21-35121                  Jury Demand: None
Cause: 16:1538 Endangered Species Act                         Nature of Suit: 893 Environmental Matters
                                                              Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Center for Biological Diversity**            represented by  **Andrea Santarsiere**
                                                              CENTER FOR BIOLOGICAL
                                                              DIVERSITY - VICTOR
                                                              P.O. Box 469
                                                              Victor, ID 83455
                                                              303-854-7748
                                                              Email: asantarsiere@biologicaldiversity.org
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Collette L. Adkins**
                                                              CENTER FOR BIOLOGICAL
                                                              DIVERSITY - CIRCLE PINES
                                                              P.O. Box 595
                                                              Circle Pines, MN 55014-0595
                                                              651-955-3821
                                                              Fax: 415-436-9683
                                                              Email: cadkins@biologicaldiversity.org
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Kristine Marie Akland**
                                                              AKLAND LAW FIRM, PLLC
                                                              317 E. Spruce St.
                                                              PO Box 7274
                                                              Missoula, MT 59807
                                                              406-544-9863
                                                              Email: aklandlawfirm@gmail.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**David Bernhardt**                            represented by  **Devon Lea Flanagan**
*Secretary of the Interior*                                   U.S. DEPARTMENT OF JUSTICE -

E.N.R.D. GENERAL LITIGATION
601 D Street NW
Washington, DC 20044
202-305-0201
Fax: 202-305-0275
Email: devon.flanagan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Davis Aaron Backer**
U.S. Department of Justice
4 Constitution Square, 150 M Street NE
Washington, DC 20002
202-514-5243
Email: davis.backer@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| | | |
|---|---|---|
| **Margaret Everson**<br>*Principal Deputy Directory of U.S. Fish and Wildlife Service* | represented by | **Devon Lea Flanagan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Davis Aaron Backer**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

<u>**Intervenor Defendant**</u>

| | | |
|---|---|---|
| **State of Wyoming** | represented by | **Adrian Ann Miller**<br>SULLIVAN MILLER LAW PLLC<br>3860 Avenue B, Suite C East<br>Billings, MT 59102<br>406-403-7066<br>Fax: 406-294-5702<br>Email: adrian.miller@sullivanmiller.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **D. David DeWald**<br>WYOMING ATTORNEY GENERAL<br>2320 Capitol Avenue<br>Cheyenne, WY 82002<br>307-777-6946<br>Email: cheryl.lobb@wyo.gov<br>*TERMINATED: 10/06/2020*<br>*LEAD ATTORNEY*<br>*PRO HAC VICE* |
| | | **Elliott B. Adler**<br>WYOMING ATTORNEY GENERAL<br>2320 Capitol Avenue |

Cheyenne, WY 82002
307-777-6946
Email: elliott.adler@wyo.gov
*TERMINATED: 02/11/2021*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erik Edward Petersen**
WYOMING ATTORNEY GENERAL
2320 Capitol Avenue
Cheyenne, WY 82002
307-777-6946
Fax: 307-777-3542
Email: erik.petersen@wyo.gov
*TERMINATED: 03/24/2020*
*LEAD ATTORNEY*
*PRO HAC VICE*

**James Kaste**
WYOMING ATTORNEY GENERAL
2320 Capitol Avenue
Cheyenne, WY 82002
307-777-6946
Fax: 307-777-3542
Email: james.kaste@wyo.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**State of Idaho**                              represented by **Owen H. Moroney**
                                                Idaho Office of the Attorney General
                                                2117 North 17th Street
                                                Boise, ID 83702
                                                208-287-2875
                                                Fax: 208-334-2148
                                                Email: owen.moroney@idfg.idaho.gov
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Wyoming Stock Growers' Association**          represented by **Cody J. Wisniewski**
*Wyoming Farm Bureau Federation, and*           MOUNTAIN STATES LEGAL
*Utah Farm Bureau Federation*                   FOUNDATION
                                                2596 South Lewis Way
                                                Lakewood, CO 80227
                                                303-292-2021 ext. 20
                                                Fax: 303-292-1980
                                                Email: cody@mslegal.org
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Ronald W. Opsahl**

OPSAHL LAW OFFICE
1740 South Estes Street
Lakewood, CO 80232
303-888-3287
Fax: 720-836-3172
Email: Ron@OpsahlLawOffice.com
*TERMINATED: 07/02/2020*
*LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2019 | 1 | COMPLAINT against All Defendants, filed by Center for Biological Diversity. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons) (CDH) Modified on 6/27/2019 to reflect NEF regenerated to counsel with proper header(CDH). (Entered: 06/27/2019) |
| 06/27/2019 | | Filing fee of $400 paid; receipt number 0977-2329913. (NOS) (Entered: 06/27/2019) |
| 06/27/2019 | 2 | Summons Issued as to All Defendants. Originals mailed to Counsel Akland. (ASG) (Entered: 06/27/2019) |
| 06/27/2019 | 3 | MOTION Andrea Santarsiere to Appear Pro Hac Vice ( Filing fee $ 255 receipt number 0977-2330661.) Kristine Marie Akland appearing for Plaintiff Center for Biological Diversity (Attachments: # 1 Affidavit Santarsiere Dec., # 2 Text of Proposed Order Proposed Order) (Akland, Kristine) (Entered: 06/27/2019) |
| 06/27/2019 | 4 | MOTION Collette Adkins to Appear Pro Hac Vice ( Filing fee $ 255 receipt number 0977-2330668.) Kristine Marie Akland appearing for Plaintiff Center for Biological Diversity (Attachments: # 1 Affidavit Adkins Dec, # 2 Text of Proposed Order Proposed Order) (Akland, Kristine) (Entered: 06/27/2019) |
| 06/28/2019 | 5 | ORDER granting 3 Motion to Appear Pro Hac Vice - Collette L. Adkins and Andrea Santarsiere for Center for Biological Diversity. Signed by Judge Dana L. Christensen on 6/28/2019. (ASG) (Entered: 06/28/2019) |
| 07/02/2019 | 6 | NOTICE of Acknowledgment of Pro Hac Vice Order by Center for Biological Diversity (Adkins, Collette) (Entered: 07/02/2019) |
| 07/02/2019 | 7 | Notice of Acknowledgment of PHV Order - Andrea Santarsiere appearing for Plaintiff Center for Biological Diversity. (Santarsiere, Andrea) Modified on 7/2/2019 to correct docket text. (ASG). (Entered: 07/02/2019) |
| 07/16/2019 | 8 | AFFIDAVIT of Service for Summons, Complaint, other case initiating documents served on US Attorney Alme, USFWS Director Everson, Attorney General Barr, Secretary Bernhardt on 7/1/19, 7/3/19, 7/5/19, 7/8/19 respectively, filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 07/16/2019) |
| 08/28/2019 | 9 | NOTICE of Appearance by Davis Aaron Backer on behalf of All Defendants (Backer, Davis) (Entered: 08/28/2019) |
| 08/28/2019 | 10 | NOTICE of Appearance by Devon Lea Flanagan on behalf of All Defendants (Flanagan, Devon) (Entered: 08/28/2019) |
| 08/29/2019 | 11 | ANSWER to 1 Complaint, by David Bernhardt, Margaret Everson. (Flanagan, Devon) (Entered: 08/29/2019) |
| 09/17/2019 | 12 | MOTION to Intervene by Interested Party State of Wyoming. (Attachments: # 1 Proposed Answer) (ASG) (Entered: 09/23/2019) |

| 09/17/2019 | 13 | Brief/Memorandum in Support re 12 MOTION to Intervene filed by State of Wyoming. (ASG) (Entered: 09/23/2019) |
|---|---|---|
| 09/23/2019 | 14 | RESPONSE to Motion re 12 MOTION to Intervene *from Wyoming* filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 09/23/2019) |
| 09/26/2019 | 15 | RESPONSE to Motion re 12 MOTION to Intervene filed by David Bernhardt, Margaret Everson. (Flanagan, Devon) (Entered: 09/26/2019) |
| 09/26/2019 | 16 | MOTION to Intervene by Interested Party State of Idaho. (Attachments: # 1 Proposed Answer) (NOS) (Entered: 09/26/2019) |
| 09/26/2019 | 17 | Brief/Memorandum in Support re 16 MOTION to Intervene filed by State of Idaho. (NOS) (Entered: 09/26/2019) |
| 09/27/2019 | 18 | REPLY to Response to Motion re 12 MOTION to Intervene filed by State of Wyoming. (ASG) (Entered: 09/27/2019) |
| 09/27/2019 | 19 | ORDER granting 12 Motion to Intervene by State of Wyoming. Defendant-Intervenor shall file its answer on or before October 14, 2019; and Defendant-Intervenor shall confer with counsel for the federal defendants on all motions and briefs to avoid repetitious arguments. Signed by Judge Dana L. Christensen on 9/27/2019. (ASG) (Entered: 09/27/2019) |
| 10/01/2019 | 20 | ANSWER to 1 Complaint, by State of Wyoming. (Miller, Adrian) (Entered: 10/01/2019) |
| 10/01/2019 | 21 | RESPONSE to Motion re 16 MOTION to Intervene filed by David Bernhardt, Margaret Everson. (Flanagan, Devon) (Entered: 10/01/2019) |
| 10/01/2019 | 22 | MOTION Erik E. Petersen to Appear Pro Hac Vice ( Filing fee $ 255 receipt number 0977-2375674.) Adrian Ann Miller appearing for Intervenor Defendant State of Wyoming (Attachments: # 1 Exhibit, # 2 Text of Proposed Order) (Miller, Adrian) (Entered: 10/01/2019) |
| 10/01/2019 | 23 | MOTION D. David DeWald to Appear Pro Hac Vice ( Filing fee $ 255 receipt number 0977-2375689.) Adrian Ann Miller appearing for Intervenor Defendant State of Wyoming (Attachments: # 1 Exhibit, # 2 Text of Proposed Order) (Miller, Adrian) (Entered: 10/01/2019) |
| 10/01/2019 | 24 | ORDER granting 22 Motion to Appear Pro Hac Vice - Erik E. Petersen for State of Wyoming. Signed by Judge Dana L. Christensen on 10/1/2019. (ASG) (Entered: 10/01/2019) |
| 10/01/2019 | 25 | ORDER granting 23 Motion to Appear Pro Hac Vice - D. David DeWald for State of Wyoming. Signed by Judge Dana L. Christensen on 10/1/2019. (ASG) (Entered: 10/01/2019) |
| 10/02/2019 | 26 | RESPONSE to Motion re 16 MOTION to Intervene *from Idaho* filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 10/02/2019) |
| 10/03/2019 | 27 | REPLY to Response to Motion re 16 MOTION to Intervene filed by State of Idaho. (ASG) (Entered: 10/03/2019) |
| 10/07/2019 | 28 | ORDER granting 16 Motion to Intervene by State of Idaho. Defendant-Intervenor shall file its answer on or before October 21, 2019. Defendant-Intervenor shall confer with counsel for the federal defendants on all motions and briefs to avoid repetitious arguments to the extent consistent with Defendant-Intervenor's interests. Signed by Judge Dana L. Christensen on 10/7/2019. (NOS) (Entered: 10/07/2019) |
| 10/08/2019 | 29 | ANSWER to 1 Complaint, by State of Idaho. (Moroney, Owen) (Entered: 10/08/2019) |

| | | |
|---|---|---|
| 10/09/2019 | 30 | NOTICE of Acknowledgment of Pro Hac Vice Order by State of Wyoming re 24 Order on Motion to Appear Pro Hac Vice (Petersen, Erik) (Entered: 10/09/2019) |
| 10/09/2019 | 31 | NOTICE of Acknowledgment of Pro Hac Vice Order by State of Wyoming re 25 Order on Motion to Appear Pro Hac Vice (DeWald, D.) (Entered: 10/09/2019) |
| 11/01/2019 | 32 | MOTION to Intervene by Interested Party Wyoming Stock Growers' Association, Wyoming Farm Federation, and Utah Farm Bureau Federation. (Attachments: # 1 Proposed Answer, # 2 Declaration of James Magagna, # 3 Declaration of Dale Newton, # 4 Declaration of Ken Hamilton) (ASG) (Entered: 11/01/2019) |
| 11/01/2019 | 33 | Brief/Memorandum in Support re 32 MOTION to Intervene filed by Wyoming Stock Growers' Association. (ASG) (Entered: 11/01/2019) |
| 11/04/2019 | 34 | ORDER granting 32 Western Entities' Motion to Intervene. Defendant-Intervenor are hereby granted leave to intervene as a defendant in this matter pursuant to Federal Rule of Civil Procedure 24(b)(1)(B); Defendant-Intervenor shall file their answer on or before November 18, 2019; and Defendant-Intervenor shall confer with counsel for the federal defendants on all motions and briefs to avoid repetitious arguments to the extent consistent with Defendant-Intervenor's interests. Signed by Judge Dana L. Christensen on 11/4/2019. (ASG) (Entered: 11/04/2019) |
| 11/05/2019 | 35 | *[Proposed]* ANSWER to 1 Complaint, *by Applicants in Intervention, Wyoming Farm Bureau Federation, Utah Farm Bureau Federation, and* by Wyoming Stock Growers' Association. (Opsahl, Ronald) (Entered: 11/05/2019) |
| 11/22/2019 | 36 | JOINT CASE MANAGEMENT PLAN by David Bernhardt, Margaret Everson. (Attachments: # 1 Text of Proposed Order) (Backer, Davis) (Entered: 11/22/2019) |
| 12/06/2019 | 37 | STIPULATION *to Settle Plaintiff's First Claim for Relief* by David Bernhardt, Margaret Everson. (Attachments: # 1 Text of Proposed Order) (Backer, Davis) (Modified to change event type to "Motion for Order" as parties are requesting entry of Court order ratifying the agreement.) (NOS) (Entered: 12/06/2019) |
| 12/09/2019 | 38 | ORDER approving 37 Settlement Agreement. Plaintiff's First Claim for Relief 1 is DISMISSED WITH PREJUDICE. The Court retains jurisdiction over the matter. Signed by Judge Dana L. Christensen on 12/9/2019. (ASG) (Entered: 12/09/2019) |
| 12/18/2019 | 39 | NOTICE by David Bernhardt, Margaret Everson *of Lodging Administrative Record* (Attachments: # 1 Exhibit A - Copy of Administrative Record Index, # 2 Exhibit B - Fortin-Noreus Declaration) (Flanagan, Devon) Modified on 12/20/2019 to reflect that one copy was placed on shelf in Clerk's Office and one copy was sent to chambers. (ASG). (Entered: 12/18/2019) |
| 01/06/2020 | 40 | Case Management Order. Signed by Judge Dana L. Christensen on 1/6/2020. (ASG) (Entered: 01/06/2020) |
| 02/10/2020 | 41 | MOTION to Compel *Completion of Administrative Record* Collette L. Adkins appearing for Plaintiff Center for Biological Diversity (Adkins, Collette) (Entered: 02/10/2020) |
| 02/10/2020 | 42 | Brief/Memorandum in Support re 41 MOTION to Compel *Completion of Administrative Record* filed by Center for Biological Diversity. (Attachments: # 1 Exhibit 1 (Emails re: petition denial), # 2 Exhibit 2 (Draft petition denial), # 3 Exhibit 3 (Emails re: communication on petition), # 4 Exhibit 4 (Draft petition communication strategy), # 5 Exhibit 5 (Agency review of Cabinet-Yaak chapter), # 6 Exhibit 6 (Agency review of Selkirk chapter), # 7 Exhibit 7 (Email and review re: 1993 Recovery Plan), # 8 Exhibit 8 (DOJ email), # 9 Exhibit 9 (Wood memo), # 10 Exhibit 10 (Bernhardt memo), # 11 Exhibit 11 (FOIA response letter)) (Adkins, Collette) (Entered: 02/10/2020) |

| | | |
|---|---|---|
| 02/24/2020 | 43 | RESPONSE to Motion re 41 MOTION to Compel *Completion of Administrative Record* filed by David Bernhardt, Margaret Everson. (Attachments: # 1 Exhibit 2008 DOJ Memorandum, # 2 Exhibit 2017 DOJ Memorandum) (Backer, Davis) (Entered: 02/24/2020) |
| 03/05/2020 | 44 | REPLY to Response to Motion re 41 MOTION to Compel *Completion of Administrative Record* filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 03/05/2020) |
| 03/09/2020 | 45 | ORDER granting in part and denying in part 41 Motion to Compel. Center's request that exhibits 42-3, 42-5, 42-6, and 42-7 be admitted to the record is GRANTED. Its request to admit the remaining exhibits is DENIED. Federal Defendants are instructed to complete the record with all documents and materials directly or indirectly considered by agency decision makers including deliberative pre-decisional materials. To the extent Federal Defendants withhold these materials, they must assert a privilege log. Signed by Judge Dana L. Christensen on 3/9/2020. (ASG) (Entered: 03/09/2020) |
| 03/19/2020 | 46 | MOTION to Amend/Correct *Case Management Order* Davis Aaron Backer appearing for Defendants David Bernhardt, Margaret Everson (Attachments: # 1 Text of Proposed Order) (Backer, Davis) (Entered: 03/19/2020) |
| 03/19/2020 | 47 | ORDER. IT IS ORDERED that the proposed case manage schedule is ADOPTED. Administrative record due by 4/14/2020. Motions due by 5/19/2020. Cross Motions due by 7/6/2020. IT IS FURTHER ORDERED that the Court's prior case management order (Doc. 40 ) remain in full force in all other respects. Signed by Judge Dana L. Christensen on 3/19/2020. (NOS) (Entered: 03/19/2020) |
| 03/20/2020 | 48 | AMENDED Case Management Order: Motions due by 5/19/2020. Cross Motions due by 7/6/2020. Responses due by 8/12/2020. Replies due by 9/18/2020. Signed by Judge Dana L. Christensen on 3/20/2020. (APP) (Entered: 03/20/2020) |
| 03/24/2020 | 49 | NOTICE of Withdrawal of Counsel: Erik Edward Petersen withdrawing from the case, filed by State of Wyoming (Petersen, Erik) (Entered: 03/24/2020) |
| 03/25/2020 | 50 | Unopposed MOTION James Kaste to Appear Pro Hac Vice ( Filing fee $ 255 receipt number 0977-2461167.) Adrian Ann Miller appearing for Intervenor Defendant State of Wyoming (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order) (Miller, Adrian) (Entered: 03/25/2020) |
| 03/26/2020 | 51 | ORDER granting 50 Motion to Appear Pro Hac Vice for Attorney James Kaste for State of Wyoming. Signed by Judge Dana L. Christensen on 3/26/2020. (ASG) (Entered: 03/26/2020) |
| 03/26/2020 | 52 | NOTICE of Acknowledgment of Pro Hac Vice Order by State of Wyoming re 51 Order on Motion to Appear Pro Hac Vice (Kaste, James) (Entered: 03/26/2020) |
| 04/10/2020 | 53 | NOTICE by David Bernhardt, Margaret Everson *of Lodging Supplemental Administrative Record* (Attachments: # 1 Exhibit A - Copy of Supplemental Administrative Record Index, # 2 Exhibit B - Fortin-Noreus Certification, # 3 Exhibit C - Privilege Log, # 4 Exhibit D - Small Declaration) (Flanagan, Devon) Modified on 4/14/2020: one thumb drive placed on shelf in Clerk's Office and one thumb drive delivered to Chambers. (ASG). (Entered: 04/10/2020) |
| 05/19/2020 | 54 | MOTION for Summary Judgment Collette L. Adkins appearing for Plaintiff Center for Biological Diversity (Attachments: # 1 Greenwald Declaration, # 2 Henderson Declaration, # 3 Hunt Declaration, # 4 McKinnon Declaration, # 5 Miller Declaration, # 6 Robinson Declaration) (Adkins, Collette) (Entered: 05/19/2020) |
| 05/19/2020 | 55 | Brief/Memorandum in Support re 54 MOTION for Summary Judgment filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 05/19/2020) |

| 05/19/2020 | 56 | Statement of Undisputed Fact re: 54 MOTION for Summary Judgment by Center for Biological Diversity filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 05/19/2020) |
|---|---|---|
| 07/02/2020 | 57 | NOTICE of Substitution of Counsel *Within Firm* by Wyoming Stock Growers' Association (Wisniewski, Cody) (Entered: 07/02/2020) |
| 07/03/2020 | 58 | Cross MOTION for Summary Judgment Adrian Ann Miller appearing for Intervenor Defendant State of Wyoming (Miller, Adrian) (Entered: 07/03/2020) |
| 07/03/2020 | 59 | Brief/Memorandum in Support re 58 Cross MOTION for Summary Judgment filed by State of Wyoming. (Miller, Adrian) (Entered: 07/03/2020) |
| 07/03/2020 | 60 | Statement of Undisputed Fact re: 59 Brief/Memorandum in Support by State of Wyoming filed by State of Wyoming. (Miller, Adrian) (Entered: 07/03/2020) |
| 07/06/2020 | 61 | Statement of Disputed Facts re: 56 Statement of Undisputed Fact. (Moroney, Owen) (Entered: 07/06/2020) |
| 07/06/2020 | 62 | Cross MOTION for Summary Judgment Owen H. Moroney appearing for Intervenor Defendant State of Idaho (Moroney, Owen) (Entered: 07/06/2020) |
| 07/06/2020 | 63 | Brief/Memorandum in Support re 62 Cross MOTION for Summary Judgment filed by State of Idaho. (Moroney, Owen) (Entered: 07/06/2020) |
| 07/06/2020 | 64 | Statement of Undisputed Fact re: 63 Brief/Memorandum in Support. (Moroney, Owen) (Entered: 07/06/2020) |
| 07/06/2020 | 65 | Cross MOTION for Summary Judgment Devon Lea Flanagan appearing for Defendants David Bernhardt, Margaret Everson (Flanagan, Devon) (Entered: 07/06/2020) |
| 07/06/2020 | 66 | Brief/Memorandum in Support re 65 Cross MOTION for Summary Judgment *and Opposition to Plaintiff's Motion for Summary Judgment* filed by David Bernhardt, Margaret Everson. (Attachments: # 1 Exhibit A - Fortin-Noreus Declaration) (Flanagan, Devon) (Entered: 07/06/2020) |
| 07/06/2020 | 67 | Statement of Undisputed Fact re: 65 Cross MOTION for Summary Judgment by David Bernhardt, Margaret Everson filed by David Bernhardt, Margaret Everson. (Flanagan, Devon) (Entered: 07/06/2020) |
| 07/06/2020 | 68 | Statement of Disputed Facts re: 56 Statement of Undisputed Fact filed by David Bernhardt, Margaret Everson. (Flanagan, Devon) (Entered: 07/06/2020) |
| 07/06/2020 | 69 | Cross MOTION for Summary Judgment Cody J. Wisniewski appearing for Intervenor Defendant Wyoming Stock Growers' Association (Wisniewski, Cody) (Entered: 07/06/2020) |
| 07/06/2020 | 70 | Brief/Memorandum in Support re 69 Cross MOTION for Summary Judgment filed by Wyoming Stock Growers' Association. (Wisniewski, Cody) (Entered: 07/06/2020) |
| 07/06/2020 | 71 | Statement of Disputed Facts re: 56 Statement of Undisputed Fact. (Wisniewski, Cody) (Entered: 07/06/2020) |
| 08/12/2020 | 72 | RESPONSE to Motion re 65 Cross MOTION for Summary Judgment , 58 Cross MOTION for Summary Judgment , 69 Cross MOTION for Summary Judgment , 62 Cross MOTION for Summary Judgment *and Reply in Support of MOTION for Summary Judgment* filed by Center for Biological Diversity. (Adkins, Collette) (Entered: 08/12/2020) |
| 08/12/2020 | 73 | Statement of Disputed Facts re: 60 Statement of Undisputed Fact, 64 Statement of Undisputed Fact, 67 Statement of Undisputed Fact filed by Center for Biological Diversity. |

| | | (Adkins, Collette) (Entered: 08/12/2020) |
|---|---|---|
| 09/15/2020 | 74 | REPLY to Response to Motion re 58 Cross MOTION for Summary Judgment filed by State of Wyoming. (Miller, Adrian) (Entered: 09/15/2020) |
| 09/18/2020 | 75 | REPLY to Response to Motion re 62 Cross MOTION for Summary Judgment filed by State of Idaho. (Moroney, Owen) (Entered: 09/18/2020) |
| 09/18/2020 | 76 | REPLY to Response to Motion re 65 Cross MOTION for Summary Judgment filed by David Bernhardt, Margaret Everson. (Flanagan, Devon) (Entered: 09/18/2020) |
| 09/18/2020 | 77 | REPLY to Response to Motion re 69 Cross MOTION for Summary Judgment filed by Wyoming Stock Growers' Association. (Wisniewski, Cody) (Entered: 09/18/2020) |
| 09/21/2020 | 78 | ORDER Setting Hearing on Cross Motions for Summary Judgment 54 , 58 , 62 , 65 and 69 . Motion Hearing set for 11/18/2020 at 01:30 PM in Missoula, MT before Judge Dana L. Christensen. Signed by Judge Dana L. Christensen on 9/21/2020. (ASG) (Entered: 09/21/2020) |
| 09/28/2020 | 79 | ORDER resetting November 18, 2020 hearing at 1:30 via zoom. Signed by Judge Dana L. Christensen on 9/28/2020. (ASG) (Entered: 09/28/2020) |
| 10/06/2020 | 80 | NOTICE of Withdrawal of Counsel: D. David DeWald withdrawing from the case, filed by State of Wyoming (DeWald, D.) (Entered: 10/06/2020) |
| 10/06/2020 | 81 | Unopposed MOTION Elliott Adler to Appear Pro Hac Vice ( Filing fee $ 255 receipt number 0977-2554589.) Adrian Ann Miller appearing for Intervenor Defendant State of Wyoming (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order) (Miller, Adrian) (Entered: 10/06/2020) |
| 10/07/2020 | 82 | ORDER granting 81 Motion to Appear Pro Hac Vice for Attorney Elliott B. Adler for State of Wyoming. Signed by Judge Dana L. Christensen on 10/7/2020. (ASG) (Entered: 10/07/2020) |
| 10/08/2020 | 83 | NOTICE of Acknowledgment of Pro Hac Vice Order by State of Wyoming (Adler, Elliott) (Entered: 10/08/2020) |
| 11/12/2020 | 84 | NOTICE by Center for Biological Diversity *of Supplemental Authority* (Adkins, Collette) (Entered: 11/12/2020) |
| 11/13/2020 | 85 | NOTICE by David Bernhardt, Margaret Everson re 84 Notice (Other) *Federal Defendants' Response to Plaintiff's Notice of Supplemental Authority* (Backer, Davis) (Entered: 11/13/2020) |
| 11/13/2020 | 86 | Unopposed MOTION for Leave to File *Response to Plaintiff's Notice of Supplemental Authority* Davis Aaron Backer appearing for Defendants David Bernhardt, Margaret Everson (Attachments: # 1 Text of Proposed Order) (Backer, Davis) (Entered: 11/13/2020) |
| 11/17/2020 | 87 | ORDER granting 86 Motion for Leave to File. Federal Defendants' response 85 will be considered. Signed by Judge Dana L. Christensen on 11/17/2020. (ASG) (Entered: 11/17/2020) |
| 11/18/2020 | 88 | MINUTE ENTRY for proceedings held VIA ZOOM before Judge Dana L. Christensen: Collette Adkins (arguing), Kristine Akland, and Andrea Zaccardi appearing on behalf of Center for Biological Diversity; Davis Backer appearing on behalf of Government; Elliott Adler appearing on behalf of Intervenor State of Wyoming; Owen Moroney appearing on behalf of Intervenor State of Idaho; Cody Wisniewski arguing on behalf of Intervenor Wyoming Stock Growers Association. Motions are argued by the parties and taken under advisement by Court. In recess. Hearing commenced at 1:40pm and concluded at 4:24pm. |

| | | (Court Reporter JoAnn Corson.) (Law Clerk: K. Luther), (Hearing held in Missoula, MT) (ASG) (Entered: 11/18/2020) |
|---|---|---|
| 12/23/2020 | 89 | ORDER CLOSING CASE. Signed by Judge Dana L. Christensen on 12/23/2020. (ASG) (Entered: 12/23/2020) |
| 12/23/2020 | 90 | CLERK'S JUDGMENT. (ASG) (Entered: 12/23/2020) |
| 02/11/2021 | 91 | NOTICE OF APPEAL as to 89 Order Dismissing Case by Center for Biological Diversity. Filing fee $ 505, receipt number 0977-2615726. (Attachments: # 1 Representation Statement) (Adkins, Collette) (Entered: 02/11/2021) |
| 02/11/2021 | 92 | NOTICE of Withdrawal of Counsel: Elliott B. Adler withdrawing from the case, filed by State of Wyoming (Adler, Elliott) (Entered: 02/11/2021) |
| 02/11/2021 | 93 | USCA Case Number 21-35121 and Time Schedule Order for 91 Notice of Appeal filed by Center for Biological Diversity. (NOS) (Entered: 02/12/2021) |
| 02/24/2021 | 94 | TRANSCRIPT DESIGNATION ORDER FORM by Center for Biological Diversity for proceedings held on 11/18/2020 before Judge Hon. Dana L. Christensen, Court reporter JoAnn Jett Corson, re 91 Notice of Appeal. Transcript due by 3/26/2021. (Adkins, Collette) Modified on 2/24/2021 to correct due date of transcript. (ASG) (Entered: 02/24/2021) |
| 03/08/2021 | 95 | TRANSCRIPT of Hearing on Motions held on 11-18-2020 before Judge Dana L. Christensen. Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER, the clerk's office, or the court reporter. NOTICE: A NOTICE OF INTENT TO REQUEST REDACTION MUST BE FILED WITHIN 7 DAYS OF THIS FILING. Contact court reporter JoAnn Jett Corson, 406-698-9965, joannjettcorson@gmail.com. For further information, please see the Transcript Redaction Procedure and Schedule on the Court Reporters page of our website.. Redaction Request due 3/29/2021. Redacted Transcript Deadline set for 4/8/2021. Release of Transcript Restriction set for 6/7/2021. (JJC) (Entered: 03/08/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/16/2021 12:15:39 | | |
| **PACER Login:** | lwoloshin:6036235:4389161 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 9:19-cv-00109-DLC |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |